Steven J. Lechner, D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Phone:  (303) 292-2021
Fax:  (303) 292-1980
lechner@mountainstateslegal.com

*Attorney for Plaintiff*
*American Exploration & Mining Association*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AMERICAN EXPLORATION &** **MINING ASSOCIATION**, a Washington Non-profit Corporation, 10 N. Post Street, Ste. 305, Spokane, WA 99201-0705, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **U.S. DEPARTMENT OF THE INTERIOR**, 1849 C Street, NW, Washington, DC 20240; **S.M.R. JEWELL**, sued in her official capacity, Secretary, U.S. Department of the Interior, 1849 C Street, NW, Washington, DC 20240; **JANICE SCHNEIDER**, sued in her official capacity, Assistant Secretary for Land and Minerals Management, 1849 C Street, NW, Washington, DC 20240; **U.S. BUREAU OF LAND MANAGEMENT**, 1849 C Street, NW, Washington, DC 20240; **NEIL KORNZE**, sued in his official capacity, Director of the Bureau of Land Management, 1849 C Street, NW, Rm. 5665, Washington, DC 20240; **MARY JO RUGWELL**, sued in her official capacity, Wyoming State Director, 5353 Yellowstone Road, Cheyenne, WY 82009; **ADEN SEIDLETZ**, sued in his official capacity, Acting Montana/Dakotas State | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |

Director, 5001 Southgate Drive, Billings, MT )
59101; )
**TIMOTHY M. MURPHY**, sued in his )
official capacity, Idaho State Director, 1387 S. )
Vinnell Way, Boise, ID 83709; )
**JOHN F. RUHS**, sued in his official capacity, )
Nevada State Director, 1340 Financial Blvd., )
Reno, NV 89502; )
**JEROME E. PEREZ**, sued in his official )
capacity, California State Director, 2800 )
Cottage Way, Suite W-1623, Sacramento, CA )
95825; )
**JAMIE E. CONNELL**, sued in her official )
capacity, Acting Oregon/Washington State )
Director, 1220 SW 3rd Ave., Portland, OR )
97204; )
**JENNA WHITLOCK**, sued in her official )
capacity, Acting Utah State Director, 440 West )
200 South, Suite 500, Salt Lake City, UT )
84101-1345; )
**U.S. DEPARTMENT OF AGRICULTURE**, )
1400 Independence Ave., SW, Washington, )
DC 20250; )
**THOMAS J. VILSACK**, sued in his )
capacity, Secretary, U.S. Department of )
Agriculture, 1400 Independence Ave., SW, )
Washington, DC 20250; )
**U.S. FOREST SERVICE**, )
1400 Independence Ave., SW, Washington, )
DC 20250; )
**THOMAS L. TIDWELL**, sued in his official )
capacity, Chief of the U.S. Forest Service, )
1400 Independence Ave., SW, Washington, )
DC 20250; )
**NORA B. RASURE**, sued in her official )
capacity, Intermountain Regional Forester, 324 )
25th Street, Ogden, UT 84401; )
**LEANNE M. MARTEN**, sued in her official )
capacity, Northern Regional Forester, 200 E. )
Broadway, Missoula, MT 59802; )
)
)
Defendants. )

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff, American Exploration & Mining Association ("AEMA"), a non-profit corporation organized under the laws of the State of Washington, brings this action for declaratory and injunctive relief against Defendants, U.S. Department of the Interior, U.S. Bureau of Land Management ("BLM"), U.S. Department of Agriculture, U.S. Forest Service ("USFS"), and the above captioned officials (referred to individually and collectively as "Defendants"), for their actions unlawfully restricting mineral exploration and development on millions of acres of federal lands in California, Idaho, Montana, Nevada, Oregon, Utah, and Wyoming, and for failing to provide for adequate public participation in the amendment and revision of their land use planning documents.  More specifically, AEMA challenges Defendants' actions in approving:

a. "Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region, including the Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon, and Utah" ("Great Basin BLM ROD"), which approved the following:

   i. "Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management Plan Amendment," ("ID/MT BLM LUPA");

   ii. "Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment" ("NV/CA BLM LUPA");

   iii. "Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment" ("OR BLM LUPA"); and

   iv. "Utah Greater Sage-Grouse Approved Resource Management Plan Amendment" ("UT BLM LUPA");

b. "Greater Sage-grouse Record of Decision for Idaho and Southwest Montana, Nevada, and Utah" ("Great Basin USFS ROD"), which approved the following:

   i. "Greater Sage-Grouse Idaho and Southwest Montana Plan Amendment," ("ID/MT USFS LUPA");

   ii. "Greater Sage-Grouse Nevada Plan Amendment" ("NV USFS LUPA");

   iii. "Greater Sage-Grouse Utah Plan Amendment" ("UT USFS LUPA"); and

      iv.    "Greater Sage-Grouse Wyoming Plan Amendment" ("WY USFS LUPA"); and

  c.    "Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, including the Greater Sage-Grouse Sub-Regions of Lewiston, North Dakota, Northwest Colorado, Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, and Worland" ("Rocky Mountain BLM ROD"), which approved the following:

      i.    "HiLine District Office Approved Resource Management Plan" ("HiLine ARMP");

      ii.    "Cody Field Office Approved Resource Management Plan" ("Cody ARMP"); and

      iii.    "Worland Field Office Approved Resource Management Plan" ("Worland ARMP").

In approving the aforementioned RODs, LUPAs, and ARMPs, Defendants violated, *inter alia*, the General Mining Law of 1872 ("Mining Law"), 30 U.S.C. § 22 *et seq.*; the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*; the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

## <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over the subject-matter of this case, pursuant to 28 U.S.C. § 1331, because the matter in controversy arises under the laws of the United States, including, but not limited to:  FLPMA, NFMA, NEPA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

2.    This Court can grant declaratory and injunctive relief and hold unlawful and set aside agency action under 28 U.S.C. §§ 2201, 2202, and the APA, 5 U.S.C. § 706, for Defendants' violations of FLPMA, NFMA, and NEPA.

3.      Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391(e), because, *inter alia*, Defendant S.M.R. Jewell, Secretary of the U.S. Department of the Interior, resides and/or performs a significant amount of her official duties in this judicial district.

## PARTIES

4.      Plaintiff AEMA (f/k/a Northwest Mining Association) is a non-profit, non-partisan, membership association incorporated under the laws of the State of Washington, with its principal place of business in Spokane, Washington.

5.      AEMA is the recognized national voice in support of exploration, the junior mining sector, and maintaining access to federal lands.

6.      AEMA's purpose is to advocate for and advance the mineral resource and mining related interests of its members.  AEMA accomplishes its purpose by representing and informing members on legislative, regulatory, safety, technical, and environmental issues.  AEMA is committed to principles that embody the protection of human health, the natural environment, and a prosperous economy.  AEMA and its members recognize that environmental protection is an essential element of mining and advocate for a balance between protection of human health, the natural environment, and the benefits of social and economic growth.

7.      AEMA has represented the hardrock mining industry for 121 years, and currently has over 2,300 members residing in 42 states, including California, Idaho, Montana, Nevada, Oregon, Utah, and Wyoming.  AEMA also has members in seven other countries.

8.      AEMA's membership is broad-based, including small miners, exploration geologists, small and large mining companies, engineers, equipment manufacturers, technical service workers, and salespersons of equipment and supplies.  Of its broad-based membership, more than 80% of AEMA's members are small businesses or work for small businesses.

AEMA's members live, work, and own property interests, including unpatented mining claims, in areas impacted by the challenged RODs, LUPAs, and ARMPs.

9.      AEMA's members are actively involved in exploration and mining operations on federal lands.  AEMA's members engage in all aspects of the mining life cycle, from exploration to reclamation and closure, which includes promoting the discovery, development, and extraction of mineral resources through economically and environmentally responsible methods.  AEMA's members presently (and plan to in the future) engage in mining activities on BLM-administered lands and National Forest System lands covered by the challenged RODs, LUPAs, and ARMPs.

10.     With respect to each challenged ROD, LUPA, and ARMP, AEMA has at least one member who holds, and/or wishes to explore for and locate, an unpatented mining claim within an area recommended for withdrawal from operation of the Mining Law.

11.     AEMA's members are injured by the mere recommendation to withdraw federal lands from operation of the Mining Law, because no reasonable and prudent operator would invest in mineral exploration and development in an area recommended for withdrawal.  Because these lands have now been segregated, AEMA's members cannot participate in notice level operations without validity determinations.

12.     AEMA and its members support conservation of the greater sage-grouse and its habitat.  For instance, AEMA's members practice stewardship on the federal lands—lands upon which the sustainability of their business models depend.  AEMA's members properly comply with existing federal, state, and local regulations, which already adequately protect the greater sage-grouse and its habitat.

13.     AEMA also supported the efforts of Defendants to conserve the greater sage-grouse and its habitat, through a thoughtful, carefully-balanced approach that is faithful to the

clear federal statutory directives outlined in FLPMA, NFMA, and NEPA.  However, Defendants did not adopt such an approach when they approved the challenged RODs, LUPAs, and ARMPs.

14.     Throughout the planning process, AEMA expended significant resources in reviewing and commenting on the draft land use plan amendments/revisions and draft environmental impact statements, the many reports and studies that Defendants cited or otherwise relied on in support of their decision (including, *inter alia*, reports by the National Technical Team ("NTT") and the Conservation Objectives Team ("COT")), and protesting the proposed land use plan amendments/revisions and final environmental impact statements.

15.     Defendants' final agency actions, *i.e.*, the signed and approved RODs, LUPAs, and ARMPs, adversely affect AEMA and its members, in particular AEMA's members' ability to finance and develop new and existing projects on BLM-administered lands and National Forest System lands impacted by these final agency actions.

16.     Defendant U.S. Department of the Interior is the federal executive department responsible for managing federal lands and overseeing various agencies, including the BLM. *See* 43 U.S.C. § 1451.

17.     Defendant BLM is a federal agency within the U.S. Department of the Interior. Defendant BLM is responsible for managing the public lands and the federal mineral estate on National Forest System lands covered by the challenged RODs, LUPAs, and ARMPs.

18.     Defendant S.M.R. Jewell is the Secretary of the U.S. Department of the Interior. Defendant Jewell is responsible for overseeing the BLM's decisions, including setting public lands policy in accordance with federal laws.  Defendant Jewell is sued in her official capacity.

19.     Defendant Janice Schneider is the Assistant Secretary for Land and Minerals Management for the U.S. Department of the Interior.  Defendant Schneider signed and approved

the challenged Great Basin BLM ROD and Rocky Mountain BLM ROD.  Defendant Schneider

is sued in her official capacity.

20.     Defendant Neil Kornze is the Director of the BLM.  Defendant Kornze signed and

approved the challenged Great Basin BLM ROD and Rocky Mountain BLM ROD.  Defendant

Kornze is sued in his official capacity.

21.     Defendant Mary Jo Rugwell is the Wyoming State Director for the BLM.

Defendant Rugwell recommended the Cody ARMP and Worland ARMP for approval.

Defendant Rugwell also oversees the implementation of the Cody ARMP and Worland ARMP.

Defendant Rugwell is sued in her official capacity.

22.     Defendant Aden Seidletz is the Acting Montana/Dakotas State Director for the

BLM.  Defendant Seidletz's predecessor, Defendant Jamie E. Connell, recommended the HiLine

ARMP and ID/MT BLM LUPA for approval.  Defendant Seidletz oversees the implementation

of the HiLine ARMP and ID/MT BLM LUPA.  Defendant Seidletz is sued in his official

capacity.

23.     Defendant Timothy M. Murphy is the Idaho State Director for the BLM.

Defendant Murphy recommended the ID/MT BLM LUPA for approval.  Defendant Murphy also

oversees the implementation of the ID/MT BLM LUPA.  Defendant Murphy is sued in his

official capacity.

24.     Defendant John F. Ruhs is the Nevada State Director for the BLM.  Defendant

Ruhs recommended the NV/CA BLM LUPA for approval.  Defendant Ruhs also oversees the

implementation of the NV/CA BLM LUPA.  Defendant Ruhs is sued in his official capacity.

25.     Defendant Jerome E. Perez is the California State Director for the BLM.

Defendant Perez's predecessor, James G. Kenna, recommended the NV/CA BLM LUPA for

approval.  Defendant Perez oversees the implementation of the NV/CA BLM LUPA.  Defendant Stout is sued in his official capacity.

26.      Defendant Jamie E. Connell is the Acting Oregon/Washington State Director for the BLM.  Defendant Connell's predecessor, Defendant Perez, recommended the OR BLM LUPA for approval.  Defendant Connell oversees the implementation of the OR BLM LUPA. Defendant Connell is sued in her official capacity.

27.      Defendant Jenna Whitlock is the Acting Utah State Director for the BLM. Defendant Whitlock recommended the UT BLM LUPA for approval.  Defendant Whitlock also oversees the implementation of the UT BLM LUPA.  Defendant Whitlock is sued in her official capacity.

28.      Defendant U.S. Department of Agriculture is the federal executive department responsible for managing National Forest System lands.  *See* 7 U.S.C. § 2202.

29.      Defendant USFS is a federal agency within the U.S. Department of Agriculture. Defendant USFS is responsible for the management of National Forest System lands covered by the Great Basin USFS ROD and LUPAs.

30.      Defendant Thomas J. Vilsack is the Secretary of the U.S. Department of Agriculture.  Defendant Vilsack is responsible for, *inter alia*, overseeing the USFS.  Defendant Vilsack is sued in his official capacity.

31.      Defendant Thomas L. Tidwell is the Chief of the USFS.  Defendant Tidwell is responsible for, *inter alia*, supervising the Regional Foresters of the USFS.  Defendant Tidwell is sued in his official capacity.

32. Defendant Nora B. Rasure is the Intermountain Regional Forester for the USFS. Defendant Rasure signed and approved the Great Basin USFS ROD. Defendant Rasure is sued in her official capacity.

33. Defendant Leanne M. Marten is the Northern Regional Forester for the USFS. Defendant Marten signed and approved the Great Basin USFS ROD. Defendant Marten is sued in her official capacity.

## LEGAL BACKGROUND

### A. The Mining Law.

34. The purpose of the Mining Law, titled "An Act [t]o promote the Development of the mining Resources of the United States," 17 Stat. 91 (May 10, 1872), is to increase the country's wealth by facilitating development of the Nation's minerals. *Deffeback v. Hawke*, 115 U.S. 392, 402 (1885). This purpose can be accomplished only if federal lands remain open to operation of the Mining Law, unless validly withdrawn.

35. The Mining Law provides: "[A]ll valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States . . . ." 30 U.S.C. § 22. Thus, the Mining Law grants all citizens a statutory right to enter upon unappropriated lands for the purpose of exploring for and developing "valuable mineral deposits." *Id*. In addition, a person who makes a "discovery" of a "valuable mineral deposit" and satisfies the procedures for "locating" a claim becomes the owner of a valid mining claim. 30 U.S.C. §§ 22, 23, 26. A valid claim "is property in the fullest sense of that term; and may be sold, transferred, mortgaged, and inherited without infringing any right or title of the United States." *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 317–18 (1930).

10

36.     It is well-established that "[t]he owner of a mining claim owns property, and is not a mere social guest of the Department of the Interior to be shooed out the door when the Department chooses." *United States v. Shumway*, 199 F.3d 1093, 1103 (9th Cir. 1999).

37.     Under the Mining Law, citizens have the right to enter federal lands open to mineral entry and locate mining claims or mill site claims. *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997); *cf.* 43 C.F.R. § 3832.30 *et seq.* (mill sites).  Once a claim is staked, the holder "has the exclusive right to possession and enjoyment of all the surface included within the lines of the locations, but the United States retains title to the land." *Independence Mining Co.*, 105 F.3d at 506.

38.     The Mining Law and the Multiple Surface Resources Act (commonly known as the Surface Resources Act), 30 U.S.C. §§ 601, 603, 611–15, guarantee citizens the right to use and occupy federal lands open to mineral entry, with or without a mining claim, for prospecting, mining, processing, and "all uses reasonably incident thereto[,]" including, but not limited to, ancillary use rights, and rights of ingress and egress.  30 U.S.C. § 612.  Moreover, the Surface Resources Act provides:  "[t]hat any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto . . . ."  *Id.* § 612(b).

39.     The Forest Service Organic Administration Act of 1897 ("Forest Service Organic Act"), 16 U.S.C. § 472 *et seq.*, extended operation of the Mining Law to National Forest System lands.  *Id.* § 478 ("Nor shall anything in [the Forest Service Organic Act] prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof.").  Although prospectors

"must comply with the rules and regulations covering such national forests[,]" *id.*, the USFS

recognizes that prospectors have a statutory right—not a privilege—to explore and mine.  39

Fed. Reg. 31,317 (Aug. 28, 1974)  ("[P]rospectors and miners have a statutory right, not mere

privilege, under the [Mining Law] and the [Forest Service Organic Act], to go upon and use the

open public domain lands of the National Forest System for the purposes of mineral exploration,

development and production.  Exercise of that right may not be unreasonably restricted.").

**B.     The Mining and Minerals Policy Act of 1970.**

40.     The purpose of the Mining Law was reaffirmed in 1970, when Congress passed

the Mining and Minerals Policy Act ("MMPA"), which provides:

> It is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and minerals reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs . . . .

> It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section.

30 U.S.C. § 21a.

**C.     FLPMA.**

41.     FLPMA "provides for the management, protection, development, and

enhancement of the public lands . . . ."  Pub. L. No. 94-579, 90 Stat. 2743, 2743 (1976).

42.     Under FLPMA, the BLM, as the Secretary of the Interior's delegate, is required to

manage the public lands on "the basis of multiple use and sustained yield unless otherwise

specified by law."  43 U.S.C. § 1701(a)(7); *id.* § 1732(a) ("The Secretary shall manage the public

lands under principles of multiple use and sustained yield . . . .").  "Multiple use" means:

> [T]he management of the public lands and their various resource values so that
> they are utilized in the combination that will best meet the present and future
> needs of the American people; making the most judicious use of the land for some
> or all of these resources or related services over areas large enough to provide
> sufficient latitude for periodic adjustments in use to conform to changing needs
> and conditions; the use of some land for less than all of the resources; a
> combination of balanced and diverse resource uses that takes into account the
> long-term needs of future generations for renewable and nonrenewable resources,
> including, but not limited to, recreation, timber, *minerals*, watershed, wildlife and
> fish, and natural scenic, scientific and historical values; and harmonious and
> coordinated management of the various resources without impairment of the
> productivity of the land and quality of the environment with consideration being
> given to the relative values of the resources and not necessarily to the
> combination of uses that will give the greatest return unit output.

*Id*. § 1702(c) (emphasis added).

43.     In enacting FLPMA, Congress explicitly acknowledged the continued vitality of

the Mining Law:

> Except as provided in section 1744, section 1782, and subsection (f) of section
> 1781 of this title *and in the last sentence of this paragraph*, no provision of this
> section or any other section of this act shall in any way amend the Mining Law . .
> . or impair the rights of any locators or claims under that Act, including, but not
> limited to, rights of ingress and egress.

*Id*. § 1732(b) (emphasis added).  The last sentence of 43 U.S.C. § 1732(b) provides that the BLM

may "take any action necessary to prevent unnecessary or undue degradation of the lands."  *Id*.;

*see* 43 C.F.R. § 3809.5 (defining "unnecessary or undue degradation").  Thus, in passing

FLPMA, Congress granted the BLM only limited authority to infringe on the rights granted by

the Mining Law.  As relevant here, that authority is limited to "prevent[ing] unnecessary or

undue degradation."  43 U.S.C. § 1732(b).

44.     In passing FLPMA, Congress also continued the policy of the MMPA by

requiring "the public lands be managed in a manner which recognizes the Nation's need for

domestic sources of minerals, food, timber, and fiber from the public lands including

implementation of the [MMPA] . . . as it pertains to the public lands . . . ."  *Id*. § 1701(a)(12).

45.     Management for multiple uses, including minerals, is achieved through the land use planning process.  *See id*. §§ 1701(a)(2), (5), (7).

46.     In administering FLPMA, the BLM is required to "develop, maintain, and, when appropriate, revise land use plans" that involve the public and are "consistent with the terms and conditions" of FLPMA.  *Id*. § 1712(a).  Importantly, FLPMA requires the BLM to provide "adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands."  *Id*. § 1712(f); 43 C.F.R. § 1610.2(a) ("The public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities.  Public involvement in the resource management planning process shall conform to the requirements of [NEPA] and associated implementing regulations.").

47.     Under FLPMA, the BLM has limited authority to designate federal land as special management areas, such as "areas of critical environmental concern" ("ACECs").  43 U.S.C. § 1701(a)(11) ("Congress declares that it is the policy of the United States that . . . regulations and plans for the protection of public land [ACECs] be promptly developed[.]").  ACECs are defined as:

> [A]reas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

*Id*. § 1702(a); *see* 43 C.F.R. § 1610.7-2(a) (providing the "relevance" and "importance" criteria that must be met to designate an ACEC).  In addition to its limited authority to designate ACECs, the BLM must also follow particular procedures in order to formally designate an ACEC.  *Id*. § 1610.7-2(b).

**D.      NFMA.**

48.      It is the responsibility of the Secretary of the U.S. Department of Agriculture and the USFS to carry out the provisions of NFMA.  16 U.S.C. § 1613.

49.      NFMA directs the USFS's management of National Forest System lands, which requires the development and maintenance of land use plans for units of the National Forest System.  *Id*. § 1604(a); 36 C.F.R. § 219.1(a).

50.      NFMA further requires the USFS to "provide for public participation in the development, review, and revision of land management plans . . . ."  16 U.S.C. § 1604(d).  Moreover, NFMA requires the USFS to provide opportunities for the public to comment on the proposed plans as well as NEPA documents.  36 C.F.R. § 219.4(a).

51.      Under NFMA, the USFS is required to use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences."  16 U.S.C. § 1604(b).

52.      The USFS is further required to "assure" that its land use plans "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [("MUSYA"), 16 U.S.C. § 528 *et seq*] . . . ."  *Id*. § 1604(e)(1).

53.      Under MUSYA, "multiple use" is defined as:

The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the

combination of uses that will give the greatest dollar return or the greatest unit output.

*Id*. § 531(a); *see* 36 C.F.R. § 219.19.  The USFS is also required to consider "nonrenewable energy and mineral resources" when developing land use plan components.  36 C.F.R. § 219.10(a)(2).

54.     Under NFMA, if an "amendment would result in a significant change in [a] plan," then such amendment must be in accordance with the multiple use and required provisions of 16 U.S.C. §§ 1604(e), (f), and public involvement required by 16 U.S.C. § 1604(d).  16 U.S.C. § 1604(f)(4).  To circumvent any of these requirements, the USFS must first make a supportable finding of non-significance, which includes an accompanying meaningful evaluation.

55.     Additionally, under USFS regulations, "[a]ll [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources . . . ."  36 C.F.R. § 228.8.

56.     Under NFMA, the USFS has limited authority to designate federal land as special management areas.  *See* 36 C.F.R. § 294.1 (recreation areas); Forest Service Manual 2372 (scenic, geological, botanical, zoological, paleontological, historical, or recreational areas); Forest Service Manual 4060 (experimental and research natural areas).

**E.     NEPA.**

57.     The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  NEPA does not mandate a particular result and does not require an agency to select the environmentally preferred alternative.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Instead, NEPA is "essentially procedural."  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

58.     NEPA requires an agency to ensure that it has considered the environmental impacts of the proposed action and has informed itself and the public of that information. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

59.     NEPA also established the Council on Environmental Quality ("CEQ"), 42 U.S.C. § 4342, which promulgated regulations for the implementation of NEPA.  40 C.F.R. §§ 1500–08.

60.     As reflected in the CEQ regulations, a primary purpose of NEPA is to provide the public and decision-makers with "high quality" information and "accurate scientific analysis" before agency action is taken.  *Id*. § 1500.1(b).  These requirements are "essential to implementing NEPA."  *Id*.

61.     The CEQ regulations also require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  *Id*. § 1506.6(a).

62.     To fulfill its purposes, NEPA requires federal agencies to "prepare an [environmental impact statement] for any 'major Federal action [] significantly affecting the quality of the human environment.'"  *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 68 (D.C. Cir. 2011) (quoting 42 U.S.C. § 4332(2)(C)).

63.     NEPA requires agencies to prepare a supplement to a draft environmental impact statement or a final environmental impact statement if, *inter alia*:  (a) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns;" or (b) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. §§ 1502.9(c)(1)(i), (ii).

64.     Federal agencies must comply with NEPA "to the fullest extent possible."  42 U.S.C. § 4332.

**F.      The Endangered Species Act.**

65.      The FWS, as the Secretary of the Interior's delegate, administers the Endangered

Species Act ("ESA"), 16 U.S.C. §§ 1531–44.  50 C.F.R. § 402.01(b).  As part of its authority, the

FWS carries out a process based on particular criteria in order to determine whether it should list

a species as threatened or endangered.  16 U.S.C. § 1533(a)(1) (requirements for listing a

species).  If a species meets the criteria to be listed, then the FWS will also, and usually

concurrently, designate critical habitat for the listed species.  *Id*. § 1533(a)(3).  The FWS has no

authority to designate critical habitat for an unlisted species.

66.      Under the ESA, "critical habitat" is defined as:

    a.      "the specific areas within the geographical area occupied by the
        species, at the time it is listed in accordance with the provisions of
        [16 U.S.C. § 1533] of this title, on which are found those physical
        or biological features (I) *essential to the conservation of the*
        *species* and (II) which may require special management
        considerations or protection;" and

    b.      "specific areas outside the geographical area occupied by the
        species at the time it is listed in accordance with the provisions of
        [16 U.S.C. § 1533] of this title, upon a determination by the
        Secretary that such areas are *essential for the conservation* of the
        species."

*Id*. §§ 1532(5)(A)(i), (ii) (all emphasis added).

67.      In designating critical habitat under the ESA, the FWS shall consider:

[T]hose physical and biological features that are *essential to the conservation* of a
given species and that may require special management considerations or
protection.  Such requirements include, but are not limited to the following:  (1)
Space for individual and population growth, and for normal behavior; (2) Food,
water, air, light, minerals, or other nutritional or physiological requirements; (3)
Cover or shelter; (4) Sites for breeding, reproduction, rearing of offspring,
germination, or seed dispersal; and generally (5) Habitats that are protected from
disturbance or are representative of the historic geographical and ecological
distributions of a species.

50 C.F.R. § 424.12(b) (2015) (emphasis added).

## G. APA.

68. The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

69. The APA also provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id*. § 702.

70. The APA mandates that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action" and "hold unlawful and set aside agency action, findings, and conclusions" found to be, *inter alia*:

   a.  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;"

   b.  "contrary to constitutional right, power, privilege, or immunity;"

   c.  "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or

   d.  "without observance of procedure required by law."

*Id*. § 706(2).

## FACTUAL BACKGROUND

### A. The Greater Sage-grouse.

71. The greater sage-grouse (Centrocercus urophasianus) is a large bird that utilizes sagebrush habitat and inhabits eleven western states, including California, Idaho, Montana, Nevada, Oregon, Utah, and Wyoming. The greater sage-grouse are known for their courtship display in areas, known as leks.

72.     States, local governments, associations, private companies and individuals, including the mining industry, have voluntarily taken actions to conserve the greater sage-grouse and its habitat.  These conservation actions have been successful.

73.     For instance in August 2015, the Western Association of Fish and Wildlife Agencies released data showing a 63% increase in the greater sage-grouse population over the previous two years.  This brought the total breeding population to 424,645.  This data was published before Defendants approved the challenged RODs, LUPAs, and ARMPs.

**B.     The Mining Industry.**

74.     As AEMA explained in its comments through the land use planning process, the domestic mining industry accounted for more than 2.11 million full-time and part-time jobs in 2011.  *See* National Mining Association, *The Economic Contributions of U.S. Mining (2011)*, at 3 (Sept. 2013).  This includes more than 637,000 direct jobs.

75.     In 2011, the domestic mining industry contributed $138 billion to labor income, and contributed $232 billion to the gross domestic product.

76.     The domestic mining industry also generated approximately $51 billion in tax payments to federal, state, and local governments in 2011.

77.     Based on these figures, it is apparent that the mining industry occupies an important and significant place in the U.S. economy.

**C.     The National Greater Sage-grouse Planning Strategy.**

78.     On March 23, 2010, the FWS published its finding that listing of the greater sage-grouse under the ESA, was "warranted, but precluded by higher priority listing actions."  75 Fed. Reg. 13,910, 13,910 (Mar. 23, 2010).

79.     In August 2011 and purportedly in response to the FWS's 2010 "warranted, but precluded" finding, the BLM began evaluating the adequacy of its existing land use plans throughout the greater sage-grouse's range.

80.     In December 2011, the NTT, established by the BLM and comprised of agency and state specialists, released "A Report on National Greater Sage-Grouse Conservation Measures" ("NTT Report").  The NTT Report claimed to "[i]dentify science-based management considerations for the greater sage-grouse (e.g., conservation measures) that are necessary to promote sustainable sage-grouse populations, and which focus on the threats . . . in each of the management zones."  NTT Report at 5.

81.     Since its release, the NTT Report has been greatly scrutinized.  In particular, reviewers and the public have questioned its scientific validity, its use of professional judgment in place of science, and its simplistic management considerations that, *inter alia*, fail to account for variations in the location, timing, and use of habitat by the greater sage-grouse.  *E.g.*, Megan Maxwell, *BLM's NTT Report:  Is it the Best Available Science or a Tool to Support a Pre-determined Outcome?* (May 20, 2013); Rob Roy Ramey II, *Review of Data Quality Issues in A Report on National Greater Sage-Grouse Conservation Measures Produced by the BLM Sage-Grouse National Technical Team (NTT) Dated December 21, 2011* (Sept. 19, 2013).

82.     On December 9, 2011, the BLM published its "Notice of Intent to Prepare Environmental Impact Statements and Supplemental Environmental Impact Statements To Incorporate Greater Sage-Grouse Conservation Measures Into Land Use Plans and Land Management Plans" ("Scoping Notice") in the *Federal Register*.  76 Fed. Reg. 77,008 (Dec. 9, 2011).  This Scoping Notice encompassed, *inter alia*, California, Idaho, Montana, Nevada, Oregon, Utah, and Wyoming.  *Id*. at 77,010.  Initially, comments in response to the Scoping

Notice were due February 7, 2012, but the BLM published a Notice of Correction that extended

the public commenting period an additional 45 days, which the USFS also adopted.  77 Fed. Reg.

7,178, 7,179 (Feb. 10, 2012); *see also* 77 Fed. Reg. 12,792 (Mar. 2, 2012) (USFS's scoping

notice adopting scoping comment extension).  Comments were accepted through March 23,

2012.

83.     The USFS coordinated with the BLM to develop new or revised regulatory

mechanisms to conserve the greater sage-grouse, *i.e.*, land use plans.  This coordination was

memorialized in a Memorandum of Understanding between the USFS, the BLM, and the FWS.

84.     Defendants' stated purpose in amending or revising the approximately 98 land use

plans was to prevent the listing of the greater sage-grouse under the ESA—a single use of a vast

amount of land.  Although its goals were perhaps laudable, to achieve that purpose Defendants

unlawfully allowed the FWS to dictate which management restrictions would be included in the

RODs, LUPAs, and ARMPs.  In doing so, Defendants abdicated their multiple use mandates and

essentially ceded their authority to the FWS.

85.     On March 23, 2012, AEMA submitted comments in response to the Scoping

Notice.  AEMA's comments, *inter alia*, criticized the NTT Report, recommended alternatives to

be analyzed, and cautioned that the land use plan amendments must comply with federal law.

86.     On March 22, 2013, the FWS released a report, titled "Greater Sage-grouse

(Centrocercus urophasianus) Conservation Objectives:  Final Report" ("COT Report").  The

COT Report's purpose was to serve as guidance for federal land management agencies by

identifying the need for flexibility in management.  *See* COT Report at ii.  Importantly, the COT

Report advised the necessity of "[s]pecific strategies or actions . . . to achieve the following

conservation objective [that] must be developed and implemented at the state or local level, with the involvement of all stakeholders." *Id*. at 31.

87.     The National Greater Sage-Grouse Planning Strategy and the process of amending or revising existing land use plans was divided into two regions:  the Great Basin Region and the Rocky Mountain Region.  The Great Basin Region encompasses Northeastern California, Idaho, Southwestern Montana, Nevada, Oregon, and Utah.  The Rocky Mountain Region encompasses Northwest Colorado, Montana, North Dakota, South Dakota, and Wyoming.

88.     The Scoping Notice initiated Defendants' rush to amend or revise approximately 98 land use plans in an abbreviated timeframe so that the FWS could allegedly evaluate the amended and revised plans for adequacy before the FWS's court-ordered deadline, which required the FWS to either list or not list the greater sage-grouse under the ESA by September 30, 2015.

**D.     The Great Basin Draft Land Use Plan Amendments And Draft Environmental Impact Statements.**

89.     Defendants released separate draft land use plan amendments and draft environmental impact statements in the Great Basin for each of the following:  (a) Idaho and Southwestern Montana; (b) Nevada and Northeastern California; (c) Oregon; and (d) Utah.

**Idaho and Southwestern Montana Draft Land Use Plan Amendments and Draft Environmental Impact Statement.**

90.     On November 1, 2013, Defendants published a "Notice of Availability of the Idaho and Southwestern Montana Greater Sage-Grouse Draft Land Use Plan Amendments and Draft Environmental Impact Statement" ("ID/MT DLUPA/EIS") in the *Federal Register*.  78 Fed. Reg. 65,703 (Nov. 1, 2013).  Comments in response were due January 30, 2014.  *Id*. at 65,703.

91.     The ID/MT DLUPA/EIS encompassed BLM-administered lands and National

Forest System lands in Idaho, Montana, and a portion of the Sawtooth National Forest in Utah.

92.     Defendants prepared the ID/MT DLUPA/EIS "for managing Greater Sage-Grouse

. . . in the Idaho and Southwestern Montana sub-region . . . ." *Id*.  The ID/MT DLUPA/EIS

provided that the purported purpose and need for amending Defendants' respective plans was "to

identify and incorporate conservation measures into [the land use plans] to conserve, enhance,

and restore [greater sage-grouse] habitat by reducing, eliminating, or minimizing threats to that

habitat."  ID/MT DLUPA/EIS at ES-4.

93.     Generally, the ID/MT DLUPA/EIS placed greater sage-grouse habitat into two

categories:  (a) preliminary priority management areas ("PPMAs"); and (b) preliminary general

management areas ("PGMAs").  *See id*. at ES-2, ES-13.  However, the State of Idaho had

already done its own habitat categorization by categorizing greater sage-grouse habitat as core

habitat zones, important habitat zones, and general habitat zones.  *Id*. at 2-28.

94.     The ID/MT DLUPA/EIS proposed six alternatives:  (A) the no action alternative;

(B) the NTT Report alternative; (C) the "citizen" group alternative; (D) the Idaho and

Southwestern Montana sub-regional alternative; (E) the Idaho Governor's alternative; and (F) a

more restrictive "citizen" group alternative.  *Id*. at ES-10.

95.     Alternative A, the no action alternative, purportedly represented the Defendants'

existing management direction as set forth in the existing land use plans, statutes, regulations,

and policies.  *Id*. at ES-11; G-1–G-55.  This alternative provided the baseline to which all other

alternatives were compared.  *Id*. at 2-47.

96.     Under Alternative A, approximately 2.4 million acres of federal mineral estate would remain withdrawn from operation of the Mining Law.  *Id*. at 4-193.  But, no additional acres would be recommended for withdrawal.

97.     Alternative B, the NTT Report alternative, would designate 8,229,500 acres as PPMAs and 3,145,000 acres as PGMAs.  *Id*. at 2-98.  No ACECs or zoological areas would be designated under Alternative B.  *Id*. at 2-42.

98.     At its core, Alternative B focused on restricting resource uses, such as mining.  It would recommend the withdrawal of all PPMAs (8,229,500 acres) from operation of the Mining Law, in addition to those acres already withdrawn.  *Id*. at 2-36, 2-171, 4-194.  It would also, *inter alia*, place a 3% surface disturbance cap on anthropogenic disturbances (not including fire) in PPMAs.  *Id*. at 2-15; 2-100.  Anthropogenic disturbances included mining.  *Id*. at 7-5. Alternative B would require mining plans of operation to include "[a]dditional, effective mitigation in perpetuity for conservation . . ." prior to surface disturbing activities in PPMAs.  *Id*. at 2-180.  It would also "[m]ake applicable [best management practices ("BMPs")] . . . mandatory as [conditions of approval ("COAs")] within PPMA[s]."  *Id*.

99.     Alternative C, the "citizen" group alternative, would designate 11,119,900 acres as PPMAs, *id*. at 2-98, but no PGMAs.  It also would "[d]esignate and manage ACECs (BLM) and [greater sage-grouse] Zoological Areas ([USFS]) to function as sagebrush reserves to conserve [greater sage-grouse] . . . ."  *Id*. at 2-184; *see also id*. at 2-42.

100.    Alternative C focused on restricting resources uses, including mining. Under Alternative C, all PPMAs (11,119,900 acres) would be recommended for withdrawal, in addition to those acres already withdrawn.  *Id*. at 2-171, 4-194.  Alternative C would also place a 3% disturbance cap on anthropogenic disturbances in PPMAs.  *Id*. at 2-15, 2-100.

Anthropogenic disturbances included mines. *Id*. at 7-5. In plans of operations for mining, Alternative C would require "[a]dditional, effective mitigation in perpetuity for conservation . . ." prior to surface disturbing activities in PPMAs. *Id*. at 2-180. It would also "[m]ake applicable BMPs . . . mandatory as COAs within PPMA[s]." *Id*.

101. Alternative D, the sub-regional alternative, would designate 6,819,100 acres as PPMAs, 1,348,100 acres as preliminary medial management areas ("PMMAs"), and 2,934,100 acres as PGMAs. *Id*. at 2-98. No ACECs or zoological areas would be designated under Alternative D.

102. Alternative D professed to balance resources and resource use among competing interests. *Id*. at ES-15. It attempted to do so by making local adjustments to conservation measures set forth in the NTT Report. *Id*. For instance, Alternative D would not recommend PPMAs or other areas be withdrawn, but areas already withdrawn would remain so. *Id*. at 4-194. Alternative D would still "require no net unmitigated loss of PPMAs instead of a disturbance cap." *Id*. at ES-15, 2-16. This "no net unmitigated loss" standard was allegedly created because "[c]ontinued losses of [greater sage-grouse] habitat through natural events such as wildfire are expected to continue. Therefore, it is incumbent on the BLM and [USFS] to minimize loss of habitat or habitat functionality arising from discretionary agency actions or authorizations." *Id*. at 2-74. This concept would require third parties wishing to utilize federal lands to offset disturbances or restore habitat for the greater sage-grouse. *Id*.

103. In addition, Alternative D would "[e]nsure compliance with regulations in 43 [C.F.R. §] 3809 and 36 [C.F.R. §] 228 to prevent unnecessary and undue degradation . . ." in PPMAs, PGMAs, and PMMAs. *Id*. at 2-181.

104. Alternative E, the Idaho Governor's alternative, would designate 4,824,900 acres as core habitat zone, 2,743,400 acres as important habitat zone, and 3,516,300 acres as general habitat zone. *Id*. at 2-98. Alternative E would not recommend any areas be withdrawn, but areas already withdrawn would remain so. *Id*. at 4-194. No ACECs or zoological areas would be designated under Alternative E.

105. Alternative E provided a blended approach to conservation of greater sage-grouse habitat. Alternative E would be more restrictive in core habitat areas for the greater sage-grouse, but more flexible in less important habitat areas by allowing for multiple uses. *Id*. at ES-15. It focused primarily on controlling the true threats to greater sage-grouse and its habitat, which include wildfire, invasive species, and large infrastructure. *Id*. at ES-16. It would "[a]pply a [3%] surface disturbance cap on fluid mineral development" in core habitat and a "[5%] surface disturbance cap on fluid mineral development" in important habitat. *Id*. at 2-100.

106. Alternative F, the more restrictive "citizen" group alternative, would designate 8,229,900 acres as PPMAs, 2,891,500 acres as PGMAs, and 500,200 acres as preliminary restoration management areas. *Id*. at 2-98. It would also "[d]esignate and manage ACECs (BLM) and [greater sage-grouse] Zoological Areas ([USFS]) to function as sagebrush reserves to conserve [greater sage-grouse] . . . ." *Id*. at 2-184.

107. Alternative F would be more restrictive of resource uses in the majority of greater sage-grouse habitat, but with less flexibility in management. *Id*. at ES-16. For instance, it would recommend all PPMAs (8,229,900 acres) be withdrawn, in addition to those areas already withdrawn. *Id*. at 2-171, 4-194. And, in plans of operations for mining, it would require "[a]dditional, effective mitigation in perpetuity for conservation . . ." prior to surface disturbing activities in PPMAs. *Id*. at 2-180. Alternative F would also "[m]ake applicable BMPs . . .

mandatory as COAs within PPMA." *Id*.  In addition, it would place a 3% disturbance cap

(including fire) on anthropogenic disturbance in PPMAs.  *Id*. at ES-16, 2-17, 2-100.

Anthropogenic disturbances included mines.  *Id*. at 7-5.

108.    Alternatives B, C, D, E, and F, to some extent, included a density cap and/or non-

uniform buffers around mating areas, *i.e.*, leks, but only in regard to a few resource uses, like

fluid mineral extraction.  *Id*. at 2-173–2-174, 2-177, 2-183.

109.    Defendants selected Alternatives D and E as co-preferred alternatives within the

ID/MT DLUPA/EIS.  *Id*. at 2-45.

110.    Mineral exploration and development is an allowable use on federal lands.  *Id*. at

1-18, 3-109–3-114; *cf. id*. at 3-112–3-113 (describing existing quarries).  In the ID/MT

DLUPA/EIS, Defendants conceded that "[t]he BLM's role is limited to recording and

adjudicating the location notices and maintenance filings, and preventing undue or unnecessary

degradation to the lands under FLPMA."  *Id*. at 3-109.

111.    The ID/MT DLUPA/EIS included minimal discussion of mineral exploration and

development by indicating that the Idaho districts collectively have 32 authorized plans of

operations with 9 pending, and 28 authorized notices with 11 pending.[1]  *Id*. at 3-112; *see* 43

---

[1] The ID/MT DLUPA/EIS incorrectly labels plans of operation and notices as either authorized
or pending.  *See id*. at 3-112.  The term "authorized" suggests that the BLM has authority to
authorize a plan of operation or a notice, which is not correct.  At most, the BLM and USFS have
authority to "approve" a plan of operations, if required, but not a notice.  *See* 43 C.F.R. §
3809.11(a) ("You must submit a plan of operations and obtain BLM's approval before beginning
operations greater than casual use . . . ."); *id*. § 3809.21(a) ("You must submit a complete notice
of your operations 15 calendar days before you commence exploration causing surface
disturbance . . . ."); 36 C.F.R. § 228.4 (providing that the USFS does not approve notices, but
may require the approval of a plan of operations).  This is because a notice provides information
that the person is exercising his/her statutory right to enter upon federal lands to explore and
develop minerals under the Mining Law and whether a plan of operations must be submitted.  30
U.S.C. § 22; 43 C.F.R. § 3809.11; 36 C.F.R. § 228.4(a)(2).  Thus, only a plan of operations
would require approval, and even then the BLM only has authority insofar as "to prevent

C.F.R. §§ 3809.11, 3809.12; 36 C.F.R. §§ 228.4, 228.5.  Some of these plans of operation and

notices, but not all, are for mineral development in greater sage-grouse habitat.  *Id*. at 3-112.  In

fact, only 19 plans of operation are located in greater sage-grouse habitat according to the ID/MT

DLUPA/EIS.  *Id*.

112.    The Boise District has "mostly small operations for zeolite and bentonite."  *Id*.

The Twin Falls District has six stone operations that "are confined to discrete quarries" that

"expand very slowly over the years, and no infrastructure such as power lines or pipelines are

required."  *Id*. at 3-112–3-113.  The Twin Falls District also has a pumice pit "where disturbance

consists of 15 acres of quarry and staging area."  *Id*. at 3-113.  The Idaho Falls District has four

plans in greater sage-grouse habitat, two for building stone and two for zeolite, but the ID/MT

DLUPA/EIS discusses only one operation.  *Id*.

113.    Based on this minimal discussion, the ID/MT DLUPA/EIS has failed to support

the necessity of the recommended withdrawals and restrictions on mining contained in the

various alternatives to protect the greater sage-grouse.

114.    On January 29, 2014, AEMA timely submitted comments in response to the

ID/MT DLUPA/EIS.

115.    On July 31, 2014, AEMA submitted supplemental comments regarding the

ID/MT DLUPA/EIS.  In its supplemental comments, AEMA brought new information to

Defendants' attention that called into question the scientific validity of the NTT Report, as well

as information that updated the agencies on conservation efforts, and new information directly

affecting the land use plan amendment process.

---

unnecessary or undue degradation of the lands [,]" and the USFS only has authority insofar "as
where feasible, to minimize adverse environmental impacts on National Forest surface
resources[.]"  43 U.S.C. § 1732(b); 36 C.F.R. § 228.8.

**Nevada and Northeastern California Draft Land Use Plan Amendments and Draft Environmental Impact Statement.**

116.    On November 1, 2013, Defendants published a "Notice of Availability of the Nevada and Northeastern California Greater Sage-Grouse Draft Land Use Plan Amendments and Draft Environmental Impact Statement" ("NV/CA DLUPA/EIS") in the *Federal Register*. 78 Fed. Reg. 65,701 (Nov. 1, 2013). Comments in response were due January 30, 2014. *Id*. at 65,701.

117.    The NV/CA DLUPA/EIS provided that the purported purpose and need for amending Defendants' respective plans was "to identify and incorporate appropriate conservation measures in [land use plans] to conserve, enhance, and restore [greater sage-grouse] habitat by reducing, eliminating, or minimizing threats to that habitat." NV/CA DLUPA/EIS Executive Summary at xiv. The amendments would be "limited to providing direction specific to the conservation of [the greater sage-grouse] species and habitats" on federal surface and mineral estates. *Id*. ch. 1 at 19.

118.    Generally, the NV/CA DLUPA/EIS placed greater sage-grouse habitat into two categories: (a) PPMAs; and (b) PGMAs. *Id*. Executive Summary at xii; *id*. ch. 2 at 7. The State of Nevada would include a third category, labeled sage-grouse management areas ("SGMAs"). *Id*.

119.    The NV/CA DLUPA/EIS proposed six alternatives: (A) the no action alternative; (B) the NTT Report alternative; (C) the "citizen" group alternative; (D) the Nevada and Northeastern California sub-regional alternative; (E) the alternative based on the State of Nevada's greater sage-grouse conservation plan; and (F) another "citizen" group alternative. *Id*. Executive Summary at xx; *id.* ch. 2 at 12–15.

120. Alternative A, the no action alternative, purportedly represented Defendants' current management direction as set forth in the existing land use plans, laws, regulations, and policies. *Id*. Executive Summary at xxi; *id*. ch. 2 at 31 (mentioning the unnecessary or undue degradation standard for mining on BLM-administered lands and the minimization of significant disturbances on USFS-administered lands). The stated purpose of this alternative was to provide a "baseline against which to compare other action alternatives and their impacts on resources and resource uses" as required by CEQ regulations. *Id*. ch. 2 at 24.

121. Alternative B, the NTT Report alternative, would designate 12,693,500 acres as PPMAs and 4,664,700 acres as PGMAs. *Id*. ch. 4 at 190. No ACECs or zoological areas would be designated under Alternative B.

122. Alternative B focused on restricting resource uses, like mining—especially in PPMAs. *Id*. Executive Summary at xxii. It would recommend all PPMAs (12,693,500 acres) be withdrawn from mineral entry "based on the risk to the [greater sage-grouse] and its habitat from conflicting locatable mineral potential and development." *Id*. ch. 2 at 254, ch. 4 at 31. Alternative B advocated a very large withdrawal, despite the fact that mining was admittedly a "lesser threat," while fire, invasive species, and conifer encroachment were described as "major threats" to the greater sage-grouse and its habitat. *Id*. ch. 5 at 24-29, 33-35, 39-42 (mining is not even listed as a threat in management zone V (management zones were delineated by WAFWA and based on floristic provinces, *i.e.*, sagebrush, across the range of the greater sage-grouse)). This recommended withdrawal would be in addition to the approximately 1,296,100 acres of preliminary priority habitat and 374,700 acres of preliminary general habitat already withdrawn. *Id*. ch. 4 at 25; *see id*. ch. 4 at 190 ("total withdrawals (including lands currently withdrawn) under this alternative would increase 186 percent compared with Alternative A, thereby further

limiting opportunities for locatable mineral development"); *id*. ch. 4 at 191 ("Once formally

withdrawn, existing claims in PPMAs would be subject to validity examinations . . . .").

123.    Additionally, Alternative B would include an objective to "[m]anage [greater

sage-grouse] PPMAs so that discrete anthropogenic disturbances cover less than 3% of the total

[greater sage-grouse] habitat regardless of ownership." *Id*. ch. 2 at 55.  Anthropogenic

disturbances included mines.  *Id*.  If the 3% disturbance cap would be exceeded, then "no further

anthropogenic disturbances [would] be permitted by BLM or [USFS] until enough habitat has

been restored to maintain the area under this threshold (subject to valid existing rights." *Id*. ch. 2

at 55–56.  This alternative would also require "[a]dditional, effective mitigation in perpetuity for

conservation" in plans of operations, as well as make BMPs mandatory.  *Id*. ch. 2 at 254, 256;

*see id*. ch. 4 at 191 ("BMPs would be mandatory as COAs within PPMAs").  However,

Alternative B also provided that "the locatable mineral BMPs are carried forward as BMPs

because the [Mining Law] prevents the agencies from imposing use restrictions on mining

claims." *Id*. ch. 2 at 12.

124.    Alternative C, the "citizen" group alternative, would designate 17,732,900 acres

as PPMAs and no PGMAs.  *Id*. ch. 4 at 191.  It would also designate ACECs with special

management prescriptions, including mineral withdrawals. *Id*. ch. 4 at 263–68; *see also id*.

Executive Summary at xxvi.

125.    Alternative C focused on restricting resource uses like mining.  *See id*. Executive

Summary at xxii.  Alternative C would require the same actions for locatable minerals as

Alternative B.  *Id*. ch. 2 at 254.  However, it would recommend far more acres for withdrawal,

*i.e.*, all PPMAs (17,732,900 acres), in addition to those areas already withdrawn.  *Id*. ch. 4 at 38.

126.    Alternative D, the sub-regional alternative, would designate 12,927,400 acres as

PPMAs and 4,805,500 acres as PGMAs.  *Id*. ch. 4 at 191.  No ACECs or zoological areas would

be designated under Alternative D.

127.    Alternative D purported to balance resources and resource uses among competing

interests while still allowing ongoing programs and land uses.  *Id*. Executive Summary at xxii–

xxiii.  For instance, Alternative D would not recommend any areas be withdrawn from mineral

entry.  It would also "adjust[] the delineation of PPMAs and PGMAs to reflect existing land

uses, use authorizations, land allocations, and habitat considerations."  *Id*. Executive Summary at

xxiii.  Essentially, "[a]reas of [preliminary priority habitat] next to large-scale mining or

[environmental impact statement]-level mine expansions . . . would be managed as PGMA[s]."

*Id*.  This would result in fewer restrictions on existing mineral operations.  Alternative D also

indicated that Defendants would "[a]uthorize locatable mineral development activity per the 43

[C.F.R. §] 3809 regulations through Plan of Operation Approvals and apply mitigation and

[BMPs] that minimize the loss of PPMAs or provides for enhancement of PPMAs through off-

site mitigation . . ." on BLM-administered lands.  *Id*. ch. 2 at 254; *see also id*. ch. 2 at 85

(including an objective that provided "reasonable access and development opportunity to

claimants in PPMAs" and that would "conserve, maintain, or enhance PPMAs through

prevention of undue or unnecessary degradation for activities not reasonably incident to explore

and develop the resource.").  Alternative D further "include[d] measures to avoid or minimize

adverse effects on [greater sage-grouse] populations or their habitat" on USFS-administered

lands.  *Id*. ch. 2 at 254–55; *id*. App. B at B-20 (Describing a USFS standard that would "[r]equire

that new plans of operation authorized under 36 [C.F.R. §] 228 Subpart A – Locatable Minerals,

include measures to avoid or minimize adverse effects to [greater sage-grouse] populations or their habitat.").

128.     In addition, Alternative D would provide for "no unmitigated loss" of greater sage-grouse habitat. *Id*. ch. 2 at 13. This standard was allegedly created because "[c]ontinued losses of [greater sage-grouse] habitat through natural events such as wildfire are expected to continue. Therefore, it is incumbent on the BLM and [USFS] to minimize loss of habitat or habitat functionality arising from discretionary agency actions or authorizations." *Id*. This concept "include[d] a suite of actions that can be taken to off-set or restore direct and indirect disturbances on [greater sage-grouse] habitat." *Id*.

129.     Alternative E, based on the State of Nevada's existing greater sage-grouse conservation plan, would only apply to BLM-administered lands and National Forest System lands in Nevada. *Id*. Executive Summary at xxiv. The State of California did not submit a proposed alternative. *Id*.

130.     Alternative E would label 10,655,300 acres as SGMA-occupied habitat, 2,295,500 acres as SGMA-suitable habitat, 2,432,200 acres as SGMA-potential habitat, and 522,600 acres as SGMA-nonhabitat. *Id*. ch. 2 at 33.

131.     In regard to mining, Alternative E would recognize "existing state and federal regulatory mechanisms to govern mining and exploration activities . . . [finding] that [those mechanisms] are adequate to conserve" the greater sage-grouse and its habitat. *Id*. ch. 2 at 86. Alternative E would allow "exploration and other mineral-related activities that create not more than five acres of surface disturbance" and that are "[c]onsistent with BLM 43 [C.F.R. §] 3809 regulations for Notice-level operations, and [USFS] 36 [C.F.R. §] 228A regulations . . . ." *Id*. ch. 2 at 85; *Id*. ch. 2 at 257–58.

132.    In regard to mitigation, Alternative E would seek to, *inter alia*, achieve "no net loss" by avoiding, minimizing, and mitigating impacts on greater sage-grouse habitat. *Id*. ch. 2 at 15.  Alternative E would require application of an "avoid, minimize, and mitigation evaluation" on activities that cover over 32 acres per square mile. *Id*. ch. 2 at 254.  Importantly, previously approved mining operations on federal lands would be exempt from new mitigation requirements "above and beyond what has already been stipulated in the projects' approval." *Id*. ch. 2 at 255–56.

133.    Alternative F, the other "citizen" group alternative, would designate 12,693,500 acres as PPMAs and 5,039,400 acres as PGMAs. *Id*. ch. 2 at 33.  Alternative F would also designate ACECs and Special Conservation Areas with special management prescriptions, including mineral withdrawals in ACECs. *Id*. ch. 2 at 263–67.

134.    Alternative F focused on restricting uses and increasing greater sage-grouse populations and habitat. *Id*. Executive Summary at xxiv, xxvii; *id*. ch. 2 at 15.  For instance, Alternative F would recommend all PPMAs (12,693,500 acres) be withdrawn from mineral entry. *Id*. Executive Summary at xxvii.  Its management actions would also "preclude energy and mineral development on the nearly 18 million acres . . . ." *Id*. Executive Summary at xxvii.  In short, Alternative F would impose the same restrictions on locatable minerals as Alternatives B and C. *Id*. ch. 2 at 254.

135.    Defendants selected Alternative D as their preferred alternative. *Id*. Executive Summary at xxv; *see also id*. ch. 2 at 24.

136.    The NV/CA DLUPA/EIS only minimally discussed mineral exploration and development by indicating that from 2004 to 2011 there had been 161 notices and 98 plans of operation reviewed by the BLM in California, and 1,588 notices and 235 plans of operation

reviewed by the BLM in Nevada.  *Id*. ch. 3 at 121.  Based upon this minimal data and the

"ubiquitous" nature of mining in the area, Defendants opined that the trend on BLM-

administered lands was one of "increased interest in developing ore deposits for [gold, silver, and

copper] and expanding existing mines within the decision area, particularly within Nevada."  *Id*.

Similarly, Defendants anticipated that the trend for USFS-administered lands would remain

fairly constant for exploration projects.  *Id*.

137.    The NV/CA DLUPA/EIS provided that, even though "[g]oals and objectives for

locatable minerals are to provide opportunities to develop the resource while preventing undue or

unnecessary degradation of public lands[,]" *id*. ch. 4 at 188, "[u]nder all of the action alternatives

(Alternative B, D, E, and F), locatable mineral development would be expected to decrease due

to restrictions and mitigation measures placed on development."  *Id*. ch. 5 at 65.

138.    Based on this minimal discussion, the NV/CA DLUPA/EIS has failed to support

the necessity of the recommended withdrawals and restrictions on mining contained in the

various alternatives to protect the greater sage-grouse.

139.    On January 29, 2014, AEMA timely submitted comments in response to the

NV/CA DLUPA/EIS.

140.    On June 24, 2014, AEMA submitted supplemental comments regarding the

NV/CA DLUPA/EIS.  In its supplemental comments, AEMA brought new information to

Defendants' attention that called into question the scientific validity of the NTT Report into

question, as well as information that updated the agencies on conservation efforts, and new

information directly affecting the land use plan amendment process.

**Oregon Draft Land Use Plan Amendment and Draft Environmental Impact Statement.**

141.    On November 26, 2013, Defendants published a "Notice of Availability of the Oregon Greater Sage-Grouse Draft Land Use Plan Amendments and Draft Environmental Impact Statement" ("OR DLUPA/EIS") in the *Federal Register*.  78 Fed. Reg. 70,571 (Nov. 26, 2013).  Comments in response were due February 24, 2014.  *Id*. at 70,571.

142.    The OR DLUPA/EIS would affect only BLM-administered lands.  OR DLUPA/EIS at ES-2, ES-4.

143.    The OR DLUPA/EIS provided that the purported purpose and need for amending Defendants' respective plans "[was] to identify and incorporate appropriate conservation measures in [resource management plans] to conserve, enhance and/or restore [greater sage-grouse] habitat by reducing, eliminating, or minimizing threats to that habitat."  *Id*. at ES-6; *id*. at 1-6.

144.    The OR DLUPA/EIS would amend existing land use plans that cover approximately 15,257,026 acres of federal surface and split-estate.  *Id*. at ES-4, *id*. at 1-9–1-10.

145.    Generally, the OR DLUPA/EIS placed greater sage-grouse habitat into two categories:  (a) PPMAs; and (b) PGMAs.

146.    The OR DLUPA/EIS proposed six alternatives:  (A)the no action alternative; (B) the NTT Report alternative; (C) the "citizen" group alternative; (D) the Oregon BLM alternative; (E) the alternative based on the State of Oregon's strategy; and (F) another "citizen" group alternative.  *Id*. at ES-14–ES-21.

147.    Alternative A, the no action alternative, purportedly represented Defendants' current management direction, as set forth in the existing management decision documents, laws, and regulations.  *Id*. at ES-14, 2-14.  The purpose of this alternative was to comply with the CEQ

requirement for a no action alternative. *Id.* It is important to note that the existing land use plans to be amended by the OR DLUPA/EIS already addressed management of the greater sage-grouse and its habitat. *Id.* at 2-15.

148.    Under Alternative A, 20,453 acres would continue to be recommended for withdrawal, in addition to those acres already withdrawn (996,760 acres). *Id.* at 2-56.

149.    Alternative B, the NTT Report alternative, would designate 4,547,043 acres as PPMAs and 5,662,632 acres as PGMAs. *Id.* at 2-51. No ACECs would be designated under Alternative B.

150.    Alternative B focused on restricting resource uses, like mining, in PPMAs. *Id.* at ES-14. Alternative B would recommend PPMAs (4,490,430 acres or 29%) be withdrawn from operation of the Mining Law, in addition to those areas already withdrawn. *Id.* at 2-56–2-57, 2-124; *id.* at 2-102 (providing the withdrawal would be "based on risk to the [greater sage-grouse] and its habitat from conflicting locatable mineral potential and development"). It would also, *inter alia*, place "a 3% surface disturbance cap [on] anthropogenic disturbances (not including fire) in PPMA. Once the habitat disturbance cap is exceeded, no additional disturbance would be allowed until the disturbance is below 3%." *Id.* at 2-58; *see also id.* at 2-124–2-125 (providing the 3% disturbance cap applies to locatable minerals). In plans of operation for mining, Alternative B would require "[a]dditional, effective mitigation in perpetuity for conservation . . ." prior to surface disturbing activities in PPMAs[ and would r]ecommend implementation of [the] BMPs in [the] NTT Report . . . ." *Id.* at 2-103.

151.    Alternative C, the "citizen group alternative, would designate 4,547,043 acres as PPMAs and 5,662,632 acres as PGMAs. *Id.* at 2-51, 2-58. It would also designate all PPMAs as new ACECs. *Id.* at 2-49.

152.     Alternative C would take "a passive restoration approach" to PPMAs and PGMAs, which would thereby restrict resource uses, like mining.  *Id*. at ES-15.  It would recommend all occupied habitat (9,653,369 acres or 63% of federal mineral estate in the decisions area) be withdrawn from operation of the Mining Law, in addition to those areas already withdrawn.  *Id*. at 2-56–2-57, 2-102, 2-124.  It also suggested applying "a 0% surface disturbance cap to anthropogenic disturbances (not including fire) in PPMA and PGMA, unless there are valid existing rights," *id*. at 2-58, and would "[r]ecommend implementation of [the] BMPs in [the] NTT Report . . . ."  *Id*. at 2-103.

153.     Alternative D, the sub-regional alternative, would designate 4,547,043 acres as PPMAs and 5,662,632 acres as PGMAs.  *Id*. at 2-51, 2-58.  It would not designate any new ACECs, but would manage greater sage-grouse habitat in the existing ACECs if these ACECs occur in "over 20% PPMA acres and/or 50% PGMA . . . ."  *Id*. at 2-105.

154.     Alternative D professed to balance resources and resource use among competing interests and land uses.  *Id*. at ES-15.  For instance, it would not recommend any areas for withdrawal, but any areas already withdrawn or recommended for withdrawal would remain so. *Id*. at 2-51–2-52.  It would also place a 3% disturbance cap on anthropogenic disturbances, like Alternative B, and mitigation would be mandatory.  *Id*. at 2-58.

155.     However, under Alternative D, these management actions would not be mandatory on mining operations.  Rather, Defendants would request that claimants with new and existing claims, operations, and notices in PPMAs "change mining operations and practices to limit surface disturbance of 3% of [PPMAs] and to mitigate impacts on [greater sage-grouse,] . . . ."  *Id*. at 2-125; *see id*. at 2-102–2-103 ("To the extent consistent with the rights of a mining claimant under existing laws and regulations, limit surface disturbance and provide

recommendations that would limit surface disturbance.").  In PPMAs and PGMAs, Alternative D

also contemplated requiring "additional mitigation measures to avoid or minimize adverse

effects on [greater] sage-grouse habitat, as appropriate and to the extent allowable by law."  *Id*. at

2-103.  Any off-site mitigation in PGMAs would be based on the "no net loss" standard, while

off-site mitigation in PPMAs would be based on the "no net loss, net benefit" standard.  *Id*. at

ES-17.

156.    Alternative D also identified "a network of [greater sage-grouse] focal areas

within eastern Oregon" which would cover over five million acres of PPMAs and PGMAs,

including private lands.  *Id*. at ES-16.  There would be three types of focal areas:  (a) "climate

change consideration areas[,]" which are high elevation areas; (b) "high density breeding

areas[,]" which purportedly have a "high density of active [greater sage-grouse] leks[;]" and (c)

"restoration opportunity areas[,]" which could either provide better habitat if restored or serve as

buffers.  *Id*. at ES-15, 2-21–2-22.  These focal areas would "represent the best options for

restoration activities related to projects or potential locations for off-site mitigation."  *Id*. at 2-19,

ES-16.  However, these focal areas would not be "land allocations, as they establish priorities for

only certain types of BLM administrative actions and do not restrict or prohibit activities."  *Id*. at

2-22.  Neither were focal areas meant to be permanently fixed, but were expected to change over

time.  *Id*.

157.    Alternative E incorporated conservation guidelines from Oregon's greater sage-

grouse state plan that applied to the planning area covered by the OR DLUPA/EIS.  *Id*. at ES-17.

Alternative E would designate 4,547,043 acres as Core Areas and 3,923,539 acres as low density

areas.  *Id*. at 2-51, 2-58.  No ACECs would be designated under Alternative D.  *Id*. at 2-105.

158.    Alternative E restricted resource uses and would "[a]pply a 0% surface disturbance cap to anthropogenic disturbances (not including fire) in Core Areas, unless non-habitat." *Id*. at 2-58.  Alternative E would also include the same management actions for locatable minerals as Alternative B, except such management actions would not apply in non-habitat. *Id*. at 2-102–2-103.  Alternative E would recommend 4,490,430 acres be withdrawn, unless non-habitat. *Id*. at 2-56, 2-102.

159.    Alternative F, the other "citizen" group alternative, would designate 4,547,043 acres as PPMAs and 5,662,632 acres as PGMAs. *Id*. at 2-51.  It would also designate 17 new ACECs within greater sage-grouse habitat. *Id*. at 2-49.

160.    Alternative F focused on conserving greater sage-grouse range-wide, and sought to accomplish this goal by proposing greater restrictions on resource uses. *Id*. at ES-21, 2-29. Alternative F suggested applying "a 3% surface disturbance cap to anthropogenic disturbances (including fire) in PPMA.  Once the habitat disturbance cap is exceeded, no additional disturbance would be allowed until the disturbance is below 3%." *Id*. at 2-58.  It would recommend PPMAs (4,490,430 acres) be withdrawn from operation of the Mining Law. *Id*. at 2-102–2-103.  Alternative E would also include the same management actions for locatable minerals as Alternative B. *Id*.

161.    Defendants selected Alternative D as their preferred alternative. *Id*. at 2-144.

162.    The OR DLUPA/EIS minimally discussed mineral exploration and development by indicating there were 671 mining claims covering 94,441 acres in preliminary priority and general habitat, 128 notices covering 18,552 acres, and 136 approved plans of operation covering 29,394 acres. *Id*. at 3-110.  It further noted that the mineral potential was unknown because mineral reports were outdated and exploration efforts had been minimal. *Id*.  However, the OR

DLUPA/EIS opined that notices and plans of operation are "expected to increase" even though the area is "under-utilized and under-analyzed." *Id*. at 3-111, *see id*. at 3-112 ("[I]t is expected the claim acreage is to remain the same or increase in the foreseeable future, depending on resource prices and regulatory fees.").

163.    Based on this minimal discussion, the OR DLUPA/EIS failed to support the necessity of the recommended withdrawals and restrictions on mining contained in the various alternatives to protect the greater sage-grouse.

164.    On February 20, 2014, AEMA timely submitted comments in response to the OR DLUPA/EIS.

**Utah Draft Land Use Plan Amendment and Draft Environmental Impact Statement.**

165.    On November 1, 2013, Defendants published a "Notice of Availability of the Utah Greater Sage-Grouse Draft Land Use Plan Amendments and Environmental Impact Statement" ("UT DLUPA/EIS") in the *Federal Register*.  78 Fed. Reg. 65,700 (Nov. 1, 2013). Comments in response were due January 30, 2014.  *Id*. at 65,700.

166.    The UT DLUPA/EIS included BLM-administered lands and National Forest System lands in Utah, including those portions of the Ashley and Uinta-Wasatch-Cache National Forests located in Wyoming.  UT DLUPA/EIS at 1-4.

167.    The UT DLUPA/EIS provided that the purported purpose and need for amending Defendants' respective plans "[was] to identify and incorporate appropriate conservation measures in [land use plans] to conserve, enhance and/or restore [greater sage-grouse] habitat by reducing, eliminating, or minimizing threats to that habitat."  *Id*.

168.    Generally, the UT DLUPA/EIS placed greater sage-grouse habitat into two categories:  (a) PPMAs; and (b) PGMAs.  *Id*. at ES-9.

169.    The UT DLUPA/EIS proposed six alternatives:  (A) the no action alternative; (B) the NTT Report alternative; (C) the "citizen" group alternative; (D) the Utah BLM/USFS alternative; and (E1) the State of Utah's alternative; and (E2) the State of Wyoming's alternative. *Id*. at ES-9–ES-13.

170.    Alternative A, the no action alternative, purportedly represented Defendants' current management direction, meaning the existing land use plans would not be amended.  *Id*. at ES-9.

171.    Under Alternative A, approximately 498,700 acres would continue to be recommended for withdrawal under the existing land use plans.  *Id*. at 2-123.  But, no new recommendations would be made.

172.    Alternative B, the NTT Report alternative, would designate 2,781,700 acres as PPMAs and 532,100 acres as PGMAs.  *Id*. at 2-15.

173.    Alternative B would apply management actions to PPMAs, but allow activities in PGMAs to continue under existing management direction.  *Id*. at ES-9, 2-2.  For instance, it would recommend PPMAs be withdrawn from operation of the Mining Law "based on the risk to the [greater sage-grouse] and its habitat from conflicting locatable mineral potential and development (3,650,900 acres) . . . ."  *Id*. at 2-123.  Alternative B would also "[m]anage PPMAs so that discrete anthropogenic disturbances cover less than 3[%] of the total [greater sage-grouse] habitat regardless of ownership."  *Id*. at 2-21.  Anthropogenic disturbances would include "mines."  *Id*.  If the 3% disturbance cap is already exceeded in PPMAs, then "no further anthropogenic disturbances [would] be permitted . . . until enough habitat has been restored to maintain the area under the threshold (subject to valid existing rights)."  *Id*.  Additionally, in plans of operation for mining, Alternative B would require "[a]dditional, effective mitigation in

perpetuity for conservation . . ." prior to surface disturbing activities in PPMAs. *Id.* at 2-124. It would also apply BMPs "as appropriate and to the extent allowable by law within PPMAs." *Id.* at 2-128.

174.    Alternative C, the "citizen" group alternative, would designate 3,313,800 acres as PPMAs and no PGMAs. *Id.* at 2-15. It would also designate 15 ACECs and zoological areas encompassing 2,233,800 acres. *Id.* at 2-148. It was the only alternative in the UT DLUPA/EIS to do so.

175.    Alternative C focused on restricting uses in PPMAs, which covered all greater sage-grouse habitat. *Id.* at ES-10, 2-3. It would recommend all PPMAs (4,008,580 acres) be withdrawn from operation of the Mining Law. *Id.* at ES-10, 2-123. It would also "[l]imit discrete surface disturbance in P[H]MAs to one instance per section of [greater sage-grouse] habitat regardless of ownership, with no more than 3[%] surface disturbance . . . ." *Id.* at 2-21. Discrete disturbances included "mines." *Id.* Additionally, in plans of operation for mining, Alternative C would require "[a]dditional, effective mitigation in perpetuity for conservation . . ." prior to surface disturbing activities in PPMAs. *Id.* at 2-124. Alternative C would also require BMPs "as appropriate and to the extent allowable by law within PPMAs." *Id.* at 2-128.

176.    Alternative D, the Utah BLM/USFS alternative, would designate 2,760,300 acres as PPMAs and 553,500 acres as PGMAs. *Id.* at 2-15.

177.    Alternative D purported to balance resources and resource use. *Id.* at ES-11. For instance, it would not recommend any areas for withdrawal. *Id.* at 2-123. Yet, it included "restrictions [that] would be more stringent within 4 miles of occupied [greater sage-grouse] leks[.]" *Id.* at ES-10. Regarding locatable minerals, Alternative D provided that "[t]o the extent allowable by law, [Defendants would] work with claimants to apply seasonal and use restrictions

for PPMAs and PGMAs . . . ."  *Id*. at 2-123; *see id*. at 2-28–2-35 (setting forth seasonal and

distance limitations on activities).

178.    Alternative D also would "[p]rotect PPMAs from fragmentation by anthropogenic

disturbances that will reduce distribution or abundance of [greater sage-grouse] by managing

PPMAs so that discrete anthropogenic disturbances cover less than 5[%] of the area within the

PPMA used by a population of [greater sage-grouse], regardless of ownership."  *Id*. at 2-21; *id*.

(disturbances on state and private lands count toward the 5% disturbance cap).  Anthropogenic

disturbances would include "mines."  *Id*. at 2-24.  In PPMAs, if the 5% disturbance cap is

exceeded, then "no further discrete anthropogenic disturbances [would] be permitted by the

BLM or [USFS] until enough habitat has been restored to maintain the area under this threshold

(subject to valid existing rights)."  *Id*.  In regard to mining under the 5% disturbance cap,

Alternative D recommended:

> To the extent consistent with the rights of a mining claimant under existing laws
> and regulations, limit surface disturbance from locatable mineral development in
> PPMAs within leks, nesting habitat, and early brood-rearing habitat and as
> possible, limit surface disturbance to under the 5[%] disturbance limit, or provide
> for enhancement of PPMAs through on-site and/or off-site mitigation.

*Id*. at 2-123–2-124.  Additionally, Alternative D did not have a requirement to achieve a "no net

loss" standard.  *Id*. at 2-170.

179.    Alternative D would "[a]pply BMPs . . . to the extent allowable by law, unless at

least one of the following [could] be demonstrated[:]"  (a) "[a] specific design feature is

documented to not be applicable to the site-specific conditions of the project/activity;" (b) "[a]

proposed design feature or BMP is determined to provide equal or better protection for [greater

sage-grouse] or its habitat;" or (c) "[a]nalyses conclude that following a specific [design] feature

will provide no more protection to [greater sage-grouse] or its habitat than not following it . . . . *Id*. at 2-128.

180.    Alternative E was split into two subsets:  (E1) the State of Utah's alternative; and (E2) the Wyoming Governor's alternative.  *Id*. at ES-11.  In total, Alternative E would designate 2,711,200 acres as SGMA-Core Areas and 650,680 acres as Non-SGMA/Noncore.  *Id*. at 2-15.

181.    Alternative E1 would only restrict activities in 11 SGMAs in Utah, whereas habitat outside of SGMAs would not be protected.  *Id*. at ES-11, 2-4.  Alternative E1 would not recommend any areas be withdrawn.  *Id*. at 2-123.  Alternative E1 would place "a general limit on new permanent disturbance of 5[%] of habitat on state or federally managed lands within any particular SGMA."  *Id.* at 2-21.  Additionally, it would subject activities to seasonal and distance restrictions.  *Id*. at 2-28.  But, Alternative E1 would not require "no net loss."  *Id*. at 2-170.  This alternative also provided conservation measures that could be applied to mining operations "[t]o the extent allowable by laws and regulations and to the extent the claimant would be willing to apply the . . . conservation measures . . . ."  *Id*. at 2-123, 2-123–2-126 (conservation measures included structure height, noise, buffers, time and day restrictions, date restrictions, etc.).

182.    Alternative E2 would only apply to the portions of the Ashley and Uinta-Wasatch-Cache National Forests in Wyoming.  *Id*. at ES-12, 2-5.  Alternative E2 would recommend areas for withdrawal "based on risk to the [greater sage-grouse] and its habitat in core areas from conflicting locatable mineral potential and development . . . ."  *Id*. at 2-123.  It would also limit mining facility density to an average of one location per 640 acres and would implement a 5% disturbance cap in core areas.  *Id*. at ES-13.  Additionally, Alternative E2 provided that "[o]perators may be requested to submit modifications to the accepted notice or approved plan of operations so that the operations minimally impact [greater sage-grouse] core

area habitat" through "suggested conservation measures . . . ."  *Id*. at 2-123–2-124 ("The request containing the suggested conservation measures must make clear that the operator's compliance is not mandatory.").  It would also apply BMPs "[w]here applicable and technically feasible" and "to the extent allowable by law . . . ."  *Id*. at 2-128.

183.    Defendants selected Alternative D as their preferred alternative.  *Id*. at 2-163.

184.    The UT DLUPA/EIS minimally discussed mineral exploration and development on the 4,008,600 acres of federal mineral estate in the decision area.  *Id*. at 3-190.  It mentioned that there are 2,575 mining claims and 39 mining operations within the decision area.  *Id*. at 3-207. Based solely on this information, Defendants estimated that the majority of acres had moderate mineral potential.  *Id*. at 3-206.  Accordingly, Defendants concluded that mineral development would continue and there could be new efforts to extract locatable minerals due to modern mining methods.  *Id*. at 3-209.

185.    Based on this minimal discussion, the UT DLUPA/EIS failed to support the necessity of the recommended withdrawals and restrictions on mining contained in the various alternatives to protect the greater sage-grouse.

186.    On January 29, 2014, AEMA timely submitted comments in response to the UT DLUPA/EIS.

187.    On July 31, 2014, AEMA submitted supplemental comments regarding the UT DLUPA/EIS.  In its supplemental comments, AEMA brought new information to Defendants' attention that called into question the scientific validity of the NTT Report, as well as information that updated the agencies on conservation efforts, and new information directly affecting the land use plan amendment process.

E.     **The Rocky Mountain Draft Resource Management Plans And Draft Environmental Impact Statements.**

188.     Defendants released draft land use plans and draft environmental impact statements in the Rocky Mountain Region for the following areas pertinent to this action:  (a) HiLine District; and (b) the Bighorn Basin—Cody and Worland Field Offices.

**HiLine Draft Resource Management Plan and Draft Environmental Impact Statement.**

189.     On March 22, 2013, Defendants published a "Notice of Availability of the HiLine District Draft Resource Management Plan and Draft Environmental Impact Statement" ("HiLine DRMP/EIS") in the *Federal Register*.  78 Fed. Reg. 17,714 (Mar. 22, 2013).  Comments in response were due June 20, 2013.  *Id*. at 17,714.

190.     The HiLine DRMP/EIS would affect only BLM-administered lands.

191.     The HiLine DRMP/EIS provided that the purported purpose and need for revising Defendants' respective plans was "the result of considerable changes within the planning area[,]" as well as "to incorporate objectives and adequate conservation measures into [resource management plans] in order to conserve, enhance, and/or restore Greater Sage-Grouse habitat [which] could reduce the need to list the species as threatened or endangered under the Endangered Species Act."  HiLine DRMP/EIS at 3.

192.     Generally, the HiLine DRMP/EIS placed greater sage-grouse habitat into two categories:  (a) Greater Sage-Grouse Protection Priority Areas; and (b) Grassland Bird/Greater Sage-Grouse Priority Areas.  Under some alternatives, these areas would be designated as ACECs.

193.     The HiLine DRMP/EIS proposed five alternatives labeled (A) through (E), including a no action alternative.

194.    At the outset, the HiLine DRMP/EIS included a summary regarding the

administration of locatable minerals.  It provided that administration "[would] continue as

required by law and regulation by taking the following steps[:]"

     a.    "Review and process notices to ensure the proposed actions do not
create unnecessary or undue degradation of the environment[;]"

     b.    "Review and process plans of operation to ensure the proposed
actions do not create unnecessary or undue degradation of the
environment (43 [C.F.R. §] 3809)[;]"

     c.    "Conduct at a minimum, annual compliance inspections on each
active notice and plan of operation[;]" and

     d.    "Allow casual use where work is done by hand and no explosives
are used.  Refer inquiries to appropriate agencies for further
guidance on other permit requirements.  Casual use does not
require a permit or prior authorization.  However, if necessary, the
BLM could monitor casual use to prevent unnecessary and undue
degradation."

*Id*. at 105; *see id*. at 343 (43 C.F.R. § 3809 "requires all operations to be conducted in a manner

that prevents unnecessary or undue degradation.").  In addition, terms and conditions "[would]

be applied to mining activities (within the constraints of the mining law) to meet land health

standards for uplands, riparian areas and wetlands, water quality, air quality, and native plant and

animal species." *Id*. at 105, 590.  This direction would be common to all alternatives.  *Id*. at 105.

195.     Alternative A, the no action alternative, would purportedly continue current

management.  This would continue "four mineral withdrawals (19,914 acres) and recommend[]

two new withdrawals (1,911 acres) . . . ." *Id*.

196.    Under Alternatives A and D, the existing withdrawal of Sweet Grass Hills, though

outside of greater sage-grouse habitat, would be allowed to expire in 2017.  *Id*. at 105–06.

However, under the other alternatives, the Sweet Grass Hills withdrawal would be recommended

for a 20-year extension.  *Id*. at 105–10.

197.    Alternative B would recommend nine new withdrawals (1,674,298 acres), in addition to continuing four withdrawals.  *Id*. at 106.  Two of the new withdrawals would focus on protecting the greater sage-grouse:  (a) Grassland Bird/Greater Sage-Grouse Priority Areas (469,916 acres); and (b) Greater Sage-Grouse Protection Priority Areas (1,067,376 acres).  *Id*. at 107–09, 123, 156.  The majority of the acres in these areas would be designated as ACECs.  *Id*. at 155, 157.

198.    Consequently, Alternative B's recommended withdrawals would remove a significant amount of lands with high mineral development potential from operation of the Mining Law.  *Id*. at 592.  The lands remaining open to mineral entry would be areas with low to moderate development potential.  *Id*. at 593.

199.    Alternative B would include an objective to "[m]anage priority greater sage-grouse habitats so that discrete anthropogenic disturbances cover less than 3% of the total sage-grouse habitat regardless of ownership . . . ."  *Id*. at 155.

200.    Alternative C would recommend ten new withdrawals (1,539,290 acres), in addition to continuing four withdrawals.  *Id*. at 109.  Two of the new withdrawals would withdraw Greater Sage-Grouse Protection Priority Areas (1,067,376 acres) and Grassland Bird/Greater Sage-Grouse Priority Areas (316,830 acres) to protect the greater sage-grouse.  *Id*. at 110, 159–61.  However, under Alternative C, these areas would not be designated as ACECs.  *Id*. at 123.

201.    Consequently, Alternative C's recommended withdrawals would remove most of the areas with moderate to high mineral development potential from operation of the Mining Law.  *Id*. at 593.  The lands remaining open to mineral entry would be areas with low to moderate development potential.  *Id*.

202.    Both Alternatives B and C would "reduce most locatable mineral development opportunities by eliminating any foreseeable development . . . ." *Id*. at 220.

203.    Alternative D would not recommend any areas for withdrawal with the sole purpose being to protect the greater sage-grouse. *Id*. at 110–11.  Moreover, no greater sage-grouse priority areas would be identified under this alternative. *Id*. at 198.  Even though Alternative D would be more favorable to mineral exploration and development, most re-opened high and moderate development potential areas "would still remain in special management areas . . . ." *Id*. at 594.

204.    Alternative E would not recommend any areas for withdrawal with the sole purpose being to protect the greater sage-grouse. *Id*. at 110–11.  However, it would still keep areas with high mineral development withdrawn through renewals of existing withdrawals, *i.e.*, the Sweet Grass Hills withdrawal. *Id*. at 594.  In fact, "the moderate and low areas of development potential that were under the restricted management category under current management would [remain] closed." *Id*.

205.    Mitigation measures for surface-disturbing activities, like mining, would be required under all alternatives. *Id*. at 151–52, 155, 159, 162, 164.  However, Alternative E would use an avoid, minimize, and compensate process. *Id*. at 164.

206.    Defendants selected Alternative E as their preferred alternative. *Id*. at 110.

207.    Various locatable minerals are present in the planning area, including gold, copper, lead, zinc, silver, bentonite, and diamonds. *Id*. at 344.  The majority of mining claims are for gold and bentonite. *Id*. at 345.  Mineral activities are one of the largest contributors to local employment and income of all primary uses of the federal lands in this area. *Id*. at 457.

208.    In reviewing current mineral activity, the HiLine DRMP/EIS projected that approximately 115 to 150 acres would be disturbed by locatable mineral development for bentonite in the short term.  *Id*. at 539.  There would be no long term disturbance because of reclamation activities.  *Id*. at 539–40.  In regard to hardrock mining, the HiLine DRMP/EIS projected that 210 to 240 acres would be disturbed in the short term.  *Id*. at 539.  There would be 185 to 2,345 acres disturbed in the long term based on "the potential for mining in the Little Rocky Mountains . . . ."  *Id*. at 540.  The HiLine DRMP/EIS concluded "that there could be approximately 2,495 acres (less than 1% of the planning area) of soil and vegetation disturbances to extract locatable minerals occurring in the Little Rocky Mountains, Sweet Grass Hills, and Brazil Creek."  *Id*. at 580.

209.    Based on this discussion, the HiLine DRMP/EIS failed to support the necessity of the recommended withdrawals and restrictions on mining contained in the various alternatives to protect the greater sage-grouse.

210.    On June 20, 2013, AEMA timely submitted comments in response to the HiLine DRMP/EIS.

211.    On July 7, 2014, AEMA submitted supplemental comments regarding the HiLine DRMP/EIS.  In its supplemental comments, AEMA brought new information to Defendants' attention that called into question the scientific validity of the NTT Report, as well as information that updated the agencies on conservation efforts, and new information directly affecting the land use plan amendment process.

**Bighorn Basin Draft Resource Management Plan and Draft Environmental Impact Statement.**

212.    On April 22, 2011, Defendants published a "Notice of Availability of Draft Resource Management Plans and Associated Environmental Impact Statement for the Bighorn

Basin Resource Management Plan Revision Project, Cody and Worland Field Offices,

Wyoming" ("Bighorn DRMP/EIS") in the *Federal Register*.  76 Fed. Reg. 22,721 (Apr. 22,

2011).  Comments were due July 21, 2011.  *Id*. at 22,721.

213.    The Bighorn DRMP/EIS would affect only BLM-administered lands managed by

the Cody and Worland Field Offices.  Bighorn DRMP/EIS at 1.

214.    The Bighorn DRMP/EIS provided that the purported purpose and need for

revising Defendants' respective plans was based on the availability of new data, changes to laws,

regulations, and policies, and new issues in the planning area that the existing plans "do not

satisfactorily address . . . ."  *Id*. at 4, 5.

215.    The Bighorn DRMP/EIS proposed four alternatives:  (A) the no action alternative;

(B) the conservation alternative; (C) the resource use alternative; and (D) the balanced use

alternative.  *Id*. at 63–71.

216.    The Bighorn DRMP/EIS provided that "[Defendants] considered, but eliminated

alternatives to pursue a withdrawal from appropriations under the mining laws for a large portion

of the Planning Area because it found those alternatives to be overly restrictive and not

reasonable."  *Id*. at 27 ("Such withdrawals may conflict with the FLPMA's mandate for multiple

use.").

217.    The Bighorn DRMP/EIS provided that the common goal for all alternatives was

to "[m]anage locatable minerals activities on lands open to mineral entry, while preventing

unnecessary and undue degradation on public lands, and while avoiding or mitigating effects of

exploration and production on other resources."  *Id*. at 102.

218.    The Bighorn DRMP/EIS provided that the management action for locatable minerals common to all alternatives would be "[l]ands not formally withdrawn or segregated from mineral entry are available for mineral entry . . . ." *Id*. at 103.

219.    Alternative A, the no action alternative, would continue the current management direction of the existing land use plans.  As part of current management, over four million acres would remain open to locatable mineral entry while 174,354 acres would remain withdrawn.  *Id*. at 63.  Alternative A would also apply stipulations to discretionary activities in the form of seasonal and distance restrictions.  *Id*. at 163–64.

220.    Alternative B, the conservation alternative, would emphasize conservation by restricting resource uses.  *Id*. at 66.  For instance, it would "conserve[] the most land area for physical, biological, and heritage resources; designate[] the highest number of ACECs; and [would be] the most restrictive to motorized vehicle use and mineral development."  *Id*.  It would accomplish this goal by recommending (and keeping withdrawn) a total of 325,102 acres.  *Id*.  It would also expand five existing ACECs and designate eight new ACECs.

221.    Alternative C, the resource use alternative, would be the least restrictive of mineral development.  *Id*. at 69.  For instance, it would recommend (or keep withdrawn) a total of 47,846 acres for withdrawal.  *Id*.  Any other withdrawals would be allowed to expire.  *Id*. Additionally, it would not expand existing ACECs or designate new ACECs.  *Id*. at 70.

222.    Alternative D, the balanced use alternative, professed to both conserve and allow uses with moderate constraints.  *Id*. at 71.  For instance, it would recommend (or keep withdrawn) a total of 72,031 acres for withdrawal.  *Id*.  Any other withdrawals would be allowed to expire.  *Id*.  However, it would designate three new ACECs.  *Id*. at 72.

223.    Alternative D would include seasonal and distance restrictions for the greater sage-grouse. *Id.* at 73, 163–66. It also provided that "[t]he location and cumulative value of existing disturbances in the area will not exceed 5[%] of sagebrush habitat within those same 640 acres." *Id.* at 167–68.

224.    Defendants selected Alternative D as their preferred alternative. *Id.* at 8.

225.    The Bighorn DRMP/EIS provided that withdrawals within ACECs and other areas may be pursued on a case-by-case basis. *Id.* at 83.

226.    As mentioned, some alternatives would expand existing ACECs, which would include the Little Mountain ACEC. *Id.* at 684. The expanded Little Mountain ACEC would contain some greater sage-grouse brood-rearing, nesting, and winter habitat. *Id.* The proposed Clarks Fork Canyon ACEC, Rattlesnake Mountain ACEC, and Sheep Mountain ACEC would also contain greater sage-grouse habitat. *Id.* at 686, 687–88. However, no expanded or proposed ACEC would be based solely on the greater sage-grouse or its habitat.

227.    The Bighorn DRMP/EIS provided that the primary locatable minerals in the planning area are bentonite and gypsum. *Id.* at 509. In fact, "[b]entonite deposits in Wyoming make up approximately 70 percent of the world's known supply." *Id.* at 510 (providing that six bentonite mines in the area employ approximately 132 persons and processing mills employ another 360 persons); *id.* at 716 (providing that Bighorn County "produces over half the bentonite in the state").

228.    To some extent, the Bighorn DRMP/EIS discussed bentonite mining. It provided that there are 30 mining notices for bentonite and 21 plans of operation for bentonite based on records from 2008. *Id.* at 511.

229.    The Bighorn DRMP/EIS provided that "[a]pproximately 30,000 acres of land ha[ve] been disturbed in the Bighorn Basin due to bentonite mining[.]"  *Id*.  The Bighorn DRMP/EIS projected that another 20,000 acres would be mined for bentonite in the next 20 or 30 years.  *Id*.

230.    The Bighorn DRMP/EIS also warned that "restrictions on exploration and development of locatable minerals would result in adverse impacts when areas are withdrawn, segregated, or classified from locatable mineral entry, or with the application of other resource restrictions that limit or prohibit mineral activity."  *Id*. at 822.

231.    AEMA's member(s) submitted comments in response to the Bighorn DRMP/EIS.

**Supplement to the Bighorn Basin Draft Resource Management Plan and Draft Environmental Impact Statement.**

232.    On July 12, 2013, Defendants published a "Notice of Availability of a Supplement to the Bighorn Basin Draft Resource Management Plan/Environmental Impact Statement, Cody and Worland Field Offices, WY" ("Bighorn SRMP/EIS") in the *Federal Register*.  78 Fed. Reg. 41,947 (July 12, 2013).  Comments in response were due October 10, 2013.  *Id*. at 41,948.

233.    The Bighorn SRMP/EIS supplemented the Bighorn DRMP/EIS purportedly because of the availability of new information, changing circumstances, and emerging issues since the release of the Bighorn DRMP/EIS.  Bighorn SRMP/EIS at ES-2.

234.    The Bighorn SRMP/EIS updated the purpose and need for revising Defendants' respective plans to consider conservation measures for the greater sage-grouse and its habitat, even though many of the alternatives already addressed the greater sage-grouse and its habitat. *Id*. at ES-2, 1-2.

235.    The Bighorn SRMP/EIS proposed two additional alternatives:  (a) Alternative E, which is the same as Bighorn DRMP/EIS's Alternative B, but with additional management actions within "Greater Sage-Grouse Key Habitat Areas;" and (b) Alternative F, which is the same as Bighorn DRMP/EIS's Alternative D, but with additional management actions within "Greater Sage-Grouse Core Habitat Areas."  *Id*. at ES-1, ES-3, 2-12, 2-13.

236.    Alternative E incorporated Alternative B, but included additional management actions to protect the greater sage-grouse, especially in regard to mineral exploration and development.  *Id*. at 2-12.  For instance, it would designate the most ACECs and be the most restrictive on mineral exploration and development.  *Id*. at ES-3.  It would designate 1,231,383 acres as a new Greater Sage-Grouse Key Habitat Areas ACEC for conservation of greater sage-grouse priority habitat.  *Id*. at 2-13, 4-122.  Further, it also would "[m]anage the Greater Sage-Grouse Key Habitat Areas ACEC so that anthropogenic disturbances do not exceed one disturbance per 640 acres and cover less than 3[%] of total sage-grouse habitat regardless of ownership."  *Id*. at 2-17, 2-13.  Anthropogenic disturbances would include "mines."  *Id*. at 2-17.  If the 3% disturbance cap were exceeded, then "further disturbance in the Greater Sage-Grouse Key Habitat Areas ACEC" would be prohibited "until enough habitat has been restored to maintain the area under this threshold (subject to valid existing rights)."  *Id*.

237.    Alternative E would also recommend areas, including greater sage-grouse habitat areas (1,764,621 acres or 42%) be withdrawn from operation of the Mining Law.  *Id*. at 2-12.  In regard to mining, it would require "[a]dditional, effective mitigation in perpetuity for conservation . . . ."  *Id*. at 2-28.

238.     Consequently, Alternative E would result in the greatest negative impact on mineral development.  *Id*. at ES-5, 4-17.  Alternative E's recommended withdrawal would include 141,563 acres with known bentonite occurrences.  *Id*. at 4-18.

239.     Alternative F incorporated Alternative D, but included additional management actions to protect the greater sage-grouse.  *Id*. at 2-13.  For instance, it would designate 1,116,234 acres as a new "Greater Sage-Grouse Core Habitat Areas ACEC" for conservation of greater sage-grouse priority habitat.  *Id*. at ES-4.  The management of locatable minerals would be the same as under Alternative D.  *Id*. at 2-14.

240.     Under Alternative F, anthropogenic disturbances would be limited to one disturbance per 640 acres and cover 3% or less of sagebrush habitat.  *Id*. at 2-17.  It also provided that "seasonal restrictions if deemed necessary to prevent unnecessary or undue degradation" should be considered.  *Id*. at 2-28.

241.     Defendants selected Alternative D as their preferred alternative.  *See id*. at ES-3.

242.     The Bighorn SRMP/EIS did not mention PPMAs or PGMAs.

243.     AEMA and its member(s) submitted comments in response to the Bighorn SRMP/EIS.

244.     On July 8, 2014, AEMA submitted supplemental comments regarding the Bighorn SRMP/EIS.  In its supplemental comments, AEMA brought new information to Defendants' attention that called into question the scientific validity of the NTT Report, as well as information that updated the agencies on conservation efforts, and new information directly affecting the land use plan amendment process.

**F.     New Information That Became Available After Public Commenting Ended.**

245.    On August 28, 2014, AEMA wrote to Defendant Kornze pointing out that the

BLM's surface management regulations, 43 C.F.R. § 3809 *et seq*., provide adequate existing

regulatory mechanisms to address the impacts of mineral development on the greater sage-grouse

and its habitat.  *See* Letter from Laura Skaer, Executive Director, AEMA, to Neil Kornze,

Director, BLM (Aug. 28, 2014).  Thus, as demonstrated by AEMA, the additional restrictions

regarding locatable minerals were unnecessary.  *Id*. at 2.

246.    In September 2014, the FWS released the "Greater Sage-Grouse Range-wide

Mitigation Framework:  Version 1.0" ("2014 FWS Mitigation Framework"), which established a

mitigation goal of "achiev[ing] a net positive conservation."  2014 FWS Mitigation Framework

at 4.  The 2014 FWS Mitigation Framework included the concept "net conservation gain,"

defined as "the actual benefit or gain above baseline conditions, after deductions for impacts, in

habitat function or value to species covered by a mitigation program."  *Id*. at 22.

247.    On October 27, 2014, Director of the FWS, Daniel Ashe, sent a memorandum

titled "Greater Sage-Grouse:  Additional Recommendations to Refine Land Use Allocations in

Highly Important Landscapes" ("2014 FWS Memo") to Defendant Kornze and Defendant

Tidwell.  2014 FWS Memo at 1.  The 2014 FWS Memo was marked "Pre-Decisional; For

Internal Review Purposes Only.  Do Not Distribute."  *Id*. at Maps 1–4.

248.    The 2014 FWS Memo identified "a subset of priority habitat most vital to the

species persistence, within which [the FWS] recommend[s] the strongest levels of protection."

*Id*. at 1.  This subset of habitat purportedly represents "'strongholds' for the species that have

been noted and referenced by the conservation community as having the highest densities of the

species and other criteria important for the persistence of the species." *Id*. The 2014 FWS Memo labeled this subset as "essential to conservation" of the greater sage-grouse. *Id*. at 2.

249.    Defendants abdicated their statutory mandates by succumbing to the pressure applied by the FWS to utilize both the 2014 FWS Mitigation Framework and 2014 FWS Memo to impose unlawful management restrictions in the proposed land use plan amendments and final environmental impact statements.

250.    On November 21, 2014, the U.S. Geological Service ("USGS") released a report, titled "Conservation Buffer Distance Estimates for Greater Sage Grouse—A Review:  USGS Open File Report 2014-1239" (Mainer et al. 2014) ("2014 USGS Buffer Study").  The 2014 USGS Buffer Study interpreted the potential lek buffer distance minimum for surface disturbances category as 3.1 miles and the maximum as 5 miles.  2014 USGS Buffer Study at 14.

**G.    The Great Basin Proposed Land Use Plan Amendments And Final Environmental Impact Statements.**

251.    On May 29, 2015, Defendants published a "Notice of Availability of the Great Basin Region Greater Sage-Grouse Proposed Land Use Plan Amendments and Final Environmental Impact Statements for the Sub-Regions of Idaho and Southwestern Montana; Nevada and Northeastern California; Oregon; and Utah" in the *Federal Register*.  80 Fed. Reg. 30,711 (May 29, 2015).  Protests were due June 29, 2015.  *Id*. at 30,711, 30,714.

252.    No supplemental EISs for the Great Basin Region were completed, despite the new information, including the 2014 FWS Mitigation Framework, 2014 FWS Memo, and 2014 USGS Buffer Study.  AEMA and the public were not given an opportunity to review or comment on the new information before the Great Basin proposed land use plan amendments and final environmental impact statements were released in May 2015—six to eight months after the Defendants had the new information.

**Idaho and Southwestern Montana Proposed Land Use Plan Amendment and Final Environmental Impact Statement.**

253.    The "Idaho and Southwestern Montana Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement" ("ID/MT PLUPA/FEIS") significantly and materially departed from the ID/MT DLUPA/EIS, and contained new management restrictions that would unnecessarily and unlawfully constrain mineral exploration and development on federal lands—all without an opportunity for public participation.

254.    The ID/MT PLUPA/FEIS placed greater sage-grouse habitat into three categories: (a) Priority Habitat Management Areas ("PHMAs") (formerly PPMAs); (b) General Habitat Management Areas ("GHMAs") (formerly PGMAs); and (c) Important Habitat Management Areas ("IHMAs").  ID/MT PLUPA/FEIS at ES-4, 1-5.

255.    The ID/MT PLUPA/FEIS proposed to designate 5,192,600 acres as PHMAs.  *Id*. at ES-4.  PHMAs were determined to have "the highest value to maintaining sustainable [greater sage-grouse] populations."  *Id*.

256.    The ID/MT PLUPA/FEIS proposed to designate 3,153,300 acres as IHMAs.  *Id*. IHMAs would not be designated in southwestern Montana.  *Id*.  IHMAs would "provide a management buffer for PHMA[s] and connect patches of PHMA[s]."  *Id*.

257.    The ID/MT PLUPA/FEIS proposed to designate 2,760,500 acres as GHMAs.  *Id*. GHMAs would "require some special management to sustain [greater sage-grouse] populations." *Id*.

258.    The ID/MT PLUPA/FEIS also proposed to designate 3,842,900 acres as Sagebrush Focal Areas ("SFAs"), which are allegedly a special subset of PHMAs.  *Id*. at ES-7. SFAs were never mentioned in the ID/MT DLUPA/EIS.  Defendants introduced and proposed to designate SFAs for the first time in the ID/MT PLUPA/FEIS.  AEMA and the public were not

given notice that there would be a special designation of greater sage-grouse habitat in the form

of SFAs prior to the publication of the ID/MT PLUPA/FEIS.

259.    According to Defendants, the SFAs were derived from greater sage-grouse

"stronghold" areas, as described in the 2014 FWS Memo.  *Id*. at ES-7, 2-21.  Defendants

proposed to designate SFAs, because the FWS determined that these areas "include

characteristics such as existing high-quality sagebrush habitat; highest breeding densities; have

been identified as essential to conservation and persistence of the species; represent a

preponderance of current federal ownership and in some cases are adjacent to protected areas

that serve to anchor the conservation importance of the landscape."  *Id*. at 2-2.  Yet, Defendants

did not release the 2014 FWS Memo to the public until after the release of the ID/MT

DLUPA/EIS—well after the commenting period for the ID/MT DLUPA/EIS had ended.  *Id*. at

ES-7 n.4.  AEMA and the public were not given an opportunity to review or comment on the

2014 FWS Memo or SFAs.

260.    The proposed designation of SFAs changed the proposed action immensely.

SFAs not only covered over 3.8 million acres of PHMAs, but would require additional onerous

management restrictions.  *Id*. at 2-2.  For instance, the ID/MT PLUPA/FEIS recommended that

SFAs (3,842,900 acres) be withdrawn from operation of the Mining Law.  *Id*. at 2-2, 2-21, 2-54,

2-96–2-97.  Thus, over 3.8 million acres would be off-limits to mineral exploration and

development pending a validity examination.

261.    Moreover, the additional management restrictions, including the recommended

withdrawal, would apply to the habitat and non-habitat portions of the SFAs, alike.  *Id*. at 2-59

n.2 ("PHMA and GHMA may contain non-habitat, but management direction would not apply to

those areas of non-habitat.  *However, management direction would apply to all areas within*

*SFAs including non-habitat*." (emphasis added)).  Thus, Defendants conceded that SFAs included areas of non-habitat.  This means the additional, and purportedly necessary, management restrictions in SFAs would not be protecting the greater sage-grouse or its habitat, but *would* unnecessarily restrict resource uses like mining without justification.

262.    Despite this drastic change from the ID/MT DLUPA/EIS, Defendants concluded that SFAs and the additional restrictions were "qualitatively within the spectrum of alternatives analyzed."  *Id*. at 2-2.  Thus, Defendants did not complete a supplemental EIS or provide an opportunity for the public to review and comment on the 2014 FWS Memo or SFAs.

263.    The ID/MT PLUPA/FEIS purported to blend Alternatives D and E to create the proposed action, *i.e.*, a land use plan amendment.  *See id*. at 2-1.  However, the proposed action would be more restrictive than either alternative.  The ID/MT PLUPA/FEIS significantly and materially differed from the alternatives described in the ID/MT DLUPA/EIS.  *See id*.

264.    The ID/MT PLUPA/FEIS proposed to enforce a 3% disturbance cap on activities as follows:

> [I]f the 3[%] anthropogenic disturbance cap is exceeded on lands (regardless of land ownership) within [greater sage-grouse] PHMA (or IHMA in Idaho) . . . in any given [biologically significant unit ("BSU")], then no further discrete anthropogenic disturbances (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights, etc.) will be permitted by BLM within [greater sage-grouse] PHMAs and IHMAs in any given BSU until the disturbance has been reduced to less than the cap.

*Id*. at 2-29; *see id*. at 2-59 (Describing a USFS standard that proposed:  "In PHMA, IHMA, and SFA, do not issue new discretionary written authorizations unless all existing discrete anthropogenic disturbances cover less than 3[%] of the total [greater sage-grouse] habitat within the BSU and the proposed project area, regardless of ownership, and the new use will not cause

exceedance of the 3[%] cap . . .").  Idaho and Montana each had specific variations of the 3% disturbance cap.

265.    In Idaho, "if the 3[%] disturbance cap is exceeded on all lands (regardless of land ownership) within a *proposed project analysis area . . .* in a PHMA (or IHMA . . .), then no further anthropogenic disturbance will be permitted by BLM until disturbance in the *proposed project analysis area* has been reduced to maintain the area under the cap (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights, etc.)."  *Id*. at 2-30 (all emphasis added).

266.    In Montana, "if the 3[%] disturbance cap is exceeded on lands (regardless of land ownership) or *if anthropogenic disturbance and habitat loss associated with conversion to agricultural tillage or fire exceed 5% within a project analysis area* in PHMAs, then no further discrete anthropogenic disturbances (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights, etc.) will be permitted by BLM within PHMA in a *project analysis area* until the disturbance has been reduced to less than the cap."  *Id*. (all emphasis added).

267.    The ID/MT PLUPA/FEIS also proposed to convert Montana's 3% disturbance cap to a 5% cap if the State of Montana's conservation plan would be comparable to the Wyoming Governor's conservation plan.  *See id*.  Although it seemed like mineral exploration and development would not be precluded by the 3% disturbance cap, it is unclear whether the 3% disturbance cap would preclude other necessary disturbances associated with mining, such as roads.

268.    Yet, the ID/MT PLUPA/FEIS contradicted the basis for the 3% disturbance cap:

*Loss of habitat from anthropogenic disturbance is not a major issue in Idaho . . .* , that does not mean that measurement and evaluation of a disturbance cap can be

arbitrary, or any less supportable, or inconsistent with the scientific research available if that research can help inform the conditions and evaluation appropriately.

*Id*. (emphasis added).  This statement exemplifies the arbitrariness of Defendants' proposal to

apply management restrictions across all greater sage-grouse habitat in Idaho without

considering the localized nature of uses (like mining) purportedly causing "surface disturbance,"

or the purported impacts of those uses.

269.    The ID/MT PLUPA/FEIS proposed a mining facility density cap as follows:

Subject to applicable laws and regulations and valid existing rights, if the average density of one energy and mining facility per 640 acres (the density cap) is exceeded on all lands (regardless of land ownership) in the [PHMA] within a proposed project analysis area, then no further disturbance from energy or mining facilities will be permitted by BLM:  (1) until disturbance in the proposed project analysis area has been reduced to maintain the limit under the cap; or (2) unless the energy or mining facility is co-located into an existing disturbed area.

*Id*.

270.    The ID/MT PLUPA/FEIS proposed to apply uniform lek buffer-distances on

activities as follows:  "In undertaking BLM management actions, and consistent with valid and

existing rights and applicable law in authorizing third-party actions, the BLM will apply the lek

buffer-distances identified in the [2014 USGS Buffer Study] . . . ."  *Id*. at 2-34; *id*. at DD-1

(indicating that the lek buffer-distance would restrict "surface disturbance (continuing human

activities that alter or remove natural vegetation) within 3.1 miles of leks").

271.    Defendants admit the uniform lek buffer-distances were derived from the 2014

USGS Buffer Study.  *Id*. at 2-34, DD-1.  Yet, the 2014 USGS Buffer Study was not released to

the public until after the release of the ID/MT PLUPA/FEIS—well after the comment period on

the ID/MT DLUPA/EIS had ended.  *Id*. at 1-1, 1-10.  AEMA and the public were not given an

opportunity to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

272.    Despite this drastic change from the ID/MT DLUPA/EIS, Defendants concluded that the new, uniform lek buffer-distances were "within the range of alternatives analyzed."  *Id*. at 2-3.  Thus, Defendants did not complete a supplemental EIS or provide an opportunity for the public to review or comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

273.    The ID/MT PLUPA/FEIS proposed to apply a net conservation gain standard as follows:

> In all [greater sage-grouse habitat], in undertaking BLM management actions, and, consistent with valid existing rights and applicable law, in authorizing third-party actions that result in habitat loss and degradation . . . , the BLM will require and ensure mitigation that provides a net conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation.  This will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.

*Id*. at 2-34; *see id*. at J-1; *see id*. at 2-59 (Describing a proposed USFS standard that provided: "In PHMA, SFA, and IHMA, only allow new authorized land uses if the residual impacts to [greater sage-grouse] or their habitats are fully offset by compensatory mitigation projects that provide a net conservation gain to the species, which will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.").

274.    The ID/MT PLUPA/FEIS defined "net conservation gain" as "[t]he actual benefit or gain *above* baseline conditions."  *Id*. at 8-16 (emphasis added).  "Baseline" is defined as:

> The pre-existing condition of a defined area and/or resource that can be quantified by an appropriate metric(s).  During environmental reviews, the baseline is considered the affected environment that exists at the time of the review's initiation, and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.

*Id*. at 8-7.  The "net conservation gain" standard replaced "no net unmitigated loss" as used in the ID/MT DLUPA/EIS and represented a material shift.

275.    Interestingly, the ID/MT PLUPA/FEIS failed to attribute the net conservation gain standard to the 2014 FWS Mitigation Framework, which was released after the ID/MT DLUPA/EIS.  The 2014 FWS Mitigation Framework established and defined net conservation gain.  2014 FWS Mitigation Framework at 22 (defining "net conservation gain" as "the actual benefit or gain above baseline conditions . . .").  The definition of "net conservation gain" in the ID/MT PLUPA/FEIS was nearly identical to the definition in the 2014 FWS Mitigation Framework.  AEMA and the public were not given an opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

276.    The purported purpose of requiring net conservation gain was to "assur[e] that proposed anthropogenic activities, when approved and implemented will not result in long-term degradation of [greater sage-grouse] habitat or population and will have a net conservation benefit to the species."  ID/MT PLUPA/FEIS at J-18; *see also id*. at 2-34, J-1.

277.    According to Defendants, the "net conservation gain" standard fit squarely within the "overall landscape-scale goal" to "enhance, conserve, and restore [greater sage-grouse] and its habitat.  *Id*. at 2-4.  However, net conservation gain was a drastic change, and flipped the previous standard of "no net unmitigated loss" on its head.

278.    Consequently, a party with a locatable mining operation would be required to improve greater sage-grouse habitat, which would require more than FLPMA's standard of preventing unnecessary or undue degradation or the USFS's standard of minimizing adverse environmental impacts.  Therefore, mining operations would be subjected to a higher standard that is unlawful under the governing statutes.

279.   Thus, the proposed net conservation gain standard conflicts with FLPMA's unnecessary or undue degradation standard and the USFS regulation to minimize, where feasible, adverse environmental impacts on surface resources.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5; 36 C.F.R. § 228.8.  Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard.  Thus, Defendants would exceed their statutory and regulatory authority by applying the net conservation gain standard to mineral development.

280.   The ID/MT PLUPA/FEIS also proposed the following USFS standard for locatable minerals:  "In PHMA, IHMA and SFA, only approve Plans of Operation if they include mitigation to protect [greater sage-grouse] and their habitats, consistent with the rights of the mining claimant as granted by the [Mining Law]."  ID/MT PLUPA/FEIS at 2-72.

281.   The ID/MT PLUPA/FEIS did not propose to designate any new ACECs or zoological areas.  But as mentioned earlier, the ID/MT PLUPA/FEIS did propose to designate SFAs.

282.   Despite these significant and material changes, new circumstances, and new information, Defendants arbitrarily determined that they were not required to prepare a supplemental EIS.

283.   In addition, the ID/MT PLUPA/FEIS updated information regarding plans of operation and notices for locatable mining operations.  *Id*. at 3-109.  As of 2015, and according to Defendants, the Idaho districts have "authorized" 15 plans of operations with none pending, and "authorized" ten notices with three pending.  *Id*.; *see supra* 27–28 n.1.  This updated information illustrates the disproportionate size of the recommended withdrawal of over 3.8 million acres of mineral estate, within SFAs, compared to the small impact of the approved

mining operations.  Moreover, the updated information demonstrated that the proposed size of the recommended withdrawal was not justified by the number of existing or pending mining operations.

284.    Further, the ID/MT PLUPA/FEIS indicated that "[l]ocatable mineral resources are associated with geological formations or units they are found within, which are typically localized and do not encompass large areas." *Id*. at 5-170.  Interestingly, the ID/MT PLUPA/FEIS forecasted in the next 20 years that less than 250 acres, in the planning area, would be disturbed by locatable mineral development.  *Id*. at 5-171.  As such, Defendants concluded: "Since all areas (250 acres) that are forecast to be disturbed in the next 20 years are on claims with valid existing rights which are exempt from the proposed withdrawals, cumulative impacts on locatable minerals *are expected to be negligible*." *Id*. (emphasis added).  Defendants' conclusion again illustrates the disproportionate size of the recommended withdrawal of over 3.8 million acres compared to the projected mining related disturbance over the next 20 years. Moreover, the total approved disturbance and projected disturbance fail to justify or support the proposed recommendation to make such a large withdrawal.

285.    The ID/MT PLUPA/FEIS also provided, regarding locatable mineral operations, that:

> Applying mitigation measures required to prevent unnecessary or undue degradation . . . , as well as reasonable and appropriate [Reasonably Foreseeable Development Scenarios ("RDFs")] consistent with applicable law . . . , and management actions outlined in Chapter 2 to plans of operations could directly impact locatable mineral operations by increasing costs, causing delays, and frustrating attempts to develop the resource.  These RDFs include such standards as noise restrictions, height limitations on structures, design requirements, water development standards, remote monitoring requirements, and reclamation standards.  Applying these requirements may impact locatable mineral operations by increasing costs, causing delays, and frustrating attempts to develop the resource.

*Id.* at 4-250.

286.    Given the updated information and 20-year projection, the ID/MT PLUPA/FEIS was unable to reasonably support or justify the proposed recommendation to withdraw over 3.8 million acres.

287.    On June 29, 2015, AEMA timely protested the ID/MT PLUPA/FEIS.

288.    By letter dated September 15, 2015, Defendants responded to AEMA's protest, dismissing it in part and denying it in part.

**Nevada and Northeastern California Proposed Land Use Plan Amendment and Final Environmental Impact Statement.**

289.    The "Nevada and Northeastern California Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement" ("NV/CA PLUPA/FEIS") significantly and materially departed from the NV/CA DLUPA/EIS, and contained draft management actions that would unnecessarily and unlawfully constrain mineral exploration and development on federal lands—all without an opportunity for public participation.

290.    The NV/CA PLUPA/FEIS placed greater sage-grouse habitat into three categories:  (a) PHMAs (formerly PPMAs); (b) GHMAs (formerly PGMAs); and (c) other habitat management areas ("OHMAs") (formerly unmapped habitat).  NV/CA PLUPA/FEIS at ES-4, 1-5.

291.    The NV/CA PLUPA/FEIS proposed to designate 10,296,100 acres as PHMAs. *Id.* at ES-4.  PHMAs were "identified as having the highest value to maintaining sustainable [greater sage-grouse] populations." *Id.*

292.    The NV/CA PLUPA/FEIS proposed to designate 6,516,700 acres as GHMAs. *Id.* GHMAs would require "some special management . . . to sustain [greater sage-grouse] populations." *Id.*

293.   The NV/CA PLUPA/FEIS proposed to designate 6,498,000 acres as OHMAs.  *Id.*
OHMAs were "identified as unmapped habitat . . . that are within the planning area and contain
seasonal or connectivity habitat areas."  *Id.*

294.   These three habitat designations/land allocations would limit or minimize
resource uses on over 22 million acres of federal lands in Nevada and California.  *Id.* at ES-16.

295.   The NV/CA PLUPA/FEIS also proposed to designate 2,797,400 acres as SFAs.
*Id.* at ES-7.  SFAs were never mentioned in the NV/CA DLUPA/EIS.  Defendants introduced
and proposed to designate SFAs for the first time in the NV/CA PLUPA/FEIS.  *Id.* at 1-1.
AEMA and the public were not given notice that there would be a special designation of greater
sage-grouse habitat in the form of SFAs prior to the NV/CA PLUPA/FEIS.

296.   According to Defendants, SFAs were derived from greater sage-grouse
"stronghold" areas, as described in the 2014 FWS Memo.  *Id.* at 1-6, 2-11.  Defendants proposed
to designate SFAs, because the FWS determined that these areas "include characteristics such as
existing high-quality sagebrush habitat; highest breeding densities; have been identified as
essential to conservation and persistence of the species; represent a preponderance of current
federal ownership and in some cases are adjacent to protected areas that serve to anchor the
conservation importance of the landscape."  *Id.* at 2-2.  Yet, Defendants did not release the 2014
FWS Memo to the public until after the release of the NV/CA DLUPA/EIS—well after
commenting period for the NV/CA DLUPA/EIS had ended.  *Id.* at 1-6.  AEMA and the public
were not given an opportunity to review or comment on the 2014 FWS Memo or SFAs.

297.   The proposed designation of SFAs changed the proposed action immensely.
SFAs not only covered over 2.7 million acres, but would require additional management
restrictions.  *Id.* at 2-11–2-12.  For instance, the NV/CA PLUPA/FEIS recommended that SFAs

(2,797,400 acres) be withdrawn from operation of the Mining Law.  *Id*. at ES-14, 2-11, 2-25.

Thus, over 2.7 million acres would be off-limits to mineral exploration and development pending

a validity exam.  *See id*. at 4-308, 4-311, 5-223.

298.    Moreover, the additional management restrictions, including the recommended

withdrawal, would apply to both habitat and non-habitat portions of the SFAs, alike.  *Id*. at 2-56

n.5 ("PHMAs and GHMAs may contain non-habitat, but management direction would not apply

to those areas of non-habitat.  However, management direction would apply to all areas within

SFAs including non-habitat.").  Thus, Defendants conceded that SFAs include non-habitat.  This

means the additional, and purportedly necessary, management restrictions in SFAs would not be

protecting the greater sage-grouse or its habitat, but would unnecessarily restrict resource uses

like mining.

299.    Despite this drastic change from the NV/CA DLUPA/EIS, Defendants concluded

that new SFAs and the additional restrictions were "qualitatively within the spectrum of

alternatives analyzed."  *Id*. at 2-3.  Thus, Defendants did not prepare a supplemental EIS or

provide an opportunity for the public to review and comment on the 2014 FWS Memo or SFAs.

300.    The NV/CA PLUPA/FEIS purported that the proposed action, *i.e.*, land use plan

amendment, was a variation of Alternative D in the NV/CA DLUPA/EIS.  *Id*. at 1-33, 1-34.

However, the proposed action was considerably more restrictive.  It also significantly and

materially differed from the alternatives described in the NV/CA DLUPA/EIS.

301.    The NV/CA PLUPA/FEIS proposed to place a 3% disturbance cap on activities as

follows:  "Manage discrete anthropogenic disturbances, whether temporary or permanent, so

they cover less than 3[%] of[:]  1) . . . BSUs; total PHMA area associated with a [greater sage-

grouse] population area[] and 2) in a proposed project analysis area."  *Id*. at 2-20; *see id*. at 2-60

(Describing a proposed USFS standard that provided:  "In PHMAs and SFAs, do not issue new discretionary written authorizations unless all existing discrete anthropogenic disturbances cover less than 3% of the total [greater sage-grouse] habitat within the [BSU] and the proposed project area, regardless of ownership, and the new use will not cause exceedance of the 3% cap . . . .").

302.    The NV/CA PLUPA/FEIS provided that the 3% disturbance cap would be calculated as follows:

> If the 3[%] human disturbance cap is exceeded on all lands (regardless of ownership) in PHMAs in any given BSU, then no further discrete human disturbances (subject to applicable laws and regulations, such as the [Mining Law], and valid existing rights) will be permitted, by BLM within [greater sage-grouse] PHMA in any given BSU until the disturbance has been reduced to less than the cap . . . .

> If the 3[%] disturbance cap is exceeded on all lands (regardless of land ownership) within a proposed project analysis area in a PHMA, then no further anthropogenic disturbance will be permitted by BLM until disturbance in the proposed project analysis area has been reduced to maintain the area under the cap (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights . . .).

*Id*. at 2-21.  In Nevada, "where a biological analysis indicates a net conservation gain to the species[,]" a project would not be subject to a the 3% disturbance cap.  *Id*. at 2-21.  Such an exception would need to be approved by the authorized officer, with the concurrence of the BLM state director.  *Id*. at 2-21; *see id*. at 2-60 (similar exception and approval requirement on National Forest System lands).

303.    In California, the NV/CA PLUPA/FEIS proposed a mining facility density cap as follows:

> For BLM land in the state of California only, subject to applicable laws and regulations and valid existing rights, if the average density of one energy and mining facility per 640 acres (the density cap) is exceeded on all lands (regardless of land ownership) in the PHMA within a proposed project analysis area, then no further disturbance from energy or mining facilities will be permitted by BLM: (1) until disturbance in the proposed project analysis area has been reduced to

maintain the limit under the cap; or (2) unless the energy or mining facility is co-located into an existing disturbed area.

*Id*. at 2-22.

304.    The NV/CA PLUPA/FEIS proposed to apply uniform lek buffer-distances on activities as follows:  "In management actions, and consistent with valid and existing rights and applicable law in authorizing third-party actions, the BLM will apply the lek buffer-distances identified in the [2014 USGS Buffer Study] . . . ."  *Id*. at 2-22; *see id*. at B-1 (indicating that the lek buffer-distance would restrict "surface disturbance (continuing human activities that alter or remove the natural vegetation) within 3.1 miles of leks"); *see id*. at 2-61 (Describing a proposed USFS standard that provided:  "During lekking (March 1 to April 30) restrict surface disturbing and disruptive activities . . . within a buffer distance[] of 3.1 miles." (footnote omitted))  These uniform lek buffer-distances would be applied in PHMAs and GHMAs.  *See id*. at 2-22, 2-24.

305.    Defendants admit the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id*. at 1-6, 2-3, 2-61 n.6.  Yet, the 2014 USGS Buffer Study was not released to the public until after the release of the NV/CA DLUPA/EIS—well after the comment period for the NV/CA DLUPA/EIS had ended.  *Id*. at 1-1, 1-6.  AEMA and the public were not given an opportunity to review or comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

306.    Despite this drastic change from the NV/CA DLUPA/EIS, Defendants concluded that the new, uniform lek buffer-distances were "qualitatively within the spectrum of alternatives analyzed."  *Id*. at 2-4.  Thus, Defendants did not complete a supplemental EIS or provide an opportunity for the public to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

307. The NV/CA PLUPA/FEIS proposed to apply a net conservation gain standard as follows: "The project/activity with associated mitigation . . . would result in an overall net conservation gain to [greater sage-grouse] . . ." in PHMAs and GHMAs. *Id*. at 2-22, 2-23; *see also id*. at 2-26, 2-89, 2-60–2-61 (Describing a proposed USFS standard that provided: "In PHMAs, GHMAs, and SFAs, only allow new authorized land uses if the residual impacts to [greater sage-grouse] or their habitats are fully offset by compensatory mitigation projects that provide a net conservation gain to the species, subject to valid existing rights, which will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions").

308. The NV/CA PLUPA/FEIS defined "net conservation gain" as "[t]he actual benefit or gain above baseline conditions." *Id*. at 8-25. "Baseline" was defined as:

> The pre-existing condition of a defined area and/or resource that can be quantified by an appropriate metric(s). During environmental reviews, the baseline is considered the affected environment that exists at the time of the review's initiation, and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.

*Id*. at 8-8. The "net conservation gain" standard replaced "no unmitigated loss" as used in the NV/CA DLUPA/EIS and represented a material shift.

309. Interestingly, the NV/CA PLUPA/FEIS failed to attribute the net conservation gain standard to the 2014 FWS Mitigation Framework, which was released after the NV/CA DLUPA/EIS. The 2014 FWS Mitigation Framework established and defined net conservation gain as "the actual benefit or gain above baseline conditions . . . ." 2014 FWS Mitigation Framework at 22. The definition of "net conservation gain" in the NV/CA PLUPA/FEIS was nearly identical to the definition in the 2014 FWS Mitigation Framework. AEMA and the public

were not given an opportunity to review or comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

310.    According to Defendants, the "net conservation gain" standard fit squarely within the "overall landscape-scale goal" to "enhance, conserve, and restore [greater sage-grouse] and its habitat.  NV/CA PLUPA/FEIS at 2-5.  However, the net conservation gain standard was a drastic change, and flipped "no unmitigated loss" on its head.

311.    Consequently, a party with a locatable mining operation would be required to improve greater sage-grouse habitat, which would require more than FLPMA's standard of preventing unnecessary or undue degradation or the USFS's standard of minimizing adverse environmental impacts.  Therefore, mining operations would be subjected to a higher standard that is unlawful under the governing statute and regulations.

312.    Thus, the proposed net conservation gain standard conflicts with FLPMA's unnecessary or undue degradation standard and the USFS regulation to minimize, where feasible, adverse environmental impacts on surface resources.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5; 36 C.F.R. § 228.8.  Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard.  Thus, Defendants would exceed their statutory and regulatory authority by applying the net conservation gain standard to mineral development.

313.    The NV/CA PLUPA/FEIS also proposed the following USFS standard for locatable minerals:  "In PHMAs, GHMAs, and SFAs, approve plans of operation if they include mitigation to protect [greater sage-grouse] and their habitats, consistent with the rights of the mining claimants as granted by the [Mining Law]."  NV/CA PLUPA/FEIS at 2-74.

314.   The NV/CA PLUPA/FEIS did not propose to designate any new ACECs or zoological areas.  *Id*. at 2-484.  But as mentioned earlier, the NV/CA PLUPA/FEIS did propose to designate SFAs.

315.   Despite these significant and material changes, new circumstances, and new information, Defendants arbitrarily determined that they were not required to prepare a supplemental EIS.

316.   Overall, the NV/CA PLUPA/FEIS proposed to provide "a layered management approach that offers the highest level of protection for the [greater sage-grouse] in the most valuable habitat."  *Id*. at 2-16.  Thus, NV/CA PLUPA/FEIS elevated the conservation of the greater sage-grouse over all other resource uses.

317.   In regard to the proposed recommended withdrawal, the NV/CA PLUPA/FEIS minimally discussed its effect on mineral exploration and development.  It provided that the recommended withdrawal would further limit opportunities for mineral development.  *Id*. at 2-481.  But, because Defendants asserted that there are "no active mines within the area recommended for withdrawal[,]" they reasoned that the impact would be less.  *Id*. at 2-481.  However, this did not justify or support Defendants' proposed recommendation to make such a large withdrawal.

318.   In regard to the proposed restrictions on mining, the NV/CA PLUPA/FEIS indicated that the restrictions could reduce the availability of mineral resources, reduce access, and make mineral development "economically infeasible."  *Id*. at 2-481.  Purportedly, there are 12 existing mines located within PHMAs that would be affected.  *Id*. at 4-308.

319.   In addition, the NV/CA PLUPA/FEIS updated information regarding plans and notices for mining operations.  It indicated that there have been approximately 6,727 notices and

576 plans of operation submitted in all of Nevada.  *Id*. at 3-141.  There have been approximately

1,012 notices and 944 plans of operation submitted in all of California.  *Id*. at 3-141.  On

National Forest System lands, the NV/CA PLUPA/FEIS provided that mineral exploration and

development have been fairly constant, though there has been more exploration than

development.  *Id*. at 3-142.  Based on this information, Defendants projected that an increased

interest in developing minerals exists, especially in Nevada.  However, this minimal information

and projection fail to justify or support the proposed recommendation to withdraw over 2.7

million acres.

320.   Despite the updated information, the NV/CA PLUPA/FEIS fails to support its

proposed recommendation to make a large withdrawal.

321.   On June 29, 2015, AEMA timely submitted its protest on the NV/CA

PLUPA/FEIS.

322.   By letter dated September 15, 2015, Defendants responded to AEMA's protest,

dismissing it in part and denying it in part.

**Oregon Proposed Land Use Plan Amendment and Final Environmental Impact
Statement.**

323.   The "Oregon Greater Sage-Grouse Proposed Resource Management Plan

Amendment and Final Environmental Impact Statement" ("OR PLUPA/FEIS") significantly and

materially departed from the OR DLUPA/EIS, and its new management restrictions would

unnecessarily and unlawfully constrain mineral exploration and development on federal lands—

all without an opportunity for public participation.

324.   The OR PLUPA/FEIS would only affect BLM-administered lands.

325.   The OR PLUPA/FEIS placed greater sage-grouse habitat into two categories:  (a)

PHMAs (formerly PPMAs); and (b) GHMAs (formerly PGMAs).  OR PLUPA/FEIS at 1-1.

326.    The OR PLUPA/FEIS proposed to designate 4,589,568 acres as PHMAs.  *Id*. at 2-18.  PHMAs were "identified as having the highest value to maintaining sustainable [greater sage-grouse] populations."  *Id*. at ES-5.

327.    The OR PLUPA/FEIS proposed to designate 5,628,628 acres as GHMAs.  *Id*. at 2-18.  GHMAs would "require some special management to sustain [greater sage-grouse] populations."  *Id*. at ES-5.

328.    The OR PLUPA/FEIS also proposed to designate 1,929,580 acres as SFAs.  *Id*. at ES-5, 2-2, 2-18.  SFAs were never mentioned in the OR DLUPA/EIS.  Defendants introduced and proposed to designate SFAs for the first time in the OR PLUPA/FEIS.  *Id*. at 1-1, 2-13–2-14.  In the OR DLUPA/EIS, "focal areas" were mentioned, but were not defined as land allocations.  In fact, the proposed management of the proposed SFAs differed greatly from the draft "focal areas" and was more restrictive in nature.  *Id*. at 1-4, 2-1–2-2, 2-13–2-14.  In the OR PLUPA/FEIS, "focal areas" were renamed "strategic areas."  *Id*. at 2-5.  AEMA and the public were not given notice that there would be a special designation of greater sage-grouse habitat in the form of SFAs prior to the OR PLUPA/FEIS.

329.    According to Defendants, the SFAs were derived from greater sage-grouse "stronghold" areas, as described in the 2014 FWS Memo.  *Id*. at ES-5.  Defendants proposed to designate SFAs, because the FWS determined these areas "include characteristics such as existing high-quality sagebrush habitat; highest breeding densities; have been identified as essential to conservation and persistence of the species; represent a preponderance of current federal ownership and in some cases are adjacent to protected areas that serve to anchor the conservation importance of the landscape."  *Id*. at 2-2.  Yet, Defendants did not release the 2014 FWS Memo to the public until after the release of the OR DLUPA/EIS—well after the

commenting period for the OR DLUPA/EIS had ended.  *Id.* at ES-5, 2-1–2-2, 2-13–2-14.

AEMA and the public were not given an opportunity to review or comment on the 2014 FWS

Memo or the SFAs.

330.    The proposed designation of SFAs changed the proposed action immensely.

SFAs not only covered over 1.8 million acres, but would require additional management

restrictions.  *Id.* at 2-2, 2-18, 2-32.  For instance, the OR PLUPA/FEIS recommended that SFAs

(1,835,800 acres) be withdrawn from operation of the Mining Law.  *Id.* at 2-2, 2-178.  Thus, over

1.8 million acres would be off-limits to mineral exploration and development pending a validity

exam.  *Id.* at 4-336.

331.    Despite this drastic change from the OR DLUPA/EIS, Defendants concluded that

the new SFAs and the additional restrictions were "qualitatively within the spectrum of

alternatives analyzed" in the OR DLUPA/EIS.  *Id.* at 2-2; *see also id.* at 2-7.  Thus, Defendants

did not prepare a supplemental EIS or provide an opportunity for AEMA and the public to

review or comment on the 2014 FWS Memo or the SFAs.

332.    The OR PLUPA/FEIS asserted that the proposed action, *i.e.*, land use plan

amendment, was a variation of the preferred alternative, Alternative D, from the OR

DLUPA/EIS.  *Id.* at 2-13.  However, the proposed action was considerably more restrictive.  It

also significantly and materially differed from the alternatives described in the OR DLUPA/EIS.

333.    The OR PLUPA/FEIS proposed to place a 3% disturbance cap on activities as

follows:

> If the anthropogenic disturbance cap, not to exceed 1% increase per decade, is
> exceeded on lands (regardless of landownership) within [greater sage-grouse
> PHMAs] in the affected Oregon [Priority Areas for Conservation ("PAC")], then
> no further discrete anthropogenic disturbances (subject to applicable laws and
> regulations, such as the [Mining Law], valid existing rights, etc.) will be permitted

by BLM within [greater sage-grouse PHMAs] in the affected Oregon PAC until the disturbance has been reduced to less than the cap.

If the 3% disturbance cap, not to exceed 1% increase per decade, is exceeded on all lands (regardless of landownership) within a *proposed project analysis area* in [PHMAs], then no further anthropogenic disturbance will be permitted by BLM until disturbance in the proposed project analysis area has been reduced to maintain the area under the cap (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights, etc.).

*Id*. at 2-18 (emphasis in original); *but see id*. at 5-93 ("The disturbance cap in the [OR PLUPA/FEIS] would not be applied to prevent locatable mineral entry projects, but any locatable mineral entry would be considered as disturbance under the cap.  When restrictions within the [OR PLUPA/FEIS] are added to these conservation actions, this would result in a net conservation gain to [greater sage-grouse] habitat and populations . . . .").

334.    The OR PLUPA/FEIS proposed a mining facility density cap as follows:

Subject to applicable laws and regulations and valid existing rights, if the average density of one energy and mining facility per 640 acres (the density cap) is exceeded on all lands (regardless of landownership) in the [PHMAs] within a proposed project analysis area, then no further disturbance from energy or mining facilities will be permitted by BLM:  (1) until disturbance in the proposed project analysis area has been reduced to maintain the limit under the cap; or (2) unless the energy or mining facility is co-located into an existing disturbed area . . . .

*Id*. at 2-19.

335.    The OR PLUPA/FEIS proposed to apply uniform lek buffer-distances on activities as follows:

Apply buffers and seasonal restrictions . . . to all occupied or pending leks in PHMA and GHMA to avoid direct disturbance to [greater sage-grouse].  In undertaking BLM management actions, and consistent with valid and existing rights and applicable law in authorizing third-party actions, the BLM will apply the lek buffer-distances identified in the [2014 USGS Buffer Study] . . . .

*Id*. at 2-19; *see id*. at S-1 (indicating that the lek buffer-distance would restrict "surface disturbance (continuing human activities that alter or remove natural vegetation) within 3.1 miles of leks").

336.    According to Defendants, the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id*. at 1-4.  Yet, the 2014 USGS Buffer Study was not released to the public until after the release of the OR DLUPA/EIS—well after the commenting period for the OR DLUPA/EIS had ended.  *Id*. at 1-4, 2-3.  AEMA and the public were not given an opportunity to review or comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

337.    Despite this drastic change from the OR DLUPA/EIS, Defendants concluded that the new, uniform lek buffer-distances were "within the range of alternatives analyzed" in the OR DLUPA/EIS.  *Id*. at 2-3.  Thus, Defendants did not prepare a supplemental EIS or provide an opportunity for AEMA and the public to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

338.    The OR PLUPA/FEIS proposed to apply a net conservation gain standard on activities as follows:

> In undertaking BLM management actions, and, consistent with valid existing rights and applicable law, in authorizing third party actions that result in habitat loss and degradation, the BLM will require and ensure mitigation that provides a net conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation.  This will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.

*Id*. at 2-19.  The OR PLUPA/FEIS defined "net conservation gain" as "[t]he actual benefit or gain above baseline conditions.  Actions which results in habitat loss and degradation include

those identified as threats which contribute to [greater sage-grouse] disturbance as identified by

the [FWS] in its 2010 listing decision . . . ." *Id*. at 8-28. "Baseline" was defined as:

> The pre-existing condition of a defined area and/or resource that can be quantified
> by an appropriate metric(s). During environmental reviews, the baseline is
> considered the affected environment that exists at the time of the review's
> initiation, and is used to compare predictions of the effects of the proposed action
> or a reasonable range of alternatives.

*Id*. at 8-8. The "net conservation gain" standard replaced the "no net loss, net benefit" standard

as used in the OR DLUPA/EIS. *Id*. at 2-4.

339.    Interestingly, the OR PLUPA/FEIS failed to attribute the net conservation gain

standard to the 2014 FWS Mitigation Framework, which was released after the OR DLUPA/EIS.

The 2014 FWS Mitigation Framework established and defined net conservation gain as "the

actual benefit or gain above baseline conditions . . . ." 2014 FWS Mitigation Framework at 22.

The definition of "net conservation gain" in the OR PLUPA/FEIS was nearly identical to the

definition in the 2014 FWS Mitigation Framework. AEMA and the public were not given an

opportunity to review or comment on the 2014 FWS Mitigation Framework or the net

conservation gain standard.

340.    According to Defendants, the "net conservation gain" standard fit squarely within

the "overall landscape goal which is to enhance, conserve, and restore [greater sage-grouse] and

its habitat." OR PLUPA/FEIS at 2-4.

341.    However, a party with a locatable mining operation would now be required to

improve greater sage-grouse habitat, which would require more than FLPMA's standard of

preventing unnecessary or undue degradation. *See id*. at 2-32 ("To the extent consistent with the

rights of a mining claimant under existing laws and regulations, limit surface disturbance, and

provide recommendations for net conservation gain of [greater sage-grouse] habitat.").

Therefore, mining operations would be subjected to a higher standard that is unlawful under the governing statute.

342.    Thus, the proposed net conservation gain standard conflicts with FLPMA's unnecessary or undue degradation standard.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5.  Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard.  Thus, Defendants would exceed their statutory and regulatory authority by applying the net conservation gain standard to mineral development.

343.    The OR PLUPA/FEIS did not propose to designate any new ACECs.  OR PLUPA/FEIS at 2-44, 4-280.  However, three existing ACECs and 15 existing Research Natural Areas would be identified as key for greater sage-grouse conservation.  *Id*. at 2-44, 4-280.  The OR PLUPA/FEIS did propose to designate SFAs.

344.    As previously mentioned, the OR PLUPA/FEIS converted "focal areas" into "strategic areas" as "local options for restoration activities . . . ."  *Id*. at 2-44, 2-47.  There would still be three types of strategic areas:  (a) climate change consideration areas; (b) high-density breeding areas; and (c) restoration opportunity areas.  *Id*. at 2-47–2-48.  These strategic areas would cover 3,778,694 acres in PHMAs and 1,391,178 acres in GHMAs.  *Id*. at 2-44.  These strategic areas would not have any associated management actions.  *Id*.  Strangely, the SFAs overlay some of these strategic areas, including the restoration opportunity areas.  *Compare id*. at 2-37 *with id*. at 2-49; *id*. at 2-48 ("Restoration opportunity areas are within existing [greater sage-grouse] habitat that, if restored, can provide better quality habitat and greater habitat connectivity . . . .").  It is counterintuitive that SFAs, purportedly representing the highest quality habitat, would include areas in need of restoration.  This contradiction illustrates the arbitrariness of the OR PLUPA/FEIS.

345.    Despite these significant and material changes, new circumstances, and new information, Defendants arbitrarily determined that they were not required to prepare a supplemental environmental impact statement.

346.    Overall, the OR PLUPA/FEIS proposed to "provide a layered management approach that offers the highest level of protection of [greater sage-grouse] in the most valuable habitat. Land use allocations in the [OR PLUPA/FEIS] would limit or eliminate new surface disturbance in PHMA, while minimizing disturbance in GHMA." *Id*. at 2-14; *id*. at 2-18 (collectively, PHMAs and GHMAs include over 10 million acres). Thus, the OR PLUPA/FEIS elevated conservation of the greater sage-grouse and its habitat over all other resource uses.

347.    The OR PLUPA/FEIS minimally discussed the effect of the recommended withdrawal on mineral exploration and development:

> Within areas withdrawn from locatable mineral entry, BLM will not approve a plan of operations or allow notice-level operations to proceed until a mineral examination report has been completed to determine whether the mining claim was valid before the withdrawal. If claims were found to be invalid, they could not be developed. These exams would also delay mineral extraction. Finally, developers may choose to relocate outside the decision area, where there are similar geology and available resources, including outside the continental United States, where there are fewer requirements.

*Id*. at 4-248. The OR PLUPA/FEIS also provided that the recommended withdrawal of SFAs coupled with the management restrictions on mineral exploration and development in PHMAs and GHMAs would increase delays and costs, especially in regard to mandatory validity exams in withdrawn areas. *Id*. at 2-178.

348.    The OR PLUPA/FEIS updated information regarding plans of operation and notices for mining operations. It indicated that 547 mining claims, 49 notices, and 13 plans of operation have been filed in greater sage-grouse habitat in the planning area. *Id*. at 3-122; *id*. at 3-123 (provided that the area is under-utilized and under-analyzed). It also noted that

"exploration efforts have been minimal so potential is unknown." *Id*. at 3-121.  Additionally, the

OR PLUPA/FEIS provided that "[c]urrent locatable mineral exploration and production is

generally limited to central Oregon." *Id*. at 5-54.  However, the OR PLUPA/FEIS explained

that:

> Mining operations in this area are small; are widely spaced across the population
> area; are generally limited in size to less than 5–10 acres; operate on a seasonal
> basis; are focused mostly on fluvial plains or terraced alluvial systems, and/or
> small, casual use activity or recreational mining claims operated by individuals . .
> . .  There are no large commercial minerals operations on BLM lands in the
> population area; existing pits/quarries are limited to established community pits
> (where small amounts of material are sold or granted), county sites, and FHA
> ROW pits, and no large scale commercial operations are expected . . . .

*Id*. at 5-54 ("Further, the BLM has not received any notices or plans indicating that these mines

are currently or will be developing plans of operation . . . ."); *id*. at 5-91 ("The potential for

locatable mineral management in the Oregon sub-region to affect GRSG habitat within

management zone IV, which only includes eastern Oregon, is low."); *id*. at 5-106 (In the Western

Great Basin, "[t]hree to five new open notices received or plans of operations approved each

year, for up to 25 acres of additional disturbance each year.").  Yet, Defendants projected that

"interest" in locating claims, exploration, and development will increase.  *Id*. at 3-123.

Defendants also projected that notices and plans will increase because of "increasing gold values

and depressed economic conditions." *Id*.  This minimal information and unsupported projection

failed to justify or support the proposed recommendation to withdraw over 1.8 million acres.

349.    Moreover, the OR PLUPA/FEIS's proposed withdrawal recommendation would

impact at least 117 claims, 1 plan of operation, and 9 notices located within SFAs.  *Id*. at 4-256.

350.    On June 29, 2015, AEMA timely submitted its protest of the OR PLUPA/FEIS.

351.    By letter dated September 15, 2015, Defendants responded to AEMA's protest,

dismissing it in part and denying it in part.

**Utah Proposed Land Use Plan Amendment and Final Environmental Impact Statement.**

352.   The "Utah Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement" ("UT PLUPA/FEIS") significantly and materially departed from the UT DLUPA/EIS and its draft management restrictions that would unnecessarily and unlawfully constrain mineral exploration and development on federal lands—all without opportunity for public participation.

353.   The UT PLUPA/FEIS would affect BLM-administered lands and National Forest System lands in Utah and the portions of the Ashley and Uinta-Wasatch-Cache National Forests in Wyoming.

354.   The UT PLUPA/FEIS placed greater sage-grouse habitat into two categories:  (a) PHMAs (formerly PPMAs); and (b) GHMAs (formerly PGMAs).  UT PLUPA/FEIS at 1-6.

355.   The UT PLUPA/FEIS proposed to designate 2,763,100 acres as PHMAs.  *Id*. at ES-3.  PHMAs were "identified as having the highest value to maintaining sustainable [greater sage-grouse] populations."  *Id*.

356.   The UT PLUPA/FEIS proposed to designate 583,000 acres as GHMAs.  *Id*. GHMAs would "require some special management to sustain [greater sage-grouse] populations." *Id*.

357.   The UT PLUPA/FEIS also proposed to designate 228,500 acres as SFAs.  *Id*. SFAs were never mentioned in the UT DLUPA/EIS.  Defendants introduced and proposed to designate SFAs for the first time in the UT PLUPA/FEIS.  *Id*. at 1-30.  AEMA and the public were not given notice that there would be a special designation of greater sage-grouse habitat in the form of SFAs prior to the UT PLUPA/FEIS.

358.     According to Defendants, SFAs were derived from greater sage-grouse "stronghold" areas, as described in the 2014 FWS Memo.  *Id*. at 1-4, 1-30.  Defendants proposed to designate SFAs, because the FWS determined that these areas include "characteristics such as existing high-quality sagebrush habitat; highest breeding densities; have been identified as essential to conservation and persistence of the species; represent a preponderance of current federal ownership and in some cases are adjacent to protected areas that serve to anchor the conservation importance of the landscape."  *Id*. at 1-30.  Yet, Defendants did not release the 2014 FWS Memo to the public until after the release of the UT DLUPA/EIS—well after the commenting period for the UT DLUPA/EIS had ended.  *Id*. at 1-4, 1-30.  AEMA and the public were not given an opportunity to review or comment on the 2014 FWS Memo or SFAs.

359.     The proposed designation of SFAs changed the proposed action immensely.  SFAs not only covered 228,500 acres, but would require additional management restrictions.  *Id*. at ES-3, 2-17.  For instance, the UT PLUPA/FEIS recommended that SFAs (over 228,500 acres) be withdrawn from operation of the Mining Law.  *Id*. at ES-3, 2-17, 2-35.  Thus, these 228,500 acres would be off-limits to mineral exploration and development pending a validity exam.  *Id*. at 4-353.

360.     Despite this drastic change from the UT PLUPA/FEIS, Defendants concluded that the new SFAs and the additional restrictions were "qualitatively within the spectrum of alternatives analyzed" in the UT DLUPA/EIS.  *Id*. at 1-30.  Thus, Defendants did not prepare a supplemental EIS or provide an opportunity for AEMA and the public to review and comment on the 2014 FWS Memo or the SFAs.

361.     The UT PLUPA/FEIS purported that the proposed action, *i.e.*, the land use plan amendment, was a variation of the preferred alternative, Alternative D, in the UT DLUPA/EIS.

88

*Id*. at 2-1, 2-5.  However, the proposed action was considerably more restrictive.  It also

significantly and materially differed from the alternatives described in the UT DLUPA/EIS.

362.    The UT PLUPA/FEIS proposed to place a 3% disturbance cap on activities as

follows:  "In PHMA, manage discrete anthropogenic disturbances, whether temporary or

permanent, so they cover less than 3[%] of[:]  1) . . . (BSU) (total PHMA area associated with a

[greater sage-grouse] population area) and 2) within a proposed project analysis area."  *Id*. at 2-

17–2-18; *id*. at 2-43 (Describing a proposed USFS standard for Utah that provided:  "In PHMA,

SFA, and Anthro Mountain, do not issue new discretionary written authorizations unless all

existing discrete anthropogenic disturbances cover less than 3[%] of the total [greater sage-

grouse] habitat within the BSU and the proposed project area, regardless of ownership, and the

new use will not cause exceedance of the 3[%] cap . . . .").

363.    The UT PLUPA/FEIS provided that the 3% disturbance cap would be calculated

as follows:

> If the 3[%] anthropogenic disturbance cap is exceeded on all lands (regardless of
> land ownership) within [greater sage-grouse] PHMA in any given BSU, then no
> further discrete anthropogenic disturbances (subject to applicable laws and
> regulations, such as the Mining Law . . . , valid existing rights, etc.) will be
> permitted by the BLM within [greater sage-grouse] PHMA in any given BSU
> until the disturbance has been reduced to less than the cap.
>
> If the 3[%] disturbance cap is exceeded on all lands (regardless of land
> ownership) within a proposed project analysis areas in PHMA, then no further
> anthropogenic disturbance will be permitted by the BLM until disturbance in the
> proposed project analysis area has been reduced to maintain the area under the
> cap (subject to applicable laws and regulations, such as the Mining Law . . . ,
> valid existing rights, etc.).
>
> An area with disturbance is not excluded from the 3[%] until it has been restored
> to provide [greater sage-grouse] habitat.

*Id*. at 2-18; *but see id*. at 5-76 ("The disturbance caps in the [UT PLUPA/FEIS] would not block locatable mineral entry projects, but any locatable mineral entry would be considered as disturbance under the cap.").

364.    For National Forest System lands in Wyoming, the UT PLUPA/FEIS proposed the following guideline for anthropogenic disturbances:

> In PHMA and SFA, do not permit surface disturbance and disruptive activities unless all existing discrete anthropogenic disturbances cover less than 5[%] of the suitable habitat in the surrounding area using the current [Density Disturbance Calculation Tool ("DDCT")] process . . . , or its replacement.  An exception to this standard is described in the Locatable Minerals section in GRSG-M-LM-ST-002-Standard.

*Id*. at 2-59.  The aforementioned exception would apply to mineral development.  The UT PLUPA/FEIS provided that the aforementioned disturbance cap "[would] not be applied to foreclose development of locatable minerals on unpatented claims located under the Mining Law . . . ; the disturbance from locatable mining will be accounted for in determining the percent disturbance and whether the cap has been exceeded."  *Id*. at 2–66–2–67.

365.    The UT PLUPA/FEIS proposed a mining facility density cap as follows:

> Subject to applicable laws and regulations and valid existing rights, if the average density of one energy and mining facility per 640 acres (the density cap) is exceeded on all lands (regardless of land ownership) in PHMA within a proposed project analysis area, then no further disturbance from energy or mining facilities will be permitted by BLM:  (1) until disturbance in the proposed project analysis area has been reduced to maintain the limit under the cap; or (2) unless the energy or mining facility is collocated into an existing disturbed area (subject to applicable laws and regulations, such as the Mining Law . . . , valid existing rights, etc.).

*Id*. at 2-18; *id*. at 2-59 (Describing a proposed USFS guideline for Wyoming that provided:  "In PHMA-core habitat management areas and SFA, limit the density of activities related to . . . mining activities to no more than an average of 1 . . . mining location per 640 acres, using the current [DDCT] process . . . , or its replacement, subject to valid existing rights.").  The UT

PLUPA/FEIS further provided that "mining facilities" included "[a]ctive locatable . . . developments." *Id.* at 2-18.

366.    The UT PLUPA/FEIS proposed to apply uniform lek buffer-distances on activities as follows:  "In undertaking BLM management actions, and consistent with valid and existing rights and applicable law in authorizing third-party actions, the BLM will apply the lek buffer-distances identified in the [2014 USGS Buffer Study] . . ." in both PHMAs and GHMAs. *Id.* at 2-19; 2-20; *see id.* at F-1 (providing that the lek buffer-distance would restrict "surface disturbance . . . within 3.1 miles of leks"); *id.* at 2-43 (Describing a proposed USFS standard for Utah that provided:  "During lekking (March 1 to April 30) restrict surface disturbing and disruptive activities . . . within a buffer distance[] of 3.1 miles." (footnote omitted)); *id.* at 2-58 (Describing a proposed USFS standard for Wyoming provided:  "During lekking (March 1 to May 15), restrict noise . . . within a buffer distance[] of 3.1 miles." (footnote omitted)).

367.    According to Defendants, the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id.* at 1-4, 2-3.  Yet, the 2014 USGS Buffer Study was not released to the public until after the release of the UT DLUPA/EIS—well after the commenting period for the UT DLUPA/EIS had ended.  *Id.* at 1-31.  AEMA and the public were not given an opportunity to review or comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

368.    Despite this drastic change from the UT DLUPA/EIS, Defendants concluded that the new, uniform lek buffer-distances were "qualitatively within the spectrum of alternatives analyzed" in the UT DLUPA/EIS.  *Id.*  Thus, Defendants did not prepare a supplemental EIS or provide an opportunity for the public to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

369.    The UT PLUPA/FEIS proposed to apply a net conservation gain standard as

follows:

> In all [greater sage-grouse] habitat, in undertaking BLM management actions,
> and, consistent with valid existing rights and applicable law, in authorizing third-
> party actions that result in habitat loss and degradation, the BLM will require and
> ensure mitigation that provides a net conservation gain to the species, including
> accounting for any uncertainty associated with the effectiveness of such
> mitigation.  This will be achieved by avoiding, minimizing, and compensating for
> impacts by applying beneficial mitigation actions.

*Id*. at 2-17; *id*. at 2-43 (Describing a proposed USFS standard for Utah that provided:  "In

PHMA, SFA, GHMA, and Anthro Mountain, only allow new authorized land uses if the residual

impacts to the [greater sage-grouse] or their habitats are fully offset by compensatory mitigation

projects that provide a net conservation gain to the species, which will be achieved by avoiding,

minimizing, and compensating for impacts by applying beneficial mitigation actions.").

370.    The UT PLUPA/FEIS defined "net conservation gain" as "[t]he actual benefit or

gain above baseline conditions.  Actions which result in habitat loss and degradation include

those identified as threats which contribute to [greater sage-grouse] disturbance as identified by

the [FWS] in its 2010 [warranted, but precluded] listing decision . . . ."  *Id*. at Glossary-19.

"Baseline" was defined as:

> The pre-existing condition of a defined area and/or resource that case be
> quantified by an appropriate metric(s).  During environmental reviews, the
> baseline is considered the affected environment that exists at the time of the
> review's initiation, and is used to compare predictions of the effects of the
> proposed action or a range of reasonable alternative.

*Id*. at Glossary-3.  The "net conservation gain" standard replaced the "no net loss" standard as

used in the UT DLUPA/EIS and represented a material shift.

371.    Interestingly, the UT PLUPA/FEIS failed to attribute the net conservation gain

standard to the 2014 FWS Mitigation Framework, which was released after the UT DLUPA/EIS.

The 2014 FWS Mitigation Framework established and defined net conservation gain as "the actual benefit or gain above baseline conditions . . . ."  2014 FWS Mitigation Framework at 22. The definition of "net conservation gain" in the UT PLUPA/FEIS was nearly identical to the definition in the 2014 FWS Mitigation Framework.  AEMA and the public were not given an opportunity to review or comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

372.    According to Defendants, the "net conservation gain" standard fit squarely within the "overall landscape-scale goal which is to enhance, conserve, and restore [greater sage-grouse] and its habitat."  UT PLUPA/FEIS at 1-31.  However, the net conservation gain standard was a drastic change, and flipped the "no net loss" standard on its head.

373.    Consequently, a party with a locatable mining operation would be required to improve greater sage-grouse habitat, which would require more than FLPMA's standard of preventing unnecessary or undue degradation or USFS's standard of minimizing adverse environmental impacts.  Therefore, mining operations would be subjected to a higher standard that is unlawful under the governing statutes.

374.    Thus, the proposed net conservation gain standard conflicts with FLPMA's unnecessary or undue degradation standard and the USFS regulation to minimize, where feasible, adverse environmental impacts on surface resources.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5; 36 C.F.R. § 228.8.  Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard.  Thus, Defendants would exceed their statutory and regulatory authority by applying the net conservation gain standard to mineral development.

375. However, the UT PLUPA/FEIS provided a purported "possible" safeguard to mining:

> In PHMA, to the extent consistent with the rights of a mining claimant under existing laws and regulations, limit surface disturbance from locatable mineral development and apply management to minimize and mitigate impacts. To the extent allowable by law, work with claimants to voluntarily apply the pertinent management for discretionary actions in PHMA . . . (e.g., mitigation, disturbance cap, minerals/energy density, buffers, seasonal restrictions, and RDFs) and in GHMA . . . (i.e., mitigation and buffers).

UT PLUPA/FEIS at 2-35. Additionally, though not discussed in the chapter outlining management actions, the UT PLUPA/FEIS provided that:

> Restrictions on locatable mineral development could only occur through existing legal avenues such as the BLM's mandate to prevent unnecessary or undue degradation . . . and the [USFS]'s requirements for environmental protection . . . . The management actions analyzed for this LUPA would not interfere with valid existing rights.

*Id*. at 4-346 ("Agencies would work with the operator to implement the conservation measures described . . . (e.g., disturbance cap, seasonal restrictions and BMPs/RDFs for locatable minerals)."); *id*. at 4-353 ("However, under the Mining Law . . . , the agencies do not have the authority to require such mitigation measures."). These "possible" safeguards, while paying lip service to mining claimants' rights under the Mining Law, do nothing to minimize the onerous restrictions the UT PLUPA/FEIS would place on AEMA's members.

376. Despite these significant and material changes, new circumstances, and new information, Defendants arbitrarily determined that they were not required to prepare a supplemental EIS.

377. For National Forest System lands in Utah, the UT PLUPA/FEIS proposed the following standard for mineral development: "In PHMA, SFA, and Anthro Mountain, only approve Plans of Operation if they include mitigation to protect [greater sage-grouse] and their

habitats, consistent with the rights of the mining claimant as granted by the Mining Law . . . ."
*Id*. at 2-53.

378.    The UT PLUPA/FEIS did not propose to designate any new ACECs or zoological
areas. *Id*. at 2-79.  But, as mentioned earlier, it did propose to designate SFAs.

379.    The UT PLUPA/FEIS included more discussion of mineral exploration and
development compared to the UT DLUPA/EIS, though still not enough.  For instance, it noted
that there are 2,575 claims and 39 operations in the decision area.  *Id*. at 3-215, 3-216.  It further
provided that 11 claims would be within the SFAs.  *Id*. at 4-352.  Because there are claims
located within SFAs, if those areas were withdrawn, those existing claims would have to undergo
a validity examination.  *Id*. at 4-353.

380.    The UT PLUPA/FEIS also explained the benefits of mining on the greater sage-
grouse:

> Many of the lands that include [greater sage-grouse] habitat are presently poor-
> quality habitat due to past disturbance.  Strip mining and some underground
> mining would allow for some or the entire surface to be reclaimed.  In the long
> term, reclaimed lands could create new habitat for [greater sage-grouse]  and
> other species to occupy.  In addition, mining on federal lands, where stipulations
> can control how the lands will be reclaimed in order to benefit [greater sage-
> grouse], could be more advantageous than closures on federal lands, which could
> encourage operations to move to private lands where controls cannot be applied.

*Id*. at 4-18–4-19.

381.    The UT PLUPA/FEIS projected that mineral exploration and development is
expected to increase over the next 20 years, but the UT PLUPA/FEIS made this projection based
on entire management zones, not solely on data from Utah.  *See* 5-104, 5-119.  While looking
specifically at Utah, the UT PLUPA/FEIS provided that locatable minerals known to exist in
management zone IV are uneconomical to produce and the existing conditions of mining in Utah
in management zones II/VII are "largely unknown[.]"  *Id*. at 5-103, 5-118.  Also, it provided that

in management zone IV, there is a lack of locatable minerals, so "the management alternatives in the Utah Sub-region for locatable mineral entry would not impact GRSG habitat." *Id*. at 5-103. Yet, the UT PLUPA/FEIS concluded that the "SFAs . . . would be recommended for withdrawal from locatable mineral entry, providing protection to [greater sage-grouse] populations in these important areas." *Id*. The UT PLUPA/FEIS has entirely failed to justify or support the proposed recommendation to withdraw approximately 228,500 acres from operation of the Mining Law.

382.    Despite the updated information and discussion of mining, the UT PLUPA/FEIS failed to justify or support the proposed recommendation to withdraw approximately 228,500 acres.

383.    On June 29, 2015, AEMA timely submitted its protest of the UT PLUPA/FEIS.

384.    By letter dated September 15, 2015, Defendants responded to AEMA's protest, dismissing it in part and denying it in part.

**H.    The Rocky Mountain Proposed Resource Management Plans And Final Environmental Impact Statements.**

**HiLine Proposed Resource Management Plan and Final Environmental Impact Statement.**

385.    The "HiLine Proposed Resource Management Plan and Final Environmental Impact Statement" ("HiLine PRMP/FEIS") significantly and materially departed from the HiLine DRMP/EIS and its draft management restrictions that would unnecessarily and unlawfully constrain mineral exploration and development on federal lands—all without opportunity for public participation.

386.    The HiLine PRMP/FEIS would only affect BLM-administered lands in Northern Montana.

387.    The HiLine PRMP/FEIS placed greater sage-grouse habitat into two categories: (a) PHMAs; and (b) GHMAs.  HiLine PRMP/FEIS at ES-4.

388.    The HiLine PRMP/FEIS proposed to designate 1,433,000 acres as PHMAs.  *Id*. PHMAs were "identified as having the highest value to maintaining sustainable sage-grouse populations." *Id*.

389.    The HiLine PRMP/FEIS proposed to designate 290,000 acres as GHMAs.  *Id*. GHMAs would "require some special management to sustain sage-grouse populations." *Id*.

390.    The HiLine PRMP/FEIS proposed to designate 927,000 acres as SFAs.  *Id*.  SFAs were never mentioned in the HiLine DRMP/EIS.  Defendants introduced and proposed to designate SFAs for the first time in the HiLine PRMP/FEIS.  *Id*. at ES-4, 28.  AEMA and the public were not given notice that there would be a special designation of greater sage-grouse habitat in the form of SFAs prior to the HiLine PRMP/FEIS.

391.    According to Defendants, SFAs were derived from greater sage-grouse "stronghold" areas, as described in the 2014 FWS Memo.  *Id*. at ES-4, 10, *id*. at 33.  Defendants proposed to designate SFAs, because the FWS determined that these areas "include characteristics such as existing high-quality sagebrush habitat; highest breeding densities; have been identified as essential to conservation and persistence of the species; represent a preponderance of current federal ownership and in some cases are adjacent to protected areas that serve to anchor the conservation importance of the landscape." *Id*. at 28.  Yet, Defendants did not release the 2014 FWS Memo to the public until after the release of the HiLine PRMP/FEIS—well after the commenting period for the HiLine DRMP/EIS had ended.  AEMA and the public were not given an opportunity to review or comment on the 2014 FWS Memo or the SFAs.

392.     The proposed designation of SFAs changed the proposed action immensely. SFAs not only covered approximately 927,000 acres, but would require additional management restrictions.  *Id*.  For instance, the HiLine PRMP/FEIS recommended that SFAs (927,000 acres) be withdrawn from operation of the Mining Law.  *Id*. at 28, 192; *but see id*. at 91 ("New withdrawals would include only the minimum area required to meet the purpose of the withdrawal.").  Thus, almost one million acres would be off-limits to mineral exploration and development pending a validity examination.

393.     Despite this drastic change from the HiLine DRMP/EIS, Defendants found that "[t]he SFA, as it relates to BLM land, approximates the Greater Sage-Grouse Protection Priority Area ACEC that was proposed and analyzed in Alternative B of the [HiLine DRMP/EIS]."  *Id*. at 27.  Defendants concluded that "the management of these areas as SFAs and the impacts of the associated management decisions was addressed in the [HiLine DRMP/EIS] and [was] qualitatively within the spectrum of alternative analyzed."  *Id*. at 28.  Thus, Defendants did not prepare a supplemental EIS or provide an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

394.     At the outset, the HiLine PRMP/FEIS provided that:

Locatable minerals (e.g., gold and silver) are managed under the [Mining Law], which allows the location and maintenance of mining claims on those federal mineral estate lands open for mining claim location and patent.  The BLM manages the Mining Law program on federal mineral estate as set forth in 43 [C.F.R. §] 3809.  BLM management includes authorizing and permitting mineral exploration, mining, and reclamation actions.  Areas should be recommended for withdrawal from the mining laws for locatable exploration or development where surface-disturbing activities are not suitable.  Any terms or conditions should also be considered when needed to protect other resource values while conducting activities under the operation of the mining laws.

*Id*. at 9.  Any management actions that conflicted with the Mining Law and surface management regulations would be unlawful.

395.    The HiLine PRMP/FEIS asserted that the proposed action, *i.e.*, the land use plan, was a variation of Alternative E and was "within the range of alternatives analyzed in the [HiLine DRMP/EIS]." *Id*. at 26.   However, the proposed action was considerably more restrictive.   It also significantly and materially departed from the alternatives described in the HiLine DRMP/EIS.

396.    The HiLine PRMP/FEIS proposed to place a 3% disturbance cap on activities as follows:

> If the 3% anthropogenic disturbance cap is exceeded on lands (regardless of land ownership) within [greater sage-grouse] PHMAs in any given [BSU], then no further discrete anthropogenic disturbances (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights, etc.) would be permitted by BLM within [greater sage-grouse] PHMAs in any given [BSU] until the disturbance has been reduced to less than the cap.
>
> If the 3% anthropogenic disturbance cap is exceeded on lands (regardless of land ownership) or if anthropogenic disturbance and habitat loss associated with conversion to agricultural tillage or fire exceed 5% within a project analysis area in PHMAs, then no further discrete anthropogenic disturbances (subject to applicable laws and regulations, such as the . . . Mining Law, valid existing rights, etc.) will be permitted by BLM within PHMA in a project analysis area until the disturbance has been reduced to less than the cap.

*Id*. at 41.   The HiLine PRMP/FEIS also proposed to convert Montana's 3% disturbance cap to a 5% cap if the State of Montana's conservation plan would be comparable to the Wyoming Governor's conservation plan.   *Id.*

397.    The HiLine PRMP/FEIS proposed a mining facility density cap as follows:

> Subject to applicable laws and regulations and valid existing rights, if the average density of one energy and mining facility per 640 acres (the density cap) is exceeded on all lands (regardless of land ownership) in [PHMAs] within a proposed project analysis area, then no further disturbance from energy or mining facilities will be permitted by BLM:  (1) until disturbance in the proposed project analysis area has been reduced to maintain the limit under the cap; or (2) unless the energy or mining facility is co-located into an existing disturbed area.

*Id*. at 42.

398.    The HiLine PRMP/FEIS proposed to apply uniform lek buffer-distances on activities as follows:  "In undertaking BLM management actions, and consistent with valid and existing rights and applicable law in authorizing third-party actions, the BLM would apply the lek buffer-distances identified in the [2014 USGS Buffer Study] . . . ."  *Id*. at 46; *see id*. at 1589 (providing that the lek buffer-distance would restrict "surface disturbance (continuing human activities that alter or remove natural vegetation) within 3.1 miles of leks").

399.    According to Defendants, the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id*. at 28.  Yet, the 2014 USGS Buffer Study was not released to the public until after the release of the HiLine DRMP/EIS—well after the commenting period for the HiLine DRMP/EIS had ended.  AEMA and the public were not given an opportunity to review or comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

400.    Despite this drastic change from the HiLine DRMP/EIS, Defendants concluded that the new, uniform lek buffer-distances were "within the range of alternatives analyzed" in the HiLine DRMP/EIS.  *Id*. at 28.  Thus, Defendants did not prepare a supplemental EIS or provide an opportunity for the public to review or comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

401.    The HiLine PRMP/FEIS proposed to apply a net conservation gain standard to activities as follows:

> In all sage-grouse habitat, in undertaking BLM management actions, and, consistent with valid existing rights and applicable law, in authorizing third-party actions that result in habitat loss and degradation, the BLM will require and ensure mitigation that provides a net conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation.  This will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.

*Id*. at 192.  The HiLine PRMP/FEIS defined "net conservation gain" as "[t]he actual benefit or gain above baseline conditions."  *Id*. at 1168.  "Baseline" was defined as:

> The pre-existing condition of a defined area and/or resource that can be quantified by an appropriate metric(s).  During environmental reviews, the baseline is considered the affected environment that exists at the time of the review's initiation, and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.

*Id*. at 1152.

402.    Interestingly, the HiLine PRMP/FEIS failed to attribute the net conservation gain standard to the 2014 FWS Mitigation Framework, which was released to the public after the HiLine DRMP/EIS.  The 2014 FWS Mitigation Framework established and defined net conservation gain as "the actual benefit or gain above baseline conditions . . . ."  2014 FWS Mitigation Framework at 22.  The definition of "net conservation gain" in the HiLine PRMP/FEIS was nearly identical to the definition in the 2014 FWS Mitigation Framework.  AEMA and the public were not given an opportunity to review or comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

403.    According to Defendants, the "net conservation gain" standard fit squarely within the "overall landscape-scale goal which is to enhance, conserve, and restore [greater sage-grouse] and its habitat."  HiLine PRMP/FEIS at 28.  However, the net conservation gain standard was a drastic change.

404.    Consequently, a party with a locatable mining operation would be required to improve greater sage-grouse habitat, which would require more than FLPMA's standard of preventing unnecessary or undue degradation.  Therefore, mining operations would be subjected to a higher standard that is unlawful under the governing statute.

405.    Thus, the proposed net conservation gain standard conflicts with FLPMA's unnecessary or undue degradation standard.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5; HiLine PRMP/FEIS at 385 ("BLM management include[s] authorizing and permitting mineral exploration, mining, and reclamation actions.  For exploration or operations other than causal use, the operator is required to submit a Notice or a Plan of Operations under regulations at 43 CFR 3809.  These regulations require all operations to be conducted in a manner that prevents unnecessary or undue degradation.").  Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard.  Thus, Defendants would exceed their statutory and regulatory authority by applying the net conservation gain standard to mineral development.

406.    The HiLine PRMP/FEIS proposed management actions for locatable minerals as: (a) "[w]ithin the limits of the Mining Laws, the BLM would apply conditions of approval (Appendix M) to Plans of Operations to prevent undue and unnecessary degradation to Greater Sage-Grouse habitat[;]" and (b) "[a] withdrawal would be proposed to segregate 927,074 acres from locatable mineral entry to protect the [SFAs]."  *Id*. at 37–38.

407.    The HiLine PRMP/FEIS did not propose to designate any new ACECs.  *Id*. at 146, 216–17.  However, it did propose to designate SFAs.

408.    Despite these significant and material changes, new circumstances, and new information, Defendants arbitrarily determined that they were not required to prepare a supplemental EIS.

409.    Overall, the HiLine PRMP/FEIS proposed to "provide a layered management approach that offers the highest level of protection for [greater sage-grouse] in most valuable habitat.  Land use allocations in the Proposed Plan would limit or eliminate new surface

disturbance in PHMA, while minimizing disturbance in GHMA." *Id*. at 33.  As such, the HiLine

PRMP/FEIS elevated the conservation of the greater sage-grouse over all other resource uses.

410.    The HiLine PRMP/FEIS discussed mineral exploration and development to some

extent.  It suggested that there were few existing mining operations.  *See id*. at 312 (discussing

closed mines).  In the Glasgow area, for example, there were 450 active, unpatented mining

claims located for bentonite, but "no active mining of bentonite [was] occurring . . . ." *Id*. at 386.

Moreover, "[a]ny future mining would require a large infusion of capital investment and a clear

market indication for any significant operation to be feasible." *Id*.

411.    In 2009, there were 93 active lode claims in Blaine, Liberty, Phillips, and Toole

counties.  *Id*. at 389.  In 2009, there were 651 placer claims in Phillips and Valley counties.  *Id*.

These are the counties where SFAs would be designated.  For instance, Brazil Creek is one such

area.  *Id*. at 1687 ("Brazil Creek is an area southwest of Glasgow that has a history of bentonite

mining.").  The HiLine PRMP/FEIS estimated that approximately 115 acres would be disturbed

in the short and long term in the Brazil Creek area and 130 acres would be disturbed in the short

and long term in the Little Rocky Mountains.  *Id*. at 454; *id*. at 1694 ("[I]t is estimated that two

bentonite mining projects would be developed in the Brazil Creek area.  These mines would be

open-cut and have 100 acres of disturbance per operation, totaling 200 acres of disturbance as a

result of mining activity.").  This information illustrated the disproportionate size of the

recommended withdrawal of approximately one million acres of mineral estate, within SFAs,

compared to the small impact of the estimated disturbance of possible mining operations.

Moreover, the information demonstrated that the proposed size of the recommended withdrawal

was not justified by the estimated disturbance.

412.    Further, if the recommended withdrawal of SFAs occurs, all of the acres with high development potential in the planning area will be closed to mineral entry and development. *Id*. at 641.  Moreover, "[w]ithin Brazil Creek, the moderate and low areas of development potential that were under the restricted management category under current management would be closed." *Id*.

413.    The HiLine PRMP/FEIS failed to justify or support its proposed recommendation to withdraw SFAs.  Such failure is especially egregious because mining as a threat to the greater sage-grouse is "not known to be present[.]" *Id*. at 275.

414.    On June 29, 2015, AEMA timely submitted its protest of the HiLine PRMP/FEIS.

415.    By letter dated September 15, 2015, Defendants responded to AEMA's protest, dismissing it in part and denying it in part.

**Bighorn Basin Proposed Resource Management Plan and Final Environmental Impact Statement.**

416.    The "Bighorn Basin Resource Management Plan Revision Project Proposed Resource Management Plan and Final Environmental Impact Statement" ("Bighorn PRMP/FEIS") significantly and materially departed from the Bighorn DRMP/EIS and Bighorn SRMP/EIS and the draft/supplemental management restrictions that would unnecessarily and unlawfully constrain mineral exploration and development on federal lands—all without opportunity for public participation.

417.    The Bighorn PRMP/FEIS would only affect BLM-administered lands managed by the Cody and Worland Field Offices.

418.    The Bighorn PRMP/FEIS placed greater sage-grouse habitat into two categories: (a) PHMAs (formerly Core Areas); and (b) GHMAs (formerly Non-Core Areas).  Bighorn

PRMP/FEIS at ES-1 n.1.  PHMAs and GHMAs would account for 99% of BLM-administered lands in the planning area.  *Id*. at ES-5.  No SFAs would be designated.

419.    The Bighorn PRMP/FEIS proposed to designate 1,115,100 acres as PHMAs.  *Id*. at ES-4.  PHMAs were "identified as having the highest value to maintaining sustainable [greater sage-grouse] populations."  *Id*.

420.    The Bighorn PRMP/FEIS proposed to designate 2,034,000 acres as GHMAs.  *Id*. GHMAs would "require some special management to sustain [greater sage-grouse] populations." *Id*.

421.    The Bighorn PRMP/FEIS asserted that the proposed action, *i.e.*, resource management plan revision, was a modification of Alternative D.  *Id*. at 2-14.  However, the proposed action was considerably more restrictive.  It also significantly and materially differed from the draft and supplemental alternatives.

422.    The Bighorn PRMP/FEIS proposed the following goal for locatable minerals: "Manage locatable minerals activities on lands open to mineral entry, while preventing unnecessary and undue degradation of public lands as defined in 43 [C.F.R. §] 3809.5, and while avoiding or mitigating effects of exploration and production on other resources."  *Id*. at 2-100.  It also proposed an objective to "[p]rovide opportunities for exploration and development of locatable minerals while reducing and mitigating effects of mining on other natural resources." *Id*.

423.    As such, Defendants "eliminated from detailed analysis alternatives to recommend a withdrawal from appropriations under the mining laws for a large portion of the Planning Area . . . ."  *Id*. at 2-40.  The Bighorn PRMP/FEIS eliminated the aforementioned

alternative because it would be "overly restrictive and not reasonable for those areas." *Id*.  In

addition, the Bighorn PRMP/FEIS highlighted the fact that:

> [W]ithdrawing an entire Planning Area would eliminate development in areas
> where conflicts can be mitigated or where conflicts do not exist, which would be
> inconsistent with the policy objectives of the Planning Area. . . .  Withdrawing a
> large portion of the Planning Area would conflict substantially with the goals and
> objectives for mineral resources and would require an extensive inventory and
> evaluation outside the scope of this RMP and EIS of the current natural uses and
> values of the site and adjacent land, as well as an analysis of how those uses and
> values would be affected.

*Id*. at 2-40–2-41.  Despite its stated objective of allowing some mining and eliminating an

alternative that contemplated a large withdrawal, the Bighorn PRMP/FEIS would still severely

and arbitrarily restrict mining.

424.    The Bighorn PRMP/FEIS proposed to impose a mining facility density cap on

activities as follows:

> In greater sage-grouse PHMAs, the density of disturbance of energy or mining
> facilities would be limited to an average of one site per square mile (640 acres)
> within the DDCT, subject to valid existing rights.  The one location and
> cumulative value of existing disturbances would not exceed 5[%] of habitat. . . .
> Inside PHMA, all suitable habitat disturbed (any program area) will not exceed
> 5% within the DDCT area using the DDCT process.

*Id*. at 2-24, 2-155.

425.    The Bighorn PRMP/FEIS proposed to apply a net conservation gain standard to

activities as follows:

> In implementing BLM management actions, and, consistent with valid existing
> rights and applicable law, in authorizing third party actions that result in habitat
> loss and degradation in PHMA, the BLM will require and ensure mitigation that
> provides a net conservation gain to the species including accounting for any
> uncertainty associated with the effectiveness of such mitigation.  This will be
> achieved by avoiding, minimizing, and compensating for impacts by applying
> beneficial mitigation actions.

*Id*. at 2-31; *see also id*. at Y-15–Y-16.

426.    The Bighorn PRMP/FEIS defined "net conservation gain" as "[t]he actual benefit

or gain above baseline conditions."  *Id*. at Glossary-24.  "Baseline" was defined as:

> The pre-existing condition of a defined area and/or resource that can be quantified
> by an appropriate metric.  During environmental reviews, the baseline is
> considered the affected environment that exists at the time of the review's
> initiation, and is used to compare predictions of the effects of the proposed action
> or a reasonable range of alternatives.

*Id*. at Glossary-4.  The "net conservation gain" standard represented a material shift.

427.    Interestingly, the Bighorn PRMP/FEIS failed to attribute the net conservation gain

standard to the 2014 FWS Mitigation Framework, which was released to the public after the

Bighorn DRMP/EIS and Bighorn SRMP/EIS.  The 2014 FWS Mitigation Framework established

and defined net conservation gain as "the actual benefit or gain above baseline conditions . . . ."

2014 FWS Mitigation Framework at 22.  The definition of "net conservation gain" in the

Bighorn PRMP/FEIS was nearly identical to the definition in the 2014 FWS Mitigation

Framework.  AEMA and the public were not given an opportunity to review or comment on the

2014 FWS Mitigation Framework or the net conservation gain standard.

428.    According to Defendants, the "net conservation gain" standard fit squarely within

"the overall landscape-scale goal which is to enhance, conserve, and restore greater sage-grouse

and its habitat."  Bighorn PRMP/FEIS at 2-13 ("All of the actions alternatives provided

management actions to meet the landscape-scale goal . . . .").  However, the net conservation

gain standard was a drastic change.

429.    Consequently, a party with a locatable mining operation would be required to

improve greater sage-grouse habitat, which would require more than FLPMA's standard of

preventing unnecessary or undue degradation.  Therefore, mining operations would be subjected

to a higher standard that is unlawful under the governing statute.

430.     Thus, the proposed net conservation gain standard conflicts with FLPMA's unnecessary or undue degradation standard.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5; Bighorn PRMP/FEIS at 4-69 ("Restrictions applicable to locatable minerals are generally limited to the prevention of unnecessary or undue degradation, as defined in 43 [C.F.R. §] 3809.5; additional requirements beyond the unnecessary or undue degradation standard may not apply to locatable minerals, and may be voluntary and achieved by negotiation with the claim holder.").  Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard.  Thus, Defendants would exceed their statutory and regulatory authority by applying the net conservation gain standard to mineral development.

431.     The Bighorn PRMP/FEIS did not propose to designate new ACECs.  *Id*. at 2-27.

432.     Despite these significant and material changes, new circumstances, and new information, Defendants arbitrarily determined that they were not required to prepare a supplemental EIS.

433.     Overall, the Bighorn PRMP/FEIS proposed to "provide a layered management approach that offers the highest level of protection for [greater sage-grouse] in the most valuable habitat.  Land use allocations in the [Bighorn PRMP/FEIS] would limit or eliminate new surface disturbance in [PHMA], while minimizing disturbance in [GHMA]."  *Id*. at ES-1.  Thus, the Bighorn PRMP/FEIS elevated conservation of the greater sage-grouse and its habitat over all other resource uses.

434.     On June 29, 2015, AEMA timely submitted its protest of the Bighorn PRMP/FEIS.

435.     By letter dated September 15, 2015, Defendants responded to AEMA's protest, dismissing it in part and denying it in part.

I.       **The Great Basin BLM ROD.**

436.     On September 21, 2015, Defendant Kornze and Defendant Schneider signed and approved the Great Basin BLM ROD.  Great Basin BLM ROD at 6-1.

437.     On September 22, 2015, Defendants released the Great Basin BLM ROD.

438.     The Great Basin BLM ROD approved four amendments:  (a) ID/MT BLM LUPA; (b) NV/CA BLM LUPA; (c) OR BLM LUPA; and (d) UT BLM LUPA.  *Id*. at ii, 1-41, 6-1; *see also* Notice of Availability for the Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Northeastern California; Oregon; and Utah, 80 Fed. Reg. 57,633 (Sept. 24, 2015).

439.     Generally, greater sage-grouse habitat is designated as:  (a) PHMAs; and (b) GHMAs.  Great Basin BLM ROD at 1-15.  However, some land use plans amendments designate greater sage-grouse habitat in a third category.  For instance, Nevada and Northeastern California designate OHMAs, and Idaho designates IHMAs.  *Id*.

440.     Additionally, all approved land use plan amendments designate SFAs.  *Id*. at 1-15. The total number of BLM-administered acres designated as SFAs is 8,385,280 acres.  *Id*. at 1-15. Across the board, 8,385,280 acres of SFAs are recommended for withdrawal from operation of the Mining Law.

441.     The Great Basin BLM ROD acknowledges that "[t]he primary threats [to the greater sage-grouse in the Great Basin Region] are the widespread present and potential impacts of wildfire, the loss of native habitat to invasive species, and conifer encroachment."  *Id*. at 1-7. Other purported threats, like habitat fragmentation associated with mining are localized and unsubstantiated.  *Id*. at 1-7, 1-10–1-11.

442.    In fact, in the Great Basin BLM ROD, Defendants concede that the management restrictions for locatable minerals are unnecessary to conserve, enhance, or restore the greater sage-grouse or its habitat, but rather are "necessary" to fill the gaps left in the management decisions regarding primary threats, like fire:

> While surface disturbance associated with development in the Great Basin is not as significant a threat to [greater sage-grouse] and its habitat as rangeland fire and invasive species, the BLM [LUPAs] include land allocations and management actions that avoid and minimize surface disturbance in PHMAs for identified threats (e.g., energy, mining, infrastructure, improper grazing, free-roaming horses and burros, recreation and urbanization). These land allocations and management actions are necessary because the location and extent of habitat loss to fire is difficult to predict, and much of the habitat, due to low precipitation in the Great Basin, is difficult to restore once lost.

*Id*. at 1-20; *see also id*. at 1-30 ("surface disturbance due to development is not as great a threat to habitat in the sub-region").  This statement is just one of many that demonstrate Defendants have failed to show a rational connection between the facts and the management restrictions, especially in regard to mining.

443.    Interestingly, for the first time in the land use plan amendment process, Defendants acknowledge their reliance on the 2014 FWS Mitigation Framework in the Great Basin BLM ROD.  *Id*. at 1-25.  The Great Basin BLM ROD provides that the "[net conservation gain] standard is consistent with the recommendation in the [2014 FWS Mitigation Framework], which states that mitigation 'should be strategically designed to result in net overall positive outcomes for sage-grouse.'"  *Id*. at 1-25.  However, AEMA and the public have never had an opportunity to comment on the 2014 FWS Mitigation Framework.

**ID/MT BLM LUPA**

444.    The ID/MT BLM LUPA applies to the federal lands administered by the BLM in Idaho and Southwestern Montana.  ID/MT BLM LUPA at 1-1–1-3.  Accordingly, it provides

management decisions for greater sage-grouse habitat, designated as SFAs, PHMAs, IHMAs, and GHMAs.  *Id*. at 1-4.

445.    Although Defendants found mining is not a primary threat to the greater sage-grouse, the ID/MT BLM LUPA recommends that SFAs be withdrawn from operation of the Mining Law.  *Id*. at 2-3, 2-9, 2-28.  The ID/MT BLM LUPA recommends the withdrawal of approximately 3,842,900 acres.  ID/MT PLUPA/FEIS at 2-2; *see* 80 Fed. Reg. 57,635 (Sept. 24, 2015) (proposing to withdraw 3,854,622 acres of SFAs in Idaho).

446.    Notably, the ID/MT BLM LUPA confirms that SFAs were created in response to the 2014 FWS Memo and its associated maps.  ID/MT BLM LUPA at 1-4–1-6 ("The SFA[s] were derived from [greater sage-grouse] stronghold areas described in [the 2014 FWS Memo] to the BLM . . . .  The memorandum and associated maps provided by the [FWS] identify areas that represent recognized strongholds . . . .").  AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

447.    The ID/MT BLM LUPA restricts mineral exploration and development vis-à-vis the following management decisions.

448.    The ID/MT BLM LUPA adopts the 3% disturbance cap proposed in the ID/MT PLUPA/FEIS, as well as the variations specific to Idaho and Montana, respectively.  *See id*. at 2-11–2-12.  Anthropogenic disturbances include "[m]ining ([a]ctive locatable . . . [d]evelopments) . . . ."  *Id*. at 2-12.  Accordingly, the 3% disturbance cap precludes further anthropogenic disturbances if existing disturbance exceeds 3% within a given area subject to the Mining Law and valid existing rights.  *Id*. at 2-11–2-12.  However, it is unclear whether the 3% disturbance cap precludes other necessary disturbances associated with mining, such as roads.

449. The ID/MT BLM LUPA adopts the mining facility density cap proposed in the ID/MT PLUPA/FEIS. *Id*. at 2-13. Accordingly, the density cap precludes further disturbance from mining facilities if the existing disturbance exceeds the density cap, until the disturbance is reduced below the cap, or unless the mining facility would be in an already disturbed area. *Id*.

450. The ID/MT BLM LUPA adopts the uniform lek buffer-distances proposed in the ID/MT PLUPA/FEIS. *Id*. at 2-15; *id*. at B-1 (providing the lek buffer-distance restricts "surface disturbance (continuing human activities that alter or remove the natural vegetation) within 3.1 miles of leks"). Accordingly, the uniform 3.1 mile lek buffer-distance applies to any surface disturbances, including mining. *Id*. at 2-15.

451. Notably, the ID/MT BLM LUPA confirms that the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study. *Id*. AEMA and the public were never given an opportunity to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

452. The uniform lek buffer-distances imposed on surface disturbances adversely affect mining operations by restricting mineral exploration and development occurring within 3.1 miles of a lek. *Id*. at B-1–B-3. This management restriction also impairs rights granted under the Mining Law.

453. The ID/MT BLM LUPA adopts the net conservation gain standard proposed in the ID/MT PLUPA/FEIS. *See id*. at 2-34 (Montana's net conservation gain standard); *id*. at F-1–F-20 (regional mitigation strategy and Idaho mitigation framework). It adopts the definitions as proposed in the ID/MT PLUPA/FEIS. *Id*. at 5-2, 5-7.

454. The ID/MT BLM LUPA's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA. *See* 43 U.S.C. § 1732(b); 43 C.F.R.

112

§§ 3809.1, 3809.5. It subjects mining operations to a higher standard that is unlawful under the governing statute. Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard. Thus, Defendants have exceeded their authority by applying the net conservation gain standard to mineral development. It also impairs rights granted under the Mining Law.

455.    Notably, the Great Basin ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework. Great Basin BLM ROD at 1-25. This was the first time Defendants explicitly attributed the net conservation gain standard to this document. Accordingly, AEMA and the public were never given the opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

456.    The ID/MT BLM LUPA does not designate any new ACECs. However, SFAs are de facto ACECs. Therefore, the designation of SFAs violates FLPMA.

**NV/CA BLM LUPA**

457.    The NV/CA BLM LUPA applies to federal lands administered by the BLM in Nevada and Northeastern California. NV/CA BLM LUPA at 1-1–1-4. Accordingly, it provides management decisions for greater sage-grouse habitat, designated as SFAs, PHMAs, GHMAs, and OHMAs. *Id*. at 1-4, 1-6.

458.    Although Defendants found that mining is not a primary threat to greater sage-grouse, the NV/CA BLM LUPA recommends that 2,797,399 acres of SFAs be withdrawn from operation of the Mining Law. *Id*. at 1-9, 2-10, 2-30; 80 Fed. Reg. at 57,636 (proposing to withdraw 2,797,399 acres of SFAs in Nevada).

459.    Notably, the NV/CA BLM LUPA confirms that SFAs were created in response to the 2014 FWS Memo and its associated maps. NV/CA BLM LUPA at 1-6 ("SFAs were derived

from [greater sage-grouse] stronghold areas described by the [FWS] in [the 2014 FWS Memo]. The memorandum and associated maps provided by the [FWS] identify areas that represent recognized strongholds for [greater sage-grouse] that have been noted and referenced as having the highest densities of [greater sage-grouse] and other criteria important for the persistence of the species."). AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

460. The NV/CA BLM LUPA restricts mineral exploration and development vis-à-vis the following management decisions.

461. The NV/CA BLM LUPA adopts the 3% disturbance cap proposed in the NV/CA PLUPA/FEIS, as well as the process for calculating whether the 3% disturbance cap has been exceeded. *Id*. at 2-6–2-7. It also carries forward the same exception in Nevada, which allows a project that "result[s] in a net conservation gain at the BSU level" to move forward. *Id*. at 2-7. However, receiving this exception requires a "unanimous finding" of a net conservation gain result, as well as approval by the authorized director and concurrence by the BLM state director. *Id*. at 2-7. Qualifying for the Nevada exception requires unanimous satisfaction of numerous criteria. *See id*. There are no exceptions in California. Accordingly, the 3% disturbance cap precludes further anthropogenic disturbances if the existing disturbance exceeds 3% within a given area subject to the Mining Law and valid existing rights. *Id*. at 2-6–2-7. However, it is unclear whether the 3% disturbance cap precludes other necessary disturbances associated with mining, such as roads.

462. The NV/CA BLM LUPA adopts the mining facility density cap proposed in the NV/CA PLUPA/FEIS. *Id*. at 2-7–2-8. Again, this density cap only applies in California. *Id*. at 2-7. The NV/CA BLM LUPA clarifies that "mining facilities" include "[a]ctive locatable . . .

developments." *Id*. at 2-8.  Accordingly, the density cap precludes further disturbance from mining facilities if existing disturbance exceeds the density cap.  Further disturbance will only be allowed if existing disturbance is reduced below the density cap, or the mining facility would be located in an "existing disturbed area." *Id*. at 2-7–2-8.

463.    The NV/CA BLM LUPA adopts the uniform lek buffer-distances for PHMAs and GHMAs proposed in the NV/CA PLUPA/FEIS.  *Id*. at 2-8, 2-9, 2-30; *id*. at B-1 (providing the lek buffer-distance restricts "surface disturbance (continuing human activities that alter or remove the natural vegetation) within 3.1 miles of leks").  Accordingly, the uniform 3.1 lek buffer-distance applies to all surface disturbances, including mining.  *Id*. at 2-8, 2-9, 2-30.

464.    The uniform lek buffer-distances imposed on surface disturbances adversely affect mining operations by restricting mineral exploration and development occurring within 3.1 miles of a lek.  Consequently, this management restriction impairs rights granted under the Mining Law.

465.    Notably, the NV/CA BLM LUPA confirms that the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id*. at 2-8, 2-10.  AEMA and the public were never given an opportunity to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

466.    The NV/CA BLM LUPA also adopts the net conservation gain standard proposed in the NV/CA PLUPA/FEIS, but adjusts the language.  *Id*. at 2-8, 2-9.  The net conservation gain standard applies to activities in both PHMAs and GHMAs as follows:

> In PHMA, in undertaking BLM management actions, and consistent with valid existing rights and applicable law, in authorizing third-party actions that result in habitat loss and degradation, the BLM will require and ensure mitigation that provides a net conservation gain to the species, including accounting for any uncertainty associated with the effectiveness of the mitigation.

*Id*. at 2-8; *see id*. at 2-9 (same, but for GHMAs). The NV/CA BLM LUPA also adopts the definitions for "net conservation gain" and "baseline." *Id*. at 5-3, 5-14.

467. The NV/CA BLM LUPA's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA. *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5. It subjects mining operations to a higher standard that is unlawful under the governing statute. Moreover, there is nothing in the statute or the regulations that allows Defendants to implement a net conservation gain standard. Thus, Defendants have exceeded their authority by applying the net conservation gain standard to mineral development. It also impairs rights granted under the Mining Law.

468. Notably, the Great Basin BLM ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework. Great Basin BLM ROD at 1-25. This was the first time Defendants explicitly attributed the net conservation gain standard to this document. Accordingly, AEMA and the public were never given an opportunity to review or comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

469. The NV/CA BLM LUPA does not designate any new ACECs. However, SFAs are de facto ACECs. Therefore, the designation of SFAs violates FLPMA.

**OR BLM LUPA**

470. The OR BLM LUPA applies to federal lands administered by the BLM in Oregon. OR BLM LUPA at 1-1–1-5. Accordingly, it provides management decisions for greater sage-grouse habitat, designated as SFAs, PHMAs, and GHMAs. *Id*. at 1-5.

471. Although Defendants found that mining is not a primary threat within SFAs, the OR BLM LUPA recommends that SFAs be withdrawn from operation of the Mining Law. *Id*. at 1-10, 2-6, 2-24. The OR BLM LUPA designates 1,929,580 acres as SFAs and recommends

withdrawing approximately 1,835,800 acres.  OR PLUPA/FEIS at 2-178; 80 Fed. Reg. at 57,637 (proposing to withdraw 1,929,580 acres of SFAs in Oregon).

472.    Notably, the OR BLM LUPA confirms that SFAs were created in response to the 2014 FWS Memo and its associated maps.  OR BLM LUPA at 1-5–1-6 ("The SFA was derived from [greater sage-grouse] stronghold areas described by the [2014 FWS Memo].  The memorandum and associated maps provided by the [FWS] identify areas that represent recognized strongholds for [greater sage-grouse] that have been noted and referenced as having the highest densities of [greater sage-grouse] and other criteria important for the persistence of the species.").  AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

473.    The OR BLM LUPA restricts mineral exploration and development vis-à-vis the following management decisions.

474.    The OR BLM LUPA adopts the 3% disturbance cap proposed in the OR PLUPA/FEIS.  *Id*. at 2-6–2-7.  Accordingly, the 3% disturbance cap precludes further anthropogenic disturbances if the existing disturbance exceeds 3% in a given area until disturbance is reduced to below the cap, subject to applicable law and valid existing rights.  *Id*. at 2-6–2-7.  However, it is unclear whether the 3% disturbance cap precludes other necessary disturbances associated with mining, such as roads.

475.    The OR BLM LUPA adopts the same mining facility density cap proposed in the OR PLUPA/FEIS.  *Id*. at 2-7.  Accordingly, the density cap precludes further disturbance from mining facilities if the existing disturbance exceeds the cap subject to applicable law and valid existing rights.  Further disturbance will only be allowed if existing disturbance is reduced to below the cap, or the mining facility would be located in an "existing disturbed area[.]"  *Id*.

476.     The OR BLM LUPA adopts the uniform lek buffer-distances for PHMAs and GHMAs proposed in the OR PLUPA/FEIS.  *Id*.; *id*. at B-1 (providing the uniform lek buffer-distance restricts "surface disturbance (continuing human activities that alter or remove the natural vegetation) within 3.1 miles of leks").  Accordingly, the uniform 3.1 lek buffer-distance applies to all surface disturbances, including mining.  *Id*. at 2-7.

477.     Notably, the OR BLM LUPA confirms that the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id*.  AEMA and the public were never given an opportunity to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

478.     The uniform lek buffer-distances imposed on surface disturbances adversely affect mining operations by restricting mineral exploration and development occurring within 3.1 miles of a lek, because of purported impacts on the greater sage-grouse and its habitat.  This management restriction also impairs rights granted under the Mining Law.

479.     The OR BLM LUPA also adopts the net conservation gain standard proposed in the OR PLUPA/FEIS, *id*. at 2-8, including the same definitions for "net conservation gain" and "baseline," except for minimal adjustments in language.  *Id*. at 5-3, 5-16.

480.     The OR BLM LUPA's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5.  It subjects mining operations to a higher standard that is unlawful under the governing statute.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded their authority by applying the net conservation gain standard to mineral development.  It also impairs rights granted under the Mining Law.

481.    The OR BLM LUPA adopts the same management decision for locatable minerals proposed in the OR PLUPA/FEIS.  OR BLM LUPA at 2-24 ("To the extent consistent with the rights of a mining claimant under existing laws and regulations, limit surface disturbance, and provide recommendations for net conservation gain of Greater Sage-grouse habitat.").

482.    Notably, the Great Basin BLM ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework.  Great Basin BLM ROD at 1-25.  This was the first time Defendants explicitly attributed the net conservation gain standard to the 2014 FWS Mitigation Framework.  Accordingly, AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

483.    The OR BLM LUPA does not designate any new ACECs.  However, SFAs are de facto ACECs.  Therefore, the designation of SFAs violates FLPMA.

**UT BLM LUPA**

484.    The UT BLM LUPA applies to federal lands administered by the BLM in Utah and Wyoming.  UT BLM LUPA at 1-1–1-7.  Accordingly, it provides management decisions for greater sage-grouse habitat, designated as SFAs, PHMAs, and GHMAs.  *Id.* at 1-5–1-6.

485.    The UT BLM LUPA recommends that SFAs (including 181,000 acres of BLM surface estate; and 52,200 acres of split-estate federal minerals) be withdrawn from operation of the Mining Law.  *Id.* at 2-8, 2-28.  In total, the UT BLM LUPA recommends the withdrawal of approximately 230,808 acres of SFAs.  80 Fed. Reg. at 57,637.

486.    Notably, the UT BLM LUPA confirms that SFAs were created in response to the 2014 FWS Memo and its associated maps.  UT BLM LUPA at 1-6 ("SFA[s] were derived from

[greater sage-grouse] stronghold areas described by the [2014 FWS Memo]. The memorandum and associated maps provided by the [FWS] identify areas that represent strongholds for [greater sage-grouse] that have been noted and referenced as having the highest breeding densities of [greater sage-grouse] and other criteria important for the persistence of the species."). AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

487. The UT BLM LUPA restricts mineral exploration and development vis-à-vis the following management decisions.

488. The UT BLM LUPA adopts the 3% disturbance cap in PHMAs proposed in the UT PLUPA/FEIS with some minor variations in language. *Id*. at 2-9–2-10. Accordingly, the 3% disturbance cap precludes further anthropogenic disturbances if the existing disturbance exceeds 3% in a given area until the disturbance is reduced to below the cap, subject to applicable law and valid existing rights. *Id*. at 2-9–2-10; *see also id*. at 2-28 ("Regardless of whether agreements with the claimant incorporates the 3[%] disturbance cap . . . , disturbance from locatable mineral development will be included as disturbance when calculating disturbance for other land uses."). However, it is unclear whether the 3% disturbance cap precludes other necessary disturbances associated with mining, like roads.

489. The UT BLM LUPA adopts the mining facility density cap in PHMAs proposed in the UT PLUPA/FEIS. *Id*. at 2-10. The UT BLM LUPA clarifies that "mining facilities" include "[a]ctive locatable . . . developments." *Id*. Accordingly, the density cap precludes further disturbance from mining facilities in a given area if the existing disturbance exceeds the density cap. Further disturbance will only be allowed if existing disturbance is reduced to below the density cap, or the mining facility would be located in an "existing disturbed area . . . ." *Id*.

490.    The UT BLM LUPA adopts the uniform lek buffer-distances for PHMAs and GHMAs proposed in the UT PLUPA/FEIS.  *Id*. at 2-11, 2-12–2-13; *id*. at B-1 (providing the lek buffer-distance restricts "surface disturbance (continuing human activities that alter or remove the natural vegetation) within 3.1 miles of leks").  Accordingly, the uniform 3.1 lek buffer-distance applies to all surface disturbances, including mining.  *Id*. at 2-11, 2-12–2-13.

491.    The uniform lek buffer-distances imposed on surface disturbances adversely affect mining operations by restricting mineral exploration and development occurring within 3.1 miles of a lek, because of purported impacts on the greater sage-grouse and its habitat.  This management restriction also impairs rights granted under the Mining Law.

492.    Notably, the UT BLM LUPA confirms that the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id*.  AEMA and the public were never given an opportunity to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

493.    The UT BLM LUPA also adopts the net conservation gain standard proposed in the UT PLUPA/FEIS.  *Id*. at 2-9, 2-12.  The net conservation gain standard applies to activities in both PHMAs and GHMAs.  *Id*. at 2-9, 2-12.  It also adopts the same definitions for "net conservation gain" and "baseline," except for minimal adjustments in language.  *Id*. at 5-2, 5-13.

494.    The UT BLM LUPA's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5.  It subjects mining operations to a higher standard that is unlawful under the governing statute.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded

their authority by applying the net conservation gain standard to mineral development.  It also impairs rights granted under the Mining Law.

495.    Notably, the Great Basin BLM ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework.  Great Basin BLM ROD at 1-25.  This was the first time Defendants explicitly attributed the net conservation gain standard to this document.  Accordingly, AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

496.    The UT BLM LUPA also provides that Defendants shall:

Allow exploration for all minerals . . . within mapped occupied [greater sage-grouse] habitat areas that are not closed to leasing, permitting, etc., to obtain exploratory information.  In areas where leasing, permitting, etc. is still available, minerals exploration shall be subject to the pertinent management for discretionary activities in PHMA . . . and GHMA . . . .

UT BLM LUPA at 2-25.  Management for discretionary activities includes the 3% disturbance cap, density cap, uniform lek buffer-distances, and the net conservation gain standard.  *Id*. at 2-25, 2-9–2-12.

497.    The UT BLM LUPA does not designate any new ACECs.  However, SFAs are de facto ACECs.  Therefore, the designation of SFAs violates FLPMA.

**J.    The Great Basin USFS ROD.**

498.    On September 16, 2015, Defendant Rasure and Defendant Marten signed and approved the Great Basin USFS ROD.  Great Basin USFS ROD at 73.

499.    The Great Basin USFS ROD approved four amendments:  (a) ID/MT USFS LUPA; (b) NV USFS LUPA; (c) UT USFS LUPA; and (d) WY USFS LUPA.  *Id*. at 74; *see also* "Notice of Availability of the Record of Decision and Approved Land Management Plan

Amendments for the Great Basin Region Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Utah," 80 Fed. Reg. 57,333 (Sept. 23, 2015).

500.    Generally, greater sage-grouse habitat is designated as:  (a) PHMA; and (b) GHMA.  Great Basin USFS ROD at 19.  However, some land use plans amendments designate greater sage-grouse habitat in a third category.  For instance, Nevada designates OHMAs and Idaho designates IHMAs.  *Id*.

501.    Additionally, all approved land use plan amendments designate SFAs.  *Id*. at 1-15.  The total number of acres (USFS-administered) designated as SFAs is 862,400 acres.  *Id*. at 21–22.  Across the board, these SFAs are recommended for withdrawal from operation of the Mining Law.  *Id*. at 34; *see also* 80 Fed. Reg. at 57,635–37 (proposing to withdraw acres of SFAs on National Forest System lands).

502.    Notably, the Great Basin USFS ROD confirms that SFAs were created in response to the 2014 FWS Memo and its associated maps.  Great Basin USFS ROD at 40.  AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

503.    Unlike the Great Basin BLM ROD, which mentioned the 2014 FWS Mitigation Framework for the first time and attributed the net conservation gain standard to it, the Great Basin USFS ROD does not mention the 2014 FWS Mitigation Framework.  Accordingly, AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

504.    The Great Basin USFS ROD also incorporated the minimum uniform lek buffer distances as specified in the 2014 USGS Buffer Study as guidelines.  *Id*. at 39 ("The lek buffer-distances specified as the lower end of the interpreted range will be applied in the report unless

justifiable departures are determined to be appropriate (as subject to applicable laws and regulations, such as the [Mining Law], as amended, valid existing rights, etc.").

505.    For the first time in the land use plan amendment process, Defendants included a "finding of non-significance" in the Great Basin USFS ROD, which reflects Defendants' belief that the amendments do not result in significant changes to the existing plans.  *Id*. at 65–67. Defendants determined that the amendments, to the existing plans, do not "significantly alter" multiple use goals and objectives, or "affect land and resources throughout a large portion of the planning area . . . ."  *Id*. at 66.  Defendants' analysis for the Curlew National Grassland was similar, and contained a finding that the amendments "would not significantly alter" multiple use goals and objectives.  *Id*. at 66.  However, Defendants have failed to support this finding of non-significance.  These amendments are significant.

506.    Importantly, the Great Basin USFS ROD premises the following approved land use plan amendments on its conclusion that greater sage-grouse and its habitat are "most threatened by fire and invasive species[,]" *id*. at 45, not mining.  Yet, the Great Basin USFS ROD still approves the overly restrictive standards and guidelines that apply to locatable mineral operations and other uses of federal lands.

### ID/MT USFS LUPA

507.    The ID/MT USFS LUPA applies to federal lands administered by the USFS in Idaho and Montana.  Great Basin USFS ROD at 15.  Accordingly, it provides management direction for SFAs, PHMAs, IHMAs, and GHMAs.  *Id*. at 19.

508.    The ID/MT USFS LUPA restricts mineral exploration and development vis-à-vis the following standards and/or guidelines.

509.    The ID/MT USFS LUPA adopts the 3% disturbance cap proposed in the ID/MT

PLUPA/FEIS, except the 3% disturbance cap no longer applies in IHMAs in Idaho.  *Id*. at 77.

The ID/MT USFS LUPA also explains that:

> Discretionary activities that might result in disturbance above 3% (5% in Montana
> when fully implemented) at the [BSU] and proposed project area would be
> prohibited unless approved by the forest supervisor with concurrence from the
> regional forester after review of new or site-specific information that indicates the
> project *would result in a net conservation gain at the [BSU] and proposed project
> area scale.*

*Id*. (emphasis added).  As the aforementioned indicates, Montana will use a 5% disturbance cap

once the Montana strategy is implemented.  *Id*.  Accordingly, the 3% disturbance cap precludes

further anthropogenic disturbances if the existing disturbance exceeds 3% (5% in Montana once

implemented) within a given area.  *Id*.  Anthropogenic disturbances are defined to include

"mines."  *Id*. at 92.  However, it does note to "[c]onsider the likelihood of surface disturbing

activities as a result of development of valid existing rights when authorizing new projects in

[PHMAs]."  *Id*. at 78.  However, it does not provide that it is subject to the Mining Law or valid

existing rights.

510.    The ID/MT USFS LUPA also adopts the net conservation gain standard, but with

some modifications to the language proposed in the ID/MT PLUPA/FEIS.  *Id*. at 78.  It proposes

the following net conservation gain standard:

> In [PHMA, GHMA, IHMA, and SFAs], only allow new authorized land uses if,
> after avoiding and minimizing impacts, any remaining residual impacts to the
> greater sage-grouse or its habitat are fully offset by compensatory mitigation
> projects that provide a net conservation gain to the species, subject to valid
> existing rights by applying beneficial mitigation actions.

*Id*.  It also modifies the definition of "net conservation gain."  *See id*. at 96.  It still defines "net

conservation gain" as "[t]he actual benefit or gain above baseline conditions[,]" but it adds the

following:  "Actions which result in habitat loss and degradation include those identified as

threats which contribute to [greater sage-grouse] disturbances as identified by the [FWS] in its 2010 listing decisions . . . ."  *Id*. at 96–97.  The ID/MT USFS LUPA now uses the term "baseline condition" instead of "baseline."  *See id*. at 92.  However, the substantive definition has not changed.

511.    The ID/MT USFS LUPA's net conservation gain standard conflicts with the USFS's regulatory requirement for operations to minimize adverse environmental impacts on surface resources.  *See* 36 C.F.R. § 228.8; *see also* 16 U.S.C. § 478.  It subjects mining operations to a higher standard that is unlawful under the governing statute or regulation.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded their authority by applying the net conservation gain standard to mineral development.  It also impairs rights granted under the Mining Law.

512.    The ID/MT USFS LUPA also adopts the standard for mitigation in regard to locatable minerals from the ID/MT PLUPA/FEIS.  Great Basin USFS ROD at 90.

513.    The ID/MT USFS LUPA does not designate any new special management areas, *i.e.*, zoological areas.  However, SFAs are de facto zoological areas.  Therefore, the designation of SFAs violates NFMA.

**NV USFS LUPA**

514.    The NV USFS LUPA applies to federal lands administered by the USFS in Nevada.  Great Basin USFS ROD at 15–16.  Accordingly, it provides management direction for SFAs, PHMAs, OHMAs, and GHMAs.  *Id*. at 19.

515.    The NV USFS LUPA restricts mineral exploration and development vis-à-vis the following standards and/or guidelines.

516.    The NV USFS LUPA adopts the 3% disturbance cap proposed in the NV/CA

PLUPA/FEIS.  *Id*. at 113.  This standard does note to "[c]onsider the likelihood of surface

disturbing activities as a result of development of valid existing rights when authorizing new

projects in [PHMAs]."  *Id*.  However, it does not provide that it is subject to the Mining Law or

valid existing rights.  Also, the NV USFS LUPA modifies the exemption proposed in the NV/CA

PLUPA/FEIS slightly.  The NV USFS LUPA now requires:

> Discretionary activities that might result in disturbance above 3% at the [BSU]
> and proposed project area would be prohibited unless approved by the forest
> supervisor with concurrence from the regional forester after review of new or site-
> specific information that indicates *the project would result in a net conservation
> gain at the [BSU] and proposed project area scale*.

*Id*. at 113 (emphasis added).  Previously, there was an additional exception—if "the project

could occur without significant impacts to [greater sage-grouse] . . . ," but this language does not

appear in the NV USFS LUPA.  NV/CA PLUPA/FEIS at 2-60.

517.    The NV USFS LUPA adopts the net conservation gain standard, but with some

modifications to the language proposed in the NV/CA PLUPA/FEIS.  It proposes the following

net conservation gain standard:

> In [PHMAs, GHMAs, and SFAS], only allow new authorized land uses, if after
> avoiding and minimizing impacts, any remaining residual impacts to greater sage-
> grouse or their habitats are fully offset by compensatory mitigation projects that
> provide a net conservation gain to the species, subject to valid existing rights, by
> applying beneficial mitigation actions.

Great Basin USFS ROD at 113.  The NV USFS LUPA also modifies the definition of "net

conservation gain."  *See id*. at 133.  It still defines "net conservation gain" as "[t]he actual benefit

or gain above baseline conditions[,]" but it adds the following:  "Actions which result in habitat

loss and degradation include those identified as threats which contribute to [greater sage-grouse]

disturbances as identified by the [FWS] in its 2010 listing decisions . . . ."  *Id*. at 133.  The NV

USFS LUPA now uses the term "baseline condition" instead of "baseline." *See id*. at 129. However, the substantive definition has not changed.

518.     The NV USFS LUPA's net conservation gain standard conflicts with the USFS's regulatory requirement for operations to minimize adverse environmental impacts on surface resources. *See* 36 C.F.R. § 228.8; *see also* 16 U.S.C. § 478.  It subjects mining operations to a higher standard that is unlawful under the governing statute or regulation.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded their authority by applying the net conservation gain standard to mineral development.  It also impairs rights granted under the Mining Law.

519.     The NV USFS LUPA adopts the same standard for mitigation in regard to locatable minerals from the NV/CA PLUPGA/FEIS.  *Id*. at 127.

520.     The NV USFS LUPA does not designate any new special management areas, *i.e.*, zoological areas.  However, SFAs are de facto zoological areas.  Therefore, the designation of SFAs violates NFMA.

**UT USFS LUPA**

521.     The UT USFS LUPA applies to federal lands administered by the USFS in Utah. Great Basin ROD at 15.  Accordingly, it provides management direction for SFAs, PHMAs, and GHMAs. *Id*. at 19–21.

522.     The UT USFS LUPA restricts mineral exploration and development vis-à-vis the following standards and/or guidelines.

523.     The UT USFS LUPA adopts the 3% disturbance cap in the UT PLUPA/FEIS.  UT USFS LUPA at 142.  This standard does note to "[c]onsider the likelihood of surface disturbing activities as a result of development of valid existing rights when authorizing new projects in

[PHMAs]." *Id.*  However, it does not provide that it is subject to the Mining Law or valid

existing rights.  Also, the UT USFS LUPA adds an exemption, as follows:

> Discretionary activities that might result in disturbance above 3% at the [BSU]
> and proposed project area would be prohibited unless approved by the forest
> supervisor with concurrence from the regional forester after review of new or site-
> specific information that indicates the project would result in a net conservation
> gain at the [BSU] and proposed project area scale.

*Id.*

524.    The UT USFS LUPA also adopts the net conservation gain standard, but with

some modifications to the language proposed in the UT PLUPA/FEIS.  *Id.*  The UT USFS LUPA

requires the following net conservation gain standard:

> In [PHMAs, GHMAs, SFAS, and Anthro Mountain], only allow new authorized
> land uses if after avoiding and minimizing impacts, any remaining residual
> impacts to greater sage-grouse or its habitat are fully offset by compensatory
> mitigation projects that provide a net conservation gain to the species, subject to
> valid existing rights, by applying beneficial mitigation actions.

*Id.*  The UT USFS LUPA also modifies the definition of "net conservation gain" slightly, by

removing the language pertaining to exceptions for vegetation treatments to benefit the Utah

prairie dog.  *Id.* at 162.  The UT USFS LUPA now uses the term "baseline condition" instead of

"baseline."  *Id.* at 158.  However, the substantive definition has not changed.

525.    The UT USFS LUPA's net conservation gain standard conflicts with the USFS's

regulatory requirement for operations to minimize adverse environmental impacts on surface

resources.  *See* 36 C.F.R. § 228.8; *see also* 16 U.S.C. § 478.  It subjects mining operations to a

higher standard that is unlawful under the governing statute or regulation.  Moreover, there is

nothing in the statute or the regulation that allows Defendants to implement a net conservation

gain standard.  Thus, Defendants have exceeded their authority FLPMA by applying the net

conservation gain standard to mineral development.  It also impairs rights granted under the

Mining Law.

526.    The UT USFS LUPA also adopts the standard for mitigation in regard to locatable

minerals from the UT PLUPA/FEIS.  Great Basin USFS ROD at 156.

527.    The UT USFS LUPA does not designate any new special management areas, *i.e.*,

zoological areas.  However, SFAs are de facto zoological areas.  Therefore, the designation of

SFAs violates NFMA.

**WY USFS LUPA**

528.    The WY USFS LUPA applies to federal lands administered by the USFS in

Wyoming, specifically the portions of the Ashley and Uinta-Wasatch-Cache National Forests

that occur in Wyoming.  Great Basin USFS ROD at 15, 173.  Accordingly, it provides

management direction for SFAs, PHMAs, and GHMAs.  Great Basin USFS ROD at 19–21.

529.    The WY USFS LUPA restricts mineral exploration and development vis-à-vis the

following standards and/or guidelines.

530.    The WY USFS LUPA adopts the 5% disturbance cap proposed in the UT

PLUPA/FEIS, but modifies the language.  *Id*. at 178.  It proposes:

> In [PHMAs and SFAs, do not authorize surface disturbing activities unless all
> existing discrete anthropogenic disturbances cover less than 5% of the suitable
> habitat in the surrounding area using the current [DDCT] process or its
> replacement and the new use will not cause exceedance of the 5% cap.  An
> exception is described in GRSG-M-LM-ST-097-Standard.  Consider the
> likelihood of surface disturbing activities as a result of development of valid
> existing rights when authorizing new projects in [PHMAs].

*Id*. at 178.  Confusingly, the 5% disturbance cap is labeled first as a guideline, and then later as a

standard.  The WY USFS LUPA's GRSG-M-LM-ST-097-Standard provides:  "The disturbance

cap described in GRSG-TDDD-ST-022-Standard will not be applied to foreclose development of

locatable minerals on unpatented claims located under the [Mining Law]; the disturbance from

locatable mining will be accounted for when determining the percent disturbance and whether

the cap has been exceeded." *Id*. at 190.  However, it is unclear whether the 5% disturbance cap

precludes other necessary disturbances associated with mining, like roads.  In addition, the WY

USFS LUPA also includes the same exemption, as follows:

> On a case-by-case basis, and only when it can be demonstrated that the activity
> will not cause declines in the greater sage-grouse populations, allow exceptions
> and modifications.  The authorized officer may grant an exception if a review
> determines that the action, as proposed or conditioned, would not impair the
> function or utility of the site for the current or subsequent seasonal habitat, life-
> history, or behavioral needs of the greater sage-grouse.

*Id*. at 178 n.3.

531.    The WY USFS LUPA for the first time adopts a particular net conservation gain

standard.  *Id*. at 177.  It provides:

> In [PHMA, GHMA, and SFA,] only allow new authorized land uses if after
> avoiding and minimizing impacts, any remaining residual impacts to the greater
> sage-grouse or its habitat are fully offset by compensatory mitigation projects that
> provide a net conservation gain to the species, subject to valid existing rights, by
> applying beneficial mitigation actions.

*Id*.  In the UT PLUPA/FEIS, the net conservation gain standard applied only to in-kind

mitigation.  UT PLUPA/FEIS at 2-58.  This is a substantial change.

532.    The WY USFS LUPA also modifies the definition of "net conservation gain"

slightly, by removing the exceptions for vegetation treatments to benefit the Utah prairie dog.

Great Basin USFS ROD at 195.  It also now defines "baseline condition" instead of "baseline."

*Id*. at 192.  However, the substantive definition has not changed.

533.    The WY USFS LUPA's new net conservation gain standard conflicts with the

USFS's regulatory requirement for operations to minimize adverse environmental impacts on

surface resources.  *See* 36 C.F.R. § 228.8; *see also* 16 U.S.C. § 478.  It subjects mining

operations to a higher standard that is unlawful under the governing statute or regulation.

Moreover, there is nothing in statute or regulation that allows Defendants to implement a net

conservation gain standard.  Thus, Defendants have exceeded their authority by applying the net

conservation gain standard to mineral development.  It also impairs rights granted under the

Mining Law.

534.    AEMA and the public were never given an opportunity to review and comment

on the 2014 FWS Mitigation Framework or the net conservation gain standard.

535.    The WY USFS LUPA adopts the mining facility density cap proposed in the UT

PLUPA/FEIS.  *Id*. 178.  The WY USFS LUPA includes the same exemption.  Great Basin USFS

ROD at 178 n.3.

536.    The WY USFS LUPA also adopts the standard for mitigation in regard to

locatable minerals from the UT PLUPA/FEIS.  *Id*. at 190.

537.    The WY USFS LUPA does not designate any new special management areas, *i.e.*,

zoological areas.  However, SFAs are de facto zoological areas.  Therefore, the designation of

SFAs violates NFMA.

**K.      The Rocky Mountain BLM ROD.**

538.    On September 21, 2015, Defendant Kornze and Defendant Schneider signed and

approved the Rocky Mountain BLM ROD.  Rocky Mountain BLM ROD at 9-1.

539.    On September 22, 2015, Defendants released the Rocky Mountain BLM ROD.

540.    The Rocky Mountain BLM ROD approves the following revised resource

management plans, as challenged in this action:  (a) HiLine ARMP; (b) Cody ARMP; and (c)

Worland ARMP.  *Id*. at iii; *see also* "Notice of Availability of the Record of Decision; and

Approved Resource Management Plan Amendments for the Rocky Mountain Region Greater

Sage-Grouse Sub-Regions of Lewiston, North Dakota, Northwest Colorado, Resource

Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National

Monument, South Dakota, and Worland," 80 Fed. Reg. 57,639 (Sept. 24, 2015).

541. Generally, greater sage-grouse habitat is designated as: (a) PHMAs; and (b)

GHMAs. Rocky Mountain BLM ROD at 1-15.

542. In addition, the HiLine ARMP designates SFAs. These SFAs (927,074 acres) are

recommended for withdrawal from operation of the Mining Law. *See* 80 Fed. Reg. at 57,636

(proposing to withdraw 983,156 acres of SFAs in Montana).

543. Interestingly, for the first time throughout the land use plan amendment process,

Defendants acknowledge the 2014 FWS Mitigation Framework in the Rocky Mountain BLM

ROD. *Id*. at 1-25. The Rocky Mountain BLM ROD provides that the "[net conservation gain]

standard is consistent with the recommendation in the [2014 FWS Mitigation Framework],

which states that mitigation 'should be strategically designed to result in net overall positive

outcomes for sage-grouse.'" *Id*. at 1-27. AEMA and the public were never given an opportunity

to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain

standard.

**HiLine ARMP**

544. The HiLine ARMP applies to the federal lands administered by the BLM in

Northern Montana. HiLine ARMP at 1-2. Accordingly, it provides management decisions for

greater sage-grouse in SFAs, PHMAs, and GHMAs. *Id*. at 2-1, 2-3.

545. Although mining is not a present threat to the greater sage-grouse, the HiLine

ARMP recommends that SFAs (927,074 acres) be withdrawn from operation of the Mining Law.

*Id*. at 3-52, 3-81.

546.     Notably, the HiLine ARMP confirms that SFAs were created as a result of the 2014 FWS Memo and its associated maps. *Id*. at 2-3 ("The SFA was derived from [greater sage-grouse] stronghold areas described in [2014 FWS Memo].  The memorandum and associated maps provided by the [FWS] identify areas that represent recognized strongholds for [greater sage-grouse] that have been noted and referenced as having the highest breeding densities of [greater sage-grouse] and other criteria important for the persistence of the species.").  AEMA and the public were never given an opportunity to review and comment on the 2014 FWS Memo or the SFAs.

547.     The HiLine ARMP restricts mineral exploration and development vis-à-vis the following management decisions.

548.     The HiLine ARMP adopts the same 3% disturbance cap (5% once implemented) proposed by the HiLine PRMP/FEIS with some slight modifications.  *Id*. at 3-81.  It provides:

> If the 3% anthropogenic disturbance cap is exceeded on lands (regardless of landownership) or if anthropogenic disturbance and habitat loss associated with conversion of agricultural tillage or fire exceed 5% within a project analysis area, then no further discrete anthropogenic disturbances (subject to applicable laws and regulations, such as the [Mining Law], valid existing rights, etc.) will be permitted by the BLM within a project analysis area until the disturbance has been reduced to less than the cap.

*Id*. at 3-81.  Accordingly, the 3% disturbance cap (5% once implemented) precludes further anthropogenic disturbances if existing disturbance exceeds 3% within a given area until disturbance is reduced to less than the cap.  *Id*.  However, it is unclear whether the 3% disturbance cap (5% once implemented) precludes other necessary disturbances associated with mining, like roads.

549.     The HiLine ARMP adopts the mining facility density cap proposed in the HiLine PRMP/FEIS.  *Id*. at 3-81–3-83.

550.     The HiLine ARMP adopts the uniform lek buffer-distances proposed in the HiLine PRMP/FEIS.  *Id.* at 3-81; *id.* at B-1.  Accordingly, the uniform lek buffer-distance of 3.1 miles applies to any surface disturbances, like mining.

551.     Notably, the HiLine ARMP confirms that the uniform lek buffer-distances were derived from the 2014 USGS Buffer Study.  *Id.* at 3-81.  AEMA and the public were never given an opportunity to review and comment on the 2014 USGS Buffer Study or the uniform lek buffer-distances.

552.     The uniform lek buffer-distances imposed on surface disturbances adversely affect mining operations by restricting mineral exploration and development occurring within 3.1 miles of a lek, because of purported impacts on the greater sage-grouse and its habitat.  This management restriction also impairs rights granted under the Mining Law.

553.     The HiLine ARMP also adopts the net conservation gain standard proposed in the HiLine PRMP/FEIS, *id.* at 3-80–3-81, including the definition for "net conservation gain."  *Id.* at 6-12.  However, it removes the definition for "baseline" completely.

554.     The HiLine ARMP's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5; HiLine ARMP at 3-52 ("Within the limits of the Mining Laws, the BLM will apply COA . . . to Plans of Operations to prevent undue and unnecessary degradation to [greater sage-grouse] habitat.").  It subjects mining operations to a higher standard that is unlawful under the governing statute.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded their statutory and regulatory authority by applying the net conservation gain standard to mineral development.  The HiLine ARMP also impairs rights granted under the Mining Law.

555.    Notably, the Rocky Mountain BLM ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework.  Rocky Mountain BLM ROD at 1-27.  This was the first time Defendants explicitly attributed the net conservation gain standard to this document.  Accordingly, AEMA and the public were never given the opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

556.    The HiLine ARMP does not designate any new ACECs for the greater sage-grouse.  However, SFAs are de facto ACECs.  Therefore, the designation of SFAs violates FLPMA.

**Cody ARMP**

557.    The Cody ARMP is a product of the Bighorn DRMP/EIS, Bighorn SRMP/EIS, and Bighorn PRMP/FEIS.  Cody ARMP at 1.

558.    The Cody ARMP applies to the federal lands administered by the BLM in Wyoming.  *Id*. at 1.  Accordingly, it provides management decisions for greater sage-grouse in PHMAs and GHMAs.  *Id*. at 11.

559.    The Cody ARMP does not designate any SFAs.  *Id*. at 11.

560.    The Cody ARMP restricts mineral exploration and development vis-à-vis the following management decisions.

561.    The Cody ARMP adopts the mining facility density cap proposed in the Bighorn PRMP/FEIS.  *Id*. at 88.

562.    The Cody ARMP also adopts the net conservation gain standard as part of its mitigation strategy.  *Id*. at 288.

563.    The Cody ARMP's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA. *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5.  It subjects mining operations to a higher standard that is unlawful under the governing statute.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded their statutory and regulatory authority by applying the net conservation gain standard to mineral development.  It also impairs rights granted under the Mining Law.

564.    Notably, the Rocky Mountain BLM ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework.  Rocky Mountain BLM ROD at 1-27.  This was the first time Defendants explicitly attributed the net conservation gain standard to this document.  Accordingly, AEMA and the public were never given the opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

**Worland ARMP**

565.    The Worland ARMP is a product of the Bighorn DRMP/EIS, Bighorn SRMP/EIS, and Bighorn PRMP/FEIS.  Worland ARMP at 1.

566.    The Worland ARMP applies to the federal lands administered by the BLM in Wyoming.  Worland ARMP at 1.  Accordingly, it provides management decisions for greater sage-grouse in PHMAs and GHMAs.  *Id*. at 11.

567.    The Worland ARMP does not designate any SFAs.  *Id*. at 11.

568.    The Worland ARMP restrict minerals exploration and development vis-à-vis the following management decisions.

569.   The Worland ARMP adopts the mining facility density cap proposed in the Bighorn PRMP/FEIS.  *Id*. at 87.

570.   The Worland ARMP also adopts the net conservation gain standard as part of its mitigation strategy.  *Id*. at 288.

571.   The Worland ARMP's net conservation gain standard conflicts with the unnecessary or undue degradation standard under FLPMA.  *See* 43 U.S.C. § 1732(b); 43 C.F.R. §§ 3809.1, 3809.5.  It subjects mining operations to a higher standard that is unlawful under the governing statute.  Moreover, there is nothing in the statute or the regulation that allows Defendants to implement a net conservation gain standard.  Thus, Defendants have exceeded their statutory and regulatory authority by applying the net conservation gain standard to mineral development.  It also impairs rights granted under the Mining Law.

572.   Notably, the Rocky Mountain BLM ROD confirms that the net conservation gain standard was derived from the 2014 FWS Mitigation Framework.  Rocky Mountain BLM ROD at 1-27.  This was the first time Defendants explicitly attributed the net conservation gain standard to this document.  Accordingly, AEMA and the public were never given the opportunity to review and comment on the 2014 FWS Mitigation Framework or the net conservation gain standard.

**L.   The Proposed Withdrawal Of SFAs And The FWS's Decision Not To List The Greater Sage-Grouse Pursuant To The ESA.**

573.   On September 24, 2015, the BLM published its "Notice of Proposed Withdrawal; Sagebrush Focal Areas; Idaho, Montana, Nevada, Oregon, Utah, and Wyoming and Notice of Intent to Prepare an Environmental Impact Statement" in the *Federal Register*.  80 Fed. Reg. at 57,635–37.  Thus, Defendants applied to withdraw approximately 10 million acres of federal locatable mineral estate (SFAs) from operation of the Mining Law.  *Id*.  Defendant Schneider

138

approved the application.  *Id*. at 57,635.  Thus, the recommendations for withdrawal in all

LUPAs/ARMPs were not mere suggestions, as they have been formally acted upon.

574.    On October 2, 2015, shortly after the RODs were signed, the FWS published its

"12-Month Finding on a Petition to List Greater Sage-Grouse (Centrocercus urophasianus) as an

Endangered or Threatened Species" in the *Federal Register* finding that "listing of the greater

sage-grouse is not warranted at this time."  80 Fed. Reg. 59,858, 59,858 (Oct. 2, 2015).

## FIRST CLAIM FOR RELIEF
### FLPMA, NFMA, and NEPA Violations
### (Failure To Provide For Public Participation)

575.    AEMA incorporates the allegations in the preceding paragraphs as if fully set

forth herein.

576.    AEMA and its members have suffered "legal wrong" and are "adversely affected"

and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

577.    The RODs, LUPAs, and ARMPs are final agency actions for which there are no

other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great

Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

578.    FLPMA requires Defendants to provide adequate notice and opportunity to

comment upon and participate in the formulation of land use plan amendments/revisions.  43

U.S.C. § 1712(f); 43 C.F.R. § 1610.2(a).

579.    NFMA requires Defendants to "provide for public participation in the

development, review, and revision of land management plans . . . ."  16 U.S.C. § 1604(d); *see

also* 36 C.F.R. § 219.4(a).  Only if the USFS makes a supportable finding of non-significance

may public participation in the amendment process not have to comply with 16 U.S.C. §

1604(d).  *See* 16 U.S.C. § 1604(f)(4).

580.     NEPA requires agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6(a).

581.     Defendants' proposed land use plan amendments/revisions and FEISs included significant and material changes that were not present in the draft land use plan amendments/revisions and DEISs.  These significant and material changes were:

      a.      proposing to designate SFAs, and recommending to withdraw SFAs from operation of the Mining Law;

      b.      proposing to adopt a net conservation gain standard; and

      c.      proposing to apply uniform lek buffer-distances.

582.     In the Great Basin USFS ROD, Defendants inexplicably made a last minute finding of non-significance.  This finding of non-significance is not supported by the evidence.  Thus, Defendants' last minute finding of non-significance in the Great Basin USFS ROD is:

      a.      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      b.      contrary to constitutional right, power, privilege, or immunity;

      c.      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

      d.      without observance of procedure required by law.

5 U.S.C. § 706(2).

583.     Defendants failed to provide AEMA and its members with notice and an opportunity to participate in the formulation of these significant and material changes before the changes were included in the proposed land use plan amendments/revisions, and ultimately adopted and approved in the RODs, LUPAs, and ARMPs.

584.   AEMA and its members were unable to submit comments on these significant and material changes, because these changes were not present in the draft land use plan amendments/revisions.

585.   Thus, Defendants violated FLPMA, NFMA, and NEPA by failing to provide AEMA and the public with an adequate opportunity to participate in regard to the significant and material changes.

586.   Therefore, the challenged RODs, LUPAs, and ARMPs are:

      a.      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      b.      contrary to constitutional right, power, privilege, or immunity;

      c.      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

      d.      without observance of procedure required by law.

5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### NEPA Violation
### (Failure To Prepare A Supplemental EIS)

587.   AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

588.   AEMA and its members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

589.   The RODs, LUPAs, and ARMPs are final agency actions for which there are no other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

590. NEPA requires agencies to supplement a draft environmental impact statement or final environmental impact statement if, *inter alia*: (a) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns;" or (b) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §§ 1502.9(c)(1)(i), (ii).

591. Defendants were provided with, and concededly considered, significant new information after the public commenting periods on the draft land use plan amendments/revisions and draft environmental impacts statements had ended. This new information, *inter alia*, included:

     a.    the 2014 FWS Memo;

     b.    the 2014 USGS Buffer Study; and

     c.    the 2014 FWS Mitigation Framework.

592. As demonstrated in the challenged decisions, this new information played a key role in Defendants' decision-making. Defendants made substantial changes to the proposed actions based on this new information. This new information created the following substantial changes:

     a.    the proposed designation of SFAs, which would be withdrawn from operation of the Mining Law—derived from the 2014 FWS Memo;

     b.    the proposed uniform lek buffer-distances—derived from the 2014 USGS Buffer Study; and

     c.    the proposed adoption of the net conservation gain standard—derived from the 2014 FWS Mitigation Framework.

593. Defendants adopted these substantial changes in the same or similar form in the challenged RODs, LUPAs, and ARMPs.

594. Defendants failed to recognize and attribute the net conservation gain standard to the 2014 FWS Mitigation Framework until the Great Basin BLM ROD and Rocky Mountain BLM ROD were released.

595. Defendants arbitrarily determined in the proposed land use plan amendments/revisions and final environmental impact statements that they were not required to prepare a supplemental environmental impact statement.

596. Defendants violated NEPA by failing to prepare a supplemental environmental impact statement to address the substantial changes and the new information released after the commenting periods for the draft land use plan amendments/revisions and draft environmental impact statements had ended.

597. Defendants' determination that a supplemental environmental impact statement was not required is:

    a.    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.    contrary to constitutional right, power, privilege, or immunity;

    c.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

    d.    without observance of procedure required by law.

5 U.S.C. § 706(2).

598. Therefore, the challenged RODs, LUPAs, and ARMPs are:

    a.    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.    contrary to constitutional right, power, privilege, or immunity;

    c.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

   d.  without observance of procedure required by law.

5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**FLPMA and NFMA Violations**
**(Failure To Comply With FLPMA And NFMA)**

  599.  AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

  600.  AEMA and its members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

  601.  The RODs, LUPAs, and ARMPs are final agency actions for which there are no other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

  602.  Under FLPMA, Defendants' authority is limited to "action[s] necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b); *see* 43 C.F.R. § 3809.5.

  603.  On National Forest System lands, Defendants' authority is limited to ensuring that "[a]ll mining operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources . . . ."  36 C.F.R. § 228.8; *see also* 16 U.S.C. § 478.

  604.  Moreover, neither FLPMA, the USFS Organic Act, nor agency regulations give Defendants the authority to implement a net conservation gain standard.

  605.  The RODs, LUPAs, and ARMPs adopted and approved the net conservation gain standard.  That standard generally requires Defendants to "require and ensure mitigation that provides a net conservation gain to the species, including accounting for any uncertainty

associated with the effectiveness of such mitigation" in approving third-party actions, including mining.  *E.g.*, UT BLM LUPA at 2-9.

606.    The net conservation gain standard exceeds Defendants' statutory and regulatory authority.  *See* 43 U.S.C. § 1732(b); 16 U.S.C. § 478; 43 C.F.R. § 3809.5; 36 C.F.R. § 228.8.  It subjects mining operations to a higher standard that is unlawful under the governing statutes and regulations.  Thus, the net conservation gain standard violates FLPMA, the Forest Service Organic Act, and regulations.

607.    Therefore, the RODs, LUPAs, and ARMPs are:

      a.    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      b.    contrary to constitutional right, power, privilege, or immunity;

      c.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

      d.    without observance of procedure required by law.

5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF
### FLPMA and NFMA Violations
### (Failure To Comply With FLPMA And NFMA)

608.    AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

609.    AEMA and its members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

610.    The RODs, LUPAs, and ARMPs are final agency actions for which there are no other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

611.     Both FLPMA and NFMA limit Defendants' authority to designate federal lands as special management areas.

612.     Under FLPMA, Defendants have authority to designate ACECs, if specific criteria are met and if the proper procedure is completed.  43 U.S.C. §§ 1701(a)(11), 1702(a); 43 C.F.R. §§ 1610.7-2(a), (b).  FLPMA defines ACECs as:

> [A]reas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

43 U.S.C. § 1702(a).

613.     Under NFMA, Defendants have authority to designate zoological areas, and other areas if specific criteria are met and if the proper procedure is completed.  *See* 36 C.F.R. § 294.1; Forest Service Manual 2372, 4060.

614.     Neither FLPMA nor NFMA provide Defendants with authority to designate SFAs.

615.     Defendants did not formerly designate the SFAs as ACECs or zoological areas or follow the proper procedure, even though SFAs are indistinguishable from ACECs and zoological areas.  Thus, SFAs are de facto ACECs and zoological areas.

616.     However, the challenged RODs, LUPAs, and ARMPs designate SFAs and place additional restrictions on resource uses within SFAs, regardless of whether the area is habitat or non-habitat.

617.     Moreover, Defendants failed to comply with the proper procedures to designate ACECs and zoological areas.  *See* 43 U.S.C. §§ 1701(a)(11), 1702(a); 43 C.F.R. §§ 1610.7-2(a), (b); 36 C.F.R. § 294.1; Forest Service Manual 2372, 4060.

618.    Therefore, the challenged RODs, LUPAs, and ARMPs are:

    a.    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.    contrary to constitutional right, power, privilege, or immunity;

    c.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

    d.    without observance of procedure required by law.

5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF
### FLPMA and NFMA Violations
### (Failure To Comply With Multiple Use Mandates)

619.    AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

620.    AEMA and its members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

621.    The RODs, LUPAs, and ARMPs are final agency actions for which there are no other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

622.    FLPMA requires Defendants to manage the public lands on "the basis of multiple use and sustained yield . . . ."  43 U.S.C. § 1701(a)(7); *id*. § 1732(a).  Multiple use includes resource uses, such as mining.  *Id*. § 1702(c).   Multiple use does *not* mean that the greater sage-grouse may be elevated over all other uses.

623.    NFMA requires Defendants to "assure" that its land use plans "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with [MUSYA]."  16 U.S.C. § 1604(e)(1).  MUSYA defines "multiple use."  16 U.S.C. § 531(a);

*see* 36 C.F.R. 219.19.  Defendants are also required to consider "nonrenewable energy and mineral resources" when developing land use plan components.  36 C.F.R. § 219.10(a)(2).  However, pursuant to the regulations, if the USFS makes a supportable finding of non-significance, then its amendment does not have to be in accordance with multiple use mandated by 16 U.S.C. § 1604(e).  16 U.S.C. § 1604(f)(4).

624.    The RODs, LUPAs, and ARMPs recommend withdrawing approximately ten million acres within SFAs from operation of the Mining Law.  The SFAs were derived from the 2014 FWS Memo.  The withdrawal recommendations in the RODs, LUPAs, and ARMPs are not supported by the record.

625.    The RODs, LUPAs, and ARMPs also include management restrictions that adversely affect mineral exploration and development, which include:

   a.    the 3% (or 5%) disturbance cap;

   b.    the net conservation gain standard derived from the 2014 FWS Mitigation Framework;

   c.    the uniform lek buffer-distance for surface disturbances; and

   d.    the mining facility density cap.

626.    The withdrawal recommendation and management restrictions arbitrarily elevate the purported conservation of the greater sage-grouse and its habitat over mining and other resource uses on millions of acres of federally controlled lands.  Thus, the withdrawal recommendation and management restrictions conflict with Defendants' multiple use mandates.

627.    The RODs, LUPAs, and ARMPs unlawfully treat conservation of the greater sage-grouse as the highest, best use of the federal lands.

628.     The RODs, LUPAs, and ARMPs were the result of a predetermined outcome, *i.e.*, the non-listing of the greater sage-grouse under the ESA by the FWS, and for that reason violate the multiple use mandates under FLPMA and NFMA.

629.     The RODs, LUPAs, and ARMPs were the result of improper influence by other agencies, specifically the FWS, to arbitrarily elevate the greater sage-grouse over all other uses, and for that reason violate the multiple use mandates under FLPMA and NFMA.

630.     Defendants unlawfully delegated and/or abdicated their statutory responsibilities to the FWS—whose statutory mandate is not multiple use— and thereby violated their multiple use mandates under FLPMA and NFMA.

631.     In the Great Basin USFS ROD, Defendants made a last minute finding of non-significance.  This finding of non-significance is not supported by the record.

632.     Thus, Defendants failed to fully consider and allow for multiple uses on millions of acres of federal lands.

633.     The withdrawal recommendation and management restrictions are:

    a.     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.     contrary to constitutional right, power, privilege, or immunity;

    c.     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

    d.     without observance of procedure required by law.

5 U.S.C. § 706(2).

634.     Therefore, the challenged RODs, LUPAs, and ARMPs are:

    a.     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.     contrary to constitutional right, power, privilege, or immunity;

    c.       in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

    d.       without observance of procedure required by law.

5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF
### FLPMA and Forest Service Organic Act Violations
### (Failure To Ensure Compliance With The Mining Law And MMPA)

635.    AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

636.    AEMA and its members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

637.    The RODs, LUPAs, and ARMPs are final agency actions for which there are no other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

638.    FLPMA directs Defendants to recognize the continued vitality of the Mining Law and provides that, except for limited exceptions not applicable here, it does not amend the Mining Law.  43 U.S.C. § 1732(b).  Nor should it be used to impair the rights granted under the Mining Law.  *Id*.

639.    FLPMA also continues the policy of the MMPA by requiring "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the [MMPA] . . . as it pertains to the public lands . . . ."  *Id*. § 1701(a)(12).

640.    The Forest Service Organic Act extended the operation of the Mining Law to National Forest System lands.  16 U.S.C. § 478.  Moreover, the Forest Service Organic Act provides that Defendants shall not "prohibit any person from entering upon such national forests

for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof." *Id.*

641.    The RODs, LUPAs, and ARMPs recommend withdrawing approximately ten million acres within SFAs from operation of the Mining Law.  The withdrawal recommendations in the RODs, LUPAs, and ARMPs are not supported by the record.

642.    The RODs, LUPAs, and ARMPs also include management restrictions that adversely affect mineral exploration and development, which include:

      a.    the 3% (or 5%) disturbance cap;

      b.    the net conservation gain standard;

      c.    the uniform lek buffer-distance for surface disturbances; and

      d.    the mining facility density cap.

643.    The withdrawal recommendations and management restrictions violate the Mining Law and MMPA, as recognized in FLPMA and the Forest Service Organic Act.

644.    Thus, Defendants have violated their statutory responsibilities to ensure federal lands are managed in accordance with the Mining Law and MMPA.

645.    The withdrawal recommendation and management restrictions are:

      a.    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      b.    contrary to constitutional right, power, privilege, or immunity;

      c.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

      d.    without observance of procedure required by law.

5 U.S.C. § 706(2).

646.    Therefore, the challenged RODs, LUPAs, and ARMPs are:

      a.        arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      b.        contrary to constitutional right, power, privilege, or immunity;

      c.        in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

      d.        without observance of procedure required by law.

5 U.S.C. § 706(2).

## SEVENTH CLAIM FOR RELIEF
**Ultra Vires Actions**
**(Unlawful Designation Of Critical Habitat)**

647.    AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

648.    AEMA and its members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by Defendants' RODs, LUPAs, and ARMPs.  *See* 5 U.S.C. § 702.

649.    The RODs, LUPAs, and ARMPs are final agency actions for which there are no other adequate remedies in court.  *See* 5 U.S.C. § 704; Rocky Mountain BLM ROD at 9-1; Great Basin BLM ROD at 6-1; Great Basin USFS ROD at 73.

650.    The FWS administers the ESA.

651.    The ESA generally requires the FWS to designate critical habitat concurrently with the listing of a species as threatened or endangered.  16 U.S.C. § 1533(a)(3).  Critical habitat is defined as "essential to the conservation of the species . . . ."  *Id*. § 1532(5)(A)(i); *see also id*. § 1532(5)(A)(ii).  Moreover, critical habitat occupied by the species must have physical or biological features that are essential for the species' conservation.  *Id*. § 1532(5)(A)(i); *see id*. 50 C.F.R. § 424.12(b) (2015) (including, *inter alia*, breeding sites).

652.     The FWS has neither listed the greater sage-grouse as threatened or endangered, nor designated critical habitat for the greater sage-grouse.

653.     The FWS purported to identify "a subset of priority habitat most vital to [the greater sage-grouse's] persistence" that, *inter alia*, "[has] the highest densities of the species" and is "essential to conservation" of the greater sage-grouse within the 2014 FWS Memo. Defendants blindly relied on the 2014 FWS Memo in proposing and later designating SFAs.

654.     Defendants adopted the 2014 FWS Memo and its associated maps in the proposed land use plan amendments/revisions and FEISs.  Defendants proposed designation of SFAs for the same reasons the FWS purportedly considered the areas as essential to the greater sage-grouse's conservation.

655.     The challenged RODs, LUPAs, and ARMPs also adopt the 2014 FWS Memo and its associated maps.

656.     The challenged RODs, LUPAs, and ARMPs designate approximately ten million acres of SFAs and recommend those areas for withdrawal, and impose more burdensome management restrictions, standards, and guidelines vis-à-vis those areas.

657.     These SFAs are nearly identical to critical habitat as defined by the ESA, and were created at the express recommendation of the FWS.  Thus, the SFAs are de facto critical habitat.  Yet, Defendants lack the statutory authority to designate critical habitat for the greater sage-grouse.

658.     Even if Defendants have such authority, Defendants failed to follow the proper procedure as set forth in the ESA.

659.     Therefore, the challenged RODs, LUPAs, and ARMPs are:

     a.     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

     b.      contrary to constitutional right, power, privilege, or immunity;

     c.      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

     d.      without observance of procedure required by law.

5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

**WHEREFORE**, AEMA respectfully requests that this Court:

1.      Declare Defendants violated FLPMA, NFMA, and NEPA in issuing the Great Basin BLM ROD, ID/MT BLM LUPA, NV/CA BLM LUPA, OR BLM LUPA, UT BLM LUPA, Great Basin USFS ROD, ID/MT USFS LUPA, NV USFS LUPA, UT USFS LUPA, WY USFS LUPA, Rocky Mountain BLM ROD, HiLine ARMP, Cody ARMP, and/or Worland ARMP;

2.      Declare the Great Basin BLM ROD, ID/MT BLM LUPA, NV/CA BLM LUPA, OR BLM LUPA, UT BLM LUPA, Great Basin USFS ROD, ID/MT USFS LUPA, NV USFS LUPA, UT USFS LUPA, WY USFS LUPA, Rocky Mountain BLM ROD, HiLine ARMP, Cody ARMP, and/or Worland ARMP are:

     a.      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

     b.      contrary to constitutional right, power, privilege, or immunity;

     c.      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or

     d.      without observance of procedure required by law;

3.      Hold unlawful and set aside the Defendants' Great Basin BLM ROD, ID/MT BLM LUPA, NV/CA BLM LUPA, OR BLM LUPA, UT BLM LUPA, Great Basin USFS ROD,

ID/MT USFS LUPA, NV USFS LUPA, UT USFS LUPA, WY USFS LUPA, Rocky Mountain

BLM ROD, HiLine ARMP, Cody ARMP, and/or Worland ARMP;

4.      Award AEMA its costs and attorneys' fees in accordance with law, including the

Equal Access to Justice Act, 28 U.S.C. § 2412; and

5.      Award AEMA such further relief as this Court deems just and equitable.

DATED this 19th day of April 2016.

Respectfully Submitted,

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Phone:  (303) 292-2021
Fax:  (303) 292-1980
lechner@mountainstateslegal.com

*Attorney for Plaintiff*
*American Exploration & Mining Association*